**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

Mathew Harley, Damali L'Elie, Michael Maniates, Emily McGrath, Susan Lahey, N.H. Quaide Williams, Jessica Roitman, Katie Von Holzen, Benjamin Cole and Ryan Burruss, *individually, and on behalf of all others similarly situated,*

*Plaintiffs*

v.

**<u>New York</u>**[1]
Peter S. Kosinski, Andrew Spano, and Douglas Kellner *in their official capacities as Commissioners of the New York State Board of Elections*, Todd D. Valentine and Robert A. Brehm *in their official capacities as Co-Executive Directors of the New York State Board of Elections,*

**<u>Pennsylvania</u>**
Kathy Boockvar *in her official capacity of Secretary of the Commonwealth of Pennsylvania*, Jonathan Marks *in his official capacity as Deputy Secretary for Elections and Commissions*, and Jessica Mathis *in her official capacity as Director of the Bureau of Election Services.*

**<u>Ohio</u>**
Frank LaRose *in his official capacity as Secretary of the State of Ohio,*

**<u>Texas</u>**
Ruth Hughes *in her official capacity as Secretary of State of Texas,*

**<u>Kentucky</u>**
Albert Benjamin Chandler *in his official capacity as Chairman of the Kentucky Board of Elections,* and Michael Adams *in his official capacity as Kentucky Secretary of State,*

Docket No. _____

**COMPLAINT**

---

[1] The labels here are for readability and clarity alone – the States themselves are not defendants in any capacity, but defendants include the *Ex Parte Young* parties for an as-applied challenge to each State's election law and the State's interpretation and application of that law. Similarly, for clarity throughout this Complaint, references to a particular State should be understood to refer to the appropriate *Ex Parte Young* officials where such reference would make sense.

**Wisconsin**
Ann S. Jacobs *in her official capacity as Chair of Wisconsin Elections Commission*, Mark L. Thomsen *in his official capacity as Vice Chair of the Wisconsin Elections Commission*, Marge Bostelmann *in her official capacity as Secretary of the Wisconsin Elections Commission*; and Julie Glancey, Dean Knudson, and Robert Spindell, Jr *in their official capacities as Commissioners of the Wisconsin Elections Commission*,

**Georgia**
Brad Raffensperger *in his official capacity as the Secretary of State of Georgia.*

*Defendants.*

## PRELIMINARY STATEMENT

1.      Plaintiffs are United States citizens registered to vote in various American States and living overseas (that group, "Overseas Americans"), who risk being disenfranchised, in derogation of Constitutional and statutory rights.

2.      In short, the confluence of the COVID-19 pandemic, restrictive laws, and a lack of institutional will on the part of Defendants to take action completely within their control to meet the current challenges, as well as actions on the part of some Defendants specifically delaying or failing to carry out their duties regarding absentee ballots, leaves untold voters with literally no way of voting, and even more with no *reliable* way of voting.

3.      At present, there is simply no mail service in many countries, while mail is extraordinarily slow returning from others.  For many voters abroad – particularly during a pandemic where they cannot safely travel themselves either – this amounts to a

total bar on voting.  However, there are easy solutions – which Defendants have all failed to adopt.

4.     First, and perhaps easiest, at this point, thirty States allow *some* form of direct electronic ballot submission (whether by email, online portal, or fax).  When physical mail cannot be delivered, such measures are one obvious – and effective – answer.

5.     Similarly, the Department of Defense offers voters a secure email-to-fax service that could easily be incorporated in any State's election system in order to count the ballots of Americans abroad.  *See generally*, Federal Voting Assistance Program, Fax & Email Guidelines (discussing the "DoD Fax Service" that "allows election officials to transmit and receive election materials via toll-free fax to/from Service members, their eligible family members, and overseas citizens), *available at* https://www.fvap.gov/eo/overview/sending-ballots/fax-email.

6.     Sadly, for voters abroad who vote in the States at issue here, the fact that their votes are thought of by all concerned as someone else's problem will lead to only one result:  disenfranchisement.  Voting regimes that provide some impossible means of voting, and "den[y voters] any alternative means of casting their vote" such that there is, in effect, an "absolute bar to voting" are unconstitutional – and demand the government take steps to ensure voting is possible.  *O'Brien v. Skinner*, 414 U.S. 524, 530 (1974).

## JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

8.     The Court has personal jurisdiction over all of the Defendants because, upon

information and belief, the election officials in each State at issue here send thousands of ballots through John F. Kennedy International Airport ("JFK") to voters abroad, and thousands of ballots return through JFK.

9.      These contacts are sufficient to confer jurisdiction as to the issues that surround each State's requirement that voters abroad send their ballots through the mail – and in thousands of cases – through JFK.  That is, because of events at JFK, upon information and belief, each State law at issue here will disenfranchise thousands of voters.

10.     As set out below, a substantial part of the disenfranchisement issue in this case grows out of the fact that unconscionable numbers of ballots that move through the mail from abroad that move through JFK,[2] end up receiving a so-called "NIXIE" – a stamp marking the ballot as undeliverable.  During the pandemic, upon information and belief, the NIXIE problem has expanded in scope to cover thousands upon thousands of ballots.

11.     Venue is proper in this district as to all Defendants pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims have occurred in this District, as described in paragraphs 8-10 above.[3]

_____

[2] JFK is one of nine international mail facilities in the United States, but because of its size, handles an outsize proportion of international mail – including, on information and belief, election mail bound for each State.
[3] In the alternative and in the interest of full disclosure, Plaintiffs submit that rather than litigating a single legal question (e.g., "does the Constitution require States to provide *some* method of voting where a pandemic prevents traditional means of returning absentee ballots?") in numerous venues across the country, this case would be appropriate for multidistrict consolidation under 42 U.S.C. § 1407.  Plaintiffs therefore request that to the extent any Defendant that prevails on a venue motion the Court sever and transfer this action to the Defendant's preferred venue, and will make an appropriate motion before the Judicial Panel on

12.     Plaintiff Mathew Harley is a citizen of the United States of America who is a resident of Ireland.  Mr. Harley has voted by mail in US elections for most of the years that he has lived in Ireland.  He requested and received his absentee ballot by email from the Kings County Board of Elections in Brooklyn, New York. Because of the 2019 novel coronavirus pandemic, widely reported slowdowns with the USPS, and statements made by various US government officials about the lack of safety of mail-in and absentee ballots, Mr. Harley is concerned that his ballot will not be received in time to be counted in the November 3, 2020 election.

13.     Plaintiff Damali L'Elie is a citizen of the United States of America who is resident of Thailand.  Ms. L'Elie has voted in US elections by mail for both years in Thailand.  She has already requested her absentee ballot from the state of New York, but she is concerned that her ballot will not be received in time to be counted in the November 3, 2020 election because outgoing mail has been stopped in Thailand and because of slowdowns in the USPS.  Ms. L'Elie sent her ballot request via diplomatic pouch and has not received any word that it has been received (after two weeks).

14.     Plaintiff Michael Maniates is a citizen of the United States of America who is a resident of Singapore.  Mr. Maniates has voted in US elections in Singapore in previous years.  He has already requested his absentee ballot from the state of Ohio, but he is concerned that his ballot will not be received in time to be counted in the November

---

Multidistrict Litigation at that time.
Counsel's understanding is that such a motion is not ripe until the *existence* of litigation in multiple districts, and since venue objections are waivable in any event (*Tri-State Employment Servs., Inc. v. Mountbatten Sur. Co., Inc.*, 295 F.3d 256, 261 (2d Cir. 2002)), Plaintiffs have initiated the case without involving the Panel.

3, 2020 election because Singapore Post is reporting only limited service between Singapore and the USA and because of slowdowns of mail delivery in the US with the USPS.

15.     Plaintiff Emily McGrath is a citizen of the United States of America who is a resident of New Zealand.  Ms. McGrath has voted in US elections by mail for years in New Zealand.  She has already requested her absentee ballot from the state of Pennsylvania, she will have to return it by postal mail once she has voted the ballot.  She is concerned about statements made by various US government officials about the lack of safety of mail-in and absentee ballots and whether her ballot will be counted.

16.     Plaintiff Susan Lahey is a citizen of the United States of America who is a resident of Portugal.  Ms. Lahey has voted in US elections by mail from Portugal in the past. She votes in Texas.  She has already requested her absentee ballot from the state of Texas, she will have to return it by postal mail once she has voted the ballot. She is concerned about her ballot arriving on time because of slowdowns in the international mail and is considering sending it by private courier as a significant financial cost.

17.     Plaintiff N.H. Quaide Williams, IV is a citizen of the United States of America who is a resident of Germany.  Mr. Williams votes in the state of Texas.  Mr. Williams has voted in US elections from Germany in previous years.  He has already requested his absentee ballot from the state of Texas, but he is concerned that his voted ballot will not be received in time to be counted in the November 3, 2020 election because of slowdowns of international mail delivery.  At present, he will be sending his voted ballot by post.

18.     Plaintiff Jessica Roitman is a citizen of the United States of America who is

a resident of the Netherlands. Ms. Roitman has voted in US elections by mail from the Netherlands in the past. She votes in Kentucky. She has already requested her absentee ballot from the state of Kentucky, she will have to return it by postal mail once she has voted the ballot. She is concerned about her ballot arriving on time because of slowdowns in the international mail.

19.    Plaintiff Katie Von Holzen is a citizen of the United States of America who is a resident of Germany. Dr. Von Holzen has voted in US elections by mail from Germany in the past. She votes in Wisconsin. She has requested and received her absentee ballot from the state of Wisconsin, and she will have to return it by postal mail once she has voted the ballot. She is concerned about her ballot arriving on time because of slowdowns in the international mail and is considering sending it by private courier as a significant financial cost.

20.    Plaintiff Benjamin Cole is a citizen of the United States of America who is a resident of Germany who votes in the state of Georgia. Mr. Cole has voted in US elections from Germany in previous years. He has sent his voted ballot by post. He is tracking his ballot through the USPS and there has been a delay. He sent his ballot on September 16, 2020, it arrived in the US on September 18, 2020, and after that has spent most of the time in a sorting facility in New York. Only on September 26, 2020 did he receive a tracking update that his ballot left the facility in New York and reached a facility in Georgia. To date, it's still waiting to be sorted in Georgia. Based on the delays that he has already seen with his ballot, Mr. Cole is concerned that his ballot will not arrive at the Board of Election in Georgia. He is also concerned that if there is a problem with his absentee ballot, and it is for any reason rejected, that there will not be enough

time for him to make corrections and send a new ballot.

21.     Plaintiff Ryan Burruss is a citizen of the United States of America who is a resident of the Netherlands who votes in the state of Georgia.  Mr. Burruss has voted in US elections from the Netherlands in previous elections.  He has sent his voted ballot by post via the US Consulate in Amsterdam. Based on the slow timing of mail going out of Consulates in the diplomatic pouches and the slowdown of mail in the USPS, Mr. Burruss is concerned that his ballot will not reach his local Board of Election in Georgia in time to be counted for the November 3, 2020 election. He is also concerned that if there is a problem with his absentee ballot, and it is for any reason rejected, that there will not be enough time for him to make corrections and send a new ballot.

22.     Peter S. Kosinski, Andrew Spano, and Douglas Kellner, are Commissioners of the New York State Board of Elections and are sued in their official capacities.

23.     Todd D. Valentine, Robert A. Brehm, are Co-Executive Directors of the New York State Board of Elections and are sued in their official capacities.

24.     Defendant Frank LaRose is the Secretary of the State of Ohio and is sued in his official capacity.

25.     Defendant Kathy Boockvar is the Secretary of the Commonwealth of the Pennsylvania and is sued in her official capacity.

26.     Jonathan Marks is Deputy Secretary for Elections and Commissions for the Commonwealth of Pennsylvania and is sued in his official capacity.

27.     Jessica Mathis is the Director of the Bureau of Election Services for the State of Pennsylvania and is sued in her official capacity.

28.     Ruth Hughes is the Secretary of State of Texas and is sued in her official

capacity.

29. Albert Benjamin Chandler is the Chairman of the Kentucky Board of Elections and is sued in his official capacity.

30. Michael Adams is the Secretary of State of Kentucky and is sued in his official capacity.

31. Ann S. Jacobs is Chair of Wisconsin Elections Commission and is sued in her official capacity.

32. Mark L. Thomsen is Vice Chair of the Wisconsin Elections Commission and is sued in his official capacity.

33. Marge Bostelmann is Secretary of the Wisconsin Elections Commission and is sued in her official capacity.

34. Julie Glancey is a Commissioner of the Wisconsin Elections Commission and is sued in her official capacity.

35. Dean Knudson is a Commissioner of the Wisconsin Elections Commission. He is sued in his official capacity.

36. Robert Spindell, Jr is a Commissioner of the Wisconsin Elections Commission. He is sued in his official capacity.

37. Brad Raffensperger is the Secretary of State of the State of Georgia and is sued official capacity.

38. Upon information and belief, all Defendants, considered together, are the appropriate *Ex Parte Young* defendants because an order of the Court could direct them to implement the relief sought.

## THE FACTS

39.     Plaintiffs are all Overseas Americans registered to vote in various states and desirous of voting by absentee ballot in the November 3, 2020 election. Plaintiffs are all at risk of disenfranchisement, of their votes not being transmitted, received in time, or counted, as a result of the acts and omissions of the Defendants set forth below.

### Overseas Americans

40.     The number of Overseas Americans has been estimated at somewhere between five million,[4] and by the State Department at nine million.[5]

41.     The Federal Voting Assistance Program (FVAP), tasked with assisting overseas Americans with voting, estimates 4.5 million to 6.5 million overseas Americans. Americans are dispersed more broadly throughout the world—in at least 100 countries[6]— than are emigrants from any other given country.

42.     About two-thirds of Americans abroad live in ten countries, Mexico and Canada have the largest population of U.S. citizens, with Israel, the United Kingdom, France, and Germany also being key host countries.[7]

43.     In 2011, the State Department estimated that 171,000 Americans live in Africa, 864,000 in East Asia and the Pacific, 1,612,000 in Europe, 870,000 in the Near East, and 212,000 in South Central Asia. "If all these Americans were placed in one state

---

[4] Janette Saxer, "Just how many American citizens are living outside the US?" CAZENOVE CAPITAL (July 1, 2019), https://www.cazenovecapital.com/articles/swusl/2019/just-how-many-american-citizens-are-living-outside-the-us/.
[5] American Citizens Abroad https://www.americansabroad.org/about/.
[6] Other sources say Americans live in 160 countries, see *The Association of American Residents Overseas* https://aaro.org/about-aaro/8m-americans-abroad cited in fn. 5 below.
[7] Joe Costanzo and Amanda Klekowski von Koppenfels, "Counting the Uncountable", *Migration Policy Institute* (May 17, 2013), https://www.migrationpolicy.org/article/counting-uncountable-overseas-americans.

it would be the 12th most populous state in the US (right between New Jersey and Virginia)!"[8]

## UOCAVA

44.     In 1986, Congress passed the Uniformed and Overseas Citizens Absentee Voting Act  ("UOCAVA") (42 U.S.C. § 1973ff, et seq.), to enforce the right of Overseas Americans to vote by absentee ballot in federal elections in the states where they maintained a residence or had last resided before leaving the U.S.

45.     An amendment to UOCAVA, known as the MOVE Act (Pub. L. No. 111-84) requires states to send absentee ballots to Americans overseas at least 45 days prior to a federal election. If these voters do not receive their ballots on time, they may download and mail a "Federal Write-In Absentee Ballot" (or "FWAB") from a Department of Defense web site[9], and the states are required by UOCAVA to accept and count these ballots.

46.     In UOCAVA, "Congress's focus [was] on solving what it considered to be the particular and substantial problem of delayed arrival of absentee ballots from military members, their families, and other United States citizens living overseas." *United States v. Alabama,* 998 F. Supp. 2D 1283 (Middle District Alabama 2014), *aff'd* 778 F.3d 926 (11th Cir. 2015).

47.     The Election Administration and Voting Survey 2016 Comprehensive Report to Congress states:[10]  "In 2016, 930,156 UOCAVA ballots were transmitted and 68.1

---

[8] "Americans Helping Americans Abroad", *The Association of American Residents Overseas* https://aaro.org/about-aaro/8m-americans-abroad.
[9] *Available at:* https://www.fvap.gov/uploads/FVAP/Forms/fwab2013.pdf
[10] *Available at* https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf

percent of these ballots were returned[11].... The voting process for overseas civilians is different from the regular absentee voting process. Voters covered under UOCAVA face unique voting obstacles due to their mobility and the time required to transmit and return ballots … … … Of the 633,592 regular ballots and FWABs that were received from voters in 2016, 512,696, or 80.9 percent, were counted by the states."

48.     In 2016, of rejected ballots, "44.4 percent of the rejected ballots" from abroad were not received on time, while "[a]n additional 3.2 percent were rejected because the ballot lacked a postmark." *Id*.

49.     The Comprehensive Report also mentions that, at that time, some states were beginning to accept ballots by secure electronic means: "[V]oters living in another country who must return their ballots by mail may have more difficulty submitting a ballot before their state's deadline compared to a voter who can return their ballot by email, especially if they do not receive their ballots until shortly before Election Day. To resolve the issues presented by mailing times, a few states have adopted online ballot submission systems."

### The Pandemic

50.     The Covid-19 pandemic is already affecting the ability of Plaintiffs and those similarly situated to receive ballots and send them back, and if the relief requested below is not granted, is likely to disenfranchise millions of Overseas Americans seeking to vote in the November election.

51.     In Ecuador, Panama, Lebanon, Liberia, Cambodia, Cuba, Venezuela and many more countries mail service is completely suspended with the US due to the

---

[11] Civilian voters "returned transmitted ballots at a higher rate of 73.7 percent."

pandemic or lack of transportation.[12]

52.     Certain embassies and consulates such as Israel are discouraging use of the diplomatic pouch for Election Mail as a "last resort,"[13] or are announcing delays and urging Overseas Americans to use expensive private courier services – in spite of warnings from the couriers themselves that they ought not be used.[14]

53.     Ballots mailed by Overseas Americans clearly addressed to Boards of Election with full street address, city and zip code, which arrive at the International Processing Center at JFK airport in New York City are being returned in significant numbers stamped "addressee unknown" for reasons the United States Postal Service cannot explain. These ballots are addressed to Boards of Election in many different states.

54.     Ballots mailed to all American states by Overseas Americans, residing in many different countries are sent via the United States Postal Service (USPS) International Service Center (ISC) at John F. Kennedy International Airport in Queens, New York.

55.     The ISC serves as a transit point for Overseas American's ballots and, of course, other mail entering the United States in transit to all American states, including all the Defendants. In other words, on information and belief, all the Defendants have received internationally mailed ballots which passed through the Kennedy Airport ISC on

---

[12] https://about.usps.com/newsroom/service-alerts/international/welcome.htm.
[13] https://il.usembassy.gov/u-s-citizen-services/voting/send-your-ballot/
[14] Compare, e.g., https://china.usembassy-china.org.cn/u-s-citizen-services/voting/ with Lisa Baertlein, UPS, FedEx warn they cannot carry ballots like U.S. Postal Service, REUTERS (Aug. 14, 2020), available at https://www.reuters.com/article/us-usa-election-ups-fedex-exclusive/exclusive-ups-fedex-warn-they-cannot-carry-ballots-like-u-s-postal-service-idUSKCN25B00I.

the way to them.

56.     On information and belief, thousands or more of Overseas Americans' ballots have been returned by, or delayed in passage through, the Kennedy Airport ISC.

57.     During the 2018 midterm Congressional election and the 2020 primaries, USPS returned numerous correctly addressed ballots to the Overseas Americans who mailed them, with a yellow "Return to Sender--Undeliverable as Addressed" " stamp known as a "NIXIE".

58.      USPS has been informed of this problem and promised to fix it, but indications are it is getting worse as ballots for the November 3 election are already starting to be returned.

59.     For example, below is a ballot envelope clearly addressed to the Board of Elections at 200 Varick Street in Manhattan, with the correct county and zip code (in fact, it is the Board's own pre-printed form), stamped with a NIXIE and returned:



60.     Ballots which are not erroneously returned are often greatly delayed at the

Kennedy Airport International Service Center, which is notorious for its slow release of mail into the US postal stream.

61.     While this problem has occurred before, never before has it occurred with the frequency or scale it is appearing now.

62.     Once absentee ballots from abroad reach the United States, when all goes well, they are then placed in the US mail and become subject to the delays being experienced currently by the United States Postal Service.

63.     Ballots sent from abroad will therefore put an already endangered system under additional pressure, as "an unprecedented 76% of Americans" were already "eligible to vote by mail as States have taken extraordinary steps to ensure voters can cast their ballots safely without risking infection from a once-in-a-century pandemic." Juliette Love et al., "A Record 76% of Americans Can Vote by Mail in 2020", *New York Times* (Aug. 14, 2020).[15]

**State Law and Interpretation**

64.     **Kentucky** disenfranchises Overseas Americans by using the following term of art throughout its Election Law: "mail in absentee ballot."  That term appears to be used in contrast to "fa[x]" and "electronic mail," for example, where Kentucky law provides that "[a]ll requests for an application for a mail-in absentee ballot may be transmitted by telephone, facsimile machine, by mail, by electronic mail, or in person." *See* Kentucky Revised Statutes Title X. Elections § 117.085.

65.     Upon information and belief, Kentucky officials interpret Kentucky law's use

---

[15] *Available at* https://www.nytimes.com/interactive/2020/08/11/us/politics/vote-by-mail-us-

of the term "mail in absentee ballot" to forbid them from accepting electronically transmitted ballots, whether through fax or email.

66. Upon information and belief, no Kentucky official has taken emergency action – for example, the Governor has not issued an executive order – that provides Overseas Americans a reliable way to cast their ballots.

67. The **New York** statute which disenfranchises Overseas Americans states: "Irrespective of the preferred method of transmission designated by a special federal voter, a special federal voter's original completed voter registration application, special federal ballot application and special federal ballot must be returned by mail or in person notwithstanding that a prior copy was sent to the board of elections by facsimile transmission or electronic mail." *See* New York State Election Law § 11-203(2).

68. Upon information and belief, New York officials interpret New York law to forbid them from accepting electronically transmitted ballots, whether through fax or email.

69. Upon information and belief, no New York official has taken emergency action – for example, the Governor has not issued an executive order – that provides Overseas Americans a reliable way to cast their ballots.

70. In **Ohio**, the requirement disenfranchising Overseas Americans is that overseas ballots "shall be submitted for mailing" in order to be counted. *See* Ohio Rev. Code § 3511.09.

71. Upon information and belief, Ohio officials interpret Ohio law to forbid them from accepting electronically transmitted ballots, whether through fax or email.

72. Upon information and belief, no Ohio official has taken emergency action –

for example, the Governor has not issued an executive order – that provides Overseas Americans a reliable way to cast their ballots.

73.     The statute presently disenfranchising Overseas Americans in **Pennsylvania** is 25 P.S. § 3146.6, which requires ballots to be marked in particular kinds of ink, and "fold[ed]" and enclosed in a physical envelope.

74.     Upon information and belief, Pennsylvania officials interpret Pennsylvania law to forbid them from accepting electronically transmitted ballots, whether through fax or email.

75.     Upon information and belief, no Pennsylvania official has taken emergency action – for example, the Governor has not issued an executive order – that provides Overseas Americans a reliable way to cast their ballots.

76.     The statute disenfranchising Overseas Americans in **Texas** is Sec. 114.007(c), applicable to UOCAVA voters:  "A ballot voted under this chapter may be returned to the early voting clerk by mail, common or contract carrier, or courier."

77.     Upon information and belief, Texas officials interpret Texas law to forbid them from accepting electronically transmitted ballots, whether through fax or email.

78.     Upon information and belief, no Texas official has taken emergency action – for example, the Governor has not issued an executive order – that provides Overseas Americans a reliable way to cast their ballots.

79.     The statute which disenfranchises Overseas Americans in **Wisconsin** is Wis. Stat. § 6.24(7), which requires that overseas ballots "shall be marked and returned, deposited and recorded in the same manner as other absentee ballots" and Wis. Stat. § 6.87(4)(b)(1) requires absentee ballots must be returned by mail.

80.     Upon information and belief, Wisconsin officials interpret Wisconsin law to forbid them from accepting electronically transmitted ballots, whether through fax or email.

81.     Upon information and belief, no Wisconsin official has taken emergency action – for example, the Governor has not issued an executive order – that provides Overseas Americans a reliable way to cast their ballots.

82.     In 2010, **Georgia** adopted a "pilot program for the electronic transmission, receipt, and counting of absentee ballots by persons who are entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act." *See* O.C.G.A. § 21-2-387.  That program was designed as an exception to the requirements in O.C.G.A. §§ 21-2-384(b) (setting the physical parameters of the envelopes for absentee ballots) and 21-2-385(a) that an absentee ballot be "fold[ed]" and "securely seal[ed]" in an envelope before being "mailed or delivered."

83.     Upon information and belief, Georgia officials interpret Georgia law, outside the pilot program, to forbid them from accepting electronically transmitted ballots, whether through fax or email.  Upon further information and belief, the pilot program has not been concluded.

84.     Upon information and belief, no Georgia official has taken emergency action – for example, the Governor has not issued an executive order – that provides Overseas Americans a reliable way to cast their ballots.

### Other States and Less Restrictive Alternatives

85.     Thirty States already permit the return of ballots by Overseas Americans via *some* method of electronic transmission, whether fax, email, or online portal.

86.     Twenty-five States already permit the return of ballots as scanned attachments to email—and some have done so for years prior to the onset of the Covid-19 pandemic.

87.     In Washington State, for example, King County has assembled a nonpartisan "Alternative Format Ballot Team" within the Elections Administration section to handle email and faxed ballots.  The team has its own procedures, guidelines and training – most are paid staff who work for 2-3 weeks during each election season.

88.     The team maintains a secure email account to which voters can email their ballots as attachments.  Critically, the account is completely separate from the broader state election network to mitigate system infiltration.

89.     During election season, the team monitors the email account regularly. When a ballot is received, team members manually download each ballot from the email account, save it to a folder and print it according to their procedures. They also check spam and other background folders to ensure that no ballots are inadvertently sorted there.  Voter authentication is generally ensured by signature verification – just as it is in person or in traditional mail. Once a ballot is received, printed and stored, the signature is compared to the one on record for that voter.

90.     In addition, each ballot has a unique serial number which is connected to that ballot and voter.  Once authenticated, the printed ballots are fed into the tabulating process just as any ballot received via postal mail.

91.     Some version of this process is followed in Oregon and the 23 other States that use email.

92.     Security risks as to emailed ballots are small.  States use cybersecurity

software that performs a threat scan on all incoming attachments. Separating the UOCAVA computer from the broader state election system can further mitigate the risk. However, one-off opportunity to affect individual ballots is simply not the sort of risk that usually materializes – or even a risk that is *more* pronounced with email (as opposed to mail or in person) balloting.

93.     In any event, the security risks do not add up to a cognizable government interest in disenfranchising Overseas Americans.

94.     There are of course privacy issues pertaining to emailed ballots. To be sure, such ballots will not remain private and anonymous, but voters who decide to vote by email understand and expressly agree to this as a trade-off for a guaranteed counted vote transmitted with ease. In Oregon, for instance, voters must sign a secret ballot waiver form when voting by email. In King County, Washington, there is an affirmative statement to this effect on the online ballot form. States can also decide to compartmentalize the downloading, printing, authenticating, and counting of emailed ballots, thereby reducing the election personnel exposed to email voter identities.

95.     The additional time and financial costs of implementing an email ballot return system are minimal. Every State already has online voter registration systems, so they also already have certain electronic security protocols in place. Every State already has some personnel to review, authenticate and tabulate UOCAVA votes received via mail, as well. The only additional cost of allowing emailed ballots is the cost of maintaining and checking a separate email account; saving and printing the attachments; and tabulating more votes—which should be the ultimate goal of any election process. And, indeed, to conclude any cost is *saved* on tabulating more votes, one

must proceed from the premise that at least some Overseas Voters will not be able to vote without email ballots.

96.     Beyond setting up their own email systems, States could take advantage of a structure already provided by the United States Department of Defense – the DoD Fax Service.

97.     The DoD Fax Service invites Overseas Americans to email their ballots to an address it provides.  It then faxes them, on behalf of the voters, to States that accept faxed ballots.

98.     Upon information and belief, the Department of Defense uses servers that are secure and use of their services for election purposes would not pose a significant security threat.  A white paper explaining this is attached hereto as **Exhibit 1**.

99.     If States had acted earlier in the pandemic, a number of other options would be available.  For example, like many State tax departments (and, for that matter, the IRS), a State could build a fully secure online portal that permitted upload of PDFs.  States might also pass laws that facilitate and provide pre-paid private courier services for voters

100.    In the end, all forms of voting carry risks that, in the case of Overseas Americans, are clearly outweighed by the critical Constitutional need to enfranchise these voters.  In the pandemic, Overseas Americans face obstacles such as the disruption of postal services around the world, the uncertainty of diplomatic pouches, and the expense or unavailability of private couriers.  Despite constant and assertive lobbying, the Defendants, who are fully aware of these obstacles faced by Overseas Americans, have been slow to modernize – or at least provide temporary alternatives to – their

traditional but unavailable voting methods. The guaranteed disenfranchisement of several million Overseas Americans outweighs the minimal potential cyber risks that would follow from allowing these voters to exercise their right via email—just as a majority of States already allow.

## Defendants Have Not Acted

101. The Defendants still have the opportunity to assure that the Plaintiffs and all Overseas Americans can actually cast their ballots in the November election.

102. As noted above, thirty States other than the Defendants have previously, or during the Covid-19 pandemic, instituted secure means of accepting absentee ballots electronically. Of these, 19 states accept ballots emailed to Boards of Election as scanned pdf attachments. [16] For example, Kansas, Maine, Massachusetts, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Carolina all allow email submission of voted ballots for UOCAVA voters.

103. At this point, due to the holding of primaries and other elections since the pandemic began, litigation in which they have been involved, tracking developments regarding the United States Postal Service, or planning for November, each State Defendant is institutionally well aware of the special problems facing absentee voters in November, especially Overseas Americans.

104. On information and belief, all States at issue have at least *some* mechanism by which government officials can relax the strictures of various election law to address a once in a century pandemic.

---

[16] Available at: https://www.fvap.gov/uploads/FVAP/Images/FWABTransmissionMethods.pdf

105.    On information and belief, all Defendants have been extensively lobbied to accept emailed or electronically transmitted ballots and have declined to do so.

106.    For example, a letter to Governor Tom Wolf of Pennsylvania is attached hereto as **Exhibit 2.**

107.    Similarly, a resolution adopted by Democrats Abroad "endors[ing] expansion of ballot return options by digital communications methods" is attached hereto as **Exhibit 3**.

108.    A Democrats Abroad press release celebrating the August adoption of electronic voting methods by Iowa, Missouri, Rhode Island, and Vermont, concluding, "[i]n the other states, we ask that state legislators urgently consider emergency legislation or, if necessary, that Governors consider executive action," is attached as **Exhibit 4**.

## COUNT I

### (42 U.S.C. § 1983, First Amendment Right to Vote)

109.    Plaintiffs incorporate by references all the allegations above.

110.    The First Amendment applies to the States regarding Plaintiffs' and Overseas Americans' rights to vote either through the *Anderson-Burdick* framework, or as a matter of pure First Amendment law (since the *Anderson-Burdick* framework is narrower, Plaintiffs describe that herein).

111.    When a case "call[s] upon" the Court "to consider the constitutionality of [an election restriction] as applied[,] … [t]here is no 'litmus-paper test' to answer th[e] question" of constitutionality. *Yang v. Kosinski*, 960 F3d 119, 129 (2d Cir. 2020) (cleaned

up), *quoting Anderson v. Celebrezze*, 460 U.S. 780, 789, (1983). Rather, the Court

"conduct[s] a two-step inquiry that applies to election-related restrictions." *Id*.

112. In the first stage, the Court evaluates the burden the restriction places on

voters and in the second applies the "Anderson-Burdick balancing test" if the restriction

is reasonable and nondiscriminatory and "the more familiar test of 'strict scrutiny'" if the

restriction is severe. *Id*.

113. The burden on voters of not being physically able to submit a ballot, during

the pandemic, in a way that will be counted is severe.

114. Because other methods of accepting ballots are available to Defendants that

are far less restrictive, Defendants fail strict scrutiny.

115. Indeed, thirty States either already allow the submission of absentee ballots

via secure electronic means, or as of this date of this Complaint have authorized such

means in response to the pandemic.

116. Defendants, however, have not authorized voting by email or other electronic

means and are continuing to insist that ballots be sent by Plaintiffs and Overseas

Americans via physical mail – even where such transmission would be physically

impossible or supremely unreliable, thus disenfranchising thousands upon thousands of

voters because of where they live.

117. Voters abroad may face – depending on the pandemic – legal as well as

physical barriers to voting in person.

118. For example, voters in Costa Rica face a travel advisory advising against

travel to that country due to COVID-19. It would also be unwise for overseas voters who

live in countries with travel advisories to return to the United States to cast a ballot in

person. Additionally, in countries where travel is allowed it would still be extremely costly to travel back to the United States. And for those who chose to travel by airplane, there would be potential health risks associated with flying in an enclosed compartment with passengers who may carry COVID-19 (with or without knowledge of their own positivity for the disease).

119. Upon information and belief, for many voters abroad, even if they could afford to travel back to the United States to vote, there may be advisories – and future executive orders – forbidding such travel. And they may *then* face a quarantine at their destination that would prevent them from actually going to the polls.

120. Thus, in a sense, the Supreme Court has already held that the kind of policies employed here – measures that have the effect of making it so voters are "simply not allowed to use the absentee ballot and are denied any alternative means of casting their vote" – are unconstitutional. *O'Brien v. Skinner*, 414 U.S. 524, 530 (1974) (failure to provide absentee voter registration to people held in jail awaiting trial outside their home county is unconstitutional).

121. Given that email voting can be accomplished safely and securely with no corresponding burden on the state beyond a small degree of cost, the severe burden that the State laws described above place on the right to vote is unconstitutional as applied during the pandemic.

## COUNT II

### (42 U.S.C. § 1983, Equal Protection and One Person, One Vote)

122. Plaintiffs incorporate by reference all the allegations above.

123. The principle of "one person, one vote" requires that courts seek to "[e]nsure

that each person's vote counts as much, insofar as it [i]s practicable, as any other person's." *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54

124.   And the Equal Protection Clause of the Fourteenth Amendment requires "that all persons similarly situated [] be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

125.   Indeed, "[a]n early case in our one person, one vote jurisprudence arose when a State accorded arbitrary and disparate treatment to voters in its different counties [and t]he [Supreme] Court found a constitutional violation." *Bush v. Gore*, 531 U.S. 98, 107 (2000), *describing Gray v. Sanders*, 372 U.S. 368, (1963).

126.   The Supreme Court has also already ruled that, once absentee voting is part of the scheme for elections, all absentee voters must have similar guarantees that their votes count, as much as possible, the same as any other person's. *O'Brien v. Skinner*, 414 U.S. 524, 530 (1974).

127.   Amid a pandemic, where the international postal systems are limited or suspended in many countries, the effects of the State laws at issue will fall differently on different voters.

128.   Specifically, whether a voter in a particular State is able to vote will turn entirely on what country that voter is living in.

129.   Thus, as applied, the policies and practices at issue violate the Constitution's promise of Equal Protection and the promise that all votes should be treated alike.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a) Issue a declaratory judgment that Defendants' actions have violated Plaintiffs rights under the Federal Constitution;

(b) Enter an injunction requiring Defendants to accept and count ballots sent by Overseas Americans via email or other electronic means, whether by (1) establishing their own email system or (2) accepting fax ballots through the DoD Fax ballot system;

(c) Grant Plaintiffs their attorneys' fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988;

(d) Grant any other and further relief that the Court may determine to be necessary and proper.

Dated: September 30, 2020.

Respectfully submitted,

/s/

_____

J. Remy Green
Jonathan Wallace, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com
