**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Mathew Harley, Damali L'Elie, Michael Maniates, Emily McGrath, Susan Lahey, N.H. Quaide Williams, Jessica Roitman, Katie Von Holzen, Benjamin Cole and Ryan Burruss, *individually, and on behalf of all others similarly situated,*<br><br>*Plaintiffs*<br><br>v.<br><br>**New York**[1]<br>Peter S. Kosinski, Andrew Spano, and Douglas Kellner *in their official capacities as Commissioners of the New York State Board of Elections*, Todd D. Valentine and Robert A. Brehm *in their official capacities as Co-Executive Directors of the New York State Board of Elections*,<br><br>[*Defendants Continue on Following Page*]<br><br>*Defendants.* | **Docket No. 20-cv-4664-BMC** |

---

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

---

J. Remy Green
Jonathan Wallace, *of counsel*
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
remy@femmelaw.com

*Attorneys for Plaintiffs*

October 5, 2020

---

[1] The labels here and on the following page are for readability and clarity alone.  The States themselves are not defendants in any capacity, but defendants include the *Ex Parte Young* parties for an as-applied challenge to each State's election law and the State's interpretation and application of that law.

*Defendants, Continued*

**Pennsylvania**
Kathy Boockvar *in her official capacity of Secretary of the Commonwealth of Pennsylvania*, Jonathan Marks *in his official capacity as Deputy Secretary for Elections and Commissions*, and Jessica Mathis *in her official capacity as Director of the Bureau of Election Services*.

**Ohio**
Frank LaRose *in his official capacity as Secretary of the State of Ohio,*

**Texas**
Ruth Hughes *in her official capacity as Secretary of State of Texas,*

**Kentucky**
Albert Benjamin Chandler *in his official capacity as Chairman of the Kentucky Board of Elections,* and Michael Adams *in his official capacity as Kentucky Secretary of State*,

**Wisconsin**
Ann S. Jacobs *in her official capacity as Chair of Wisconsin Elections Commission*, Mark L. Thomsen *in his official capacity as Vice Chair of the Wisconsin Elections Commission*, Marge Bostelmann *in her official capacity as Secretary of the Wisconsin Elections Commission*; and Julie Glancey, Dean Knudson, and Robert Spindell, Jr *in their official capacities as Commissioners of the Wisconsin Elections Commission*,

**Georgia**
Brad Raffensperger *in his official capacity as the Secretary of State of Georgia.*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL HISTORY .......................................................................................................... 2

ARGUMENT ........................................................................................................................ 8

    I.    As a Threshold Matter, this Court Has Jurisdiction and Venue is Appropriate. ............... 8

    II.    A Mandatory Injunction Is the Appropriate Remedy to Redress the Deprivation of the Plaintiffs' Rights. ......................................................................................................... 11

    III.    Plaintiffs' Claims Will Succeed on the Merits Because, Without Immediate Action by the Defendants, Plaintiffs – and Others Similarly Situated – Will Be Disenfranchised.......... 14

        A.    The restrictions here require strict scrutiny. ............................................................. 16

        i.    The burden is severe, standing alone. ...................................................................... 16

        ii.    The burden of the State laws requiring physical mail delivery falls very differently on Overseas Americans......................................................................................................... 16

        B.    If not strict scrutiny, the restrictions here require analysis on the high end of Anderson-Burdick's sliding scale. ...................................................................................... 17

        C.    Under any level of scrutiny, the restrictions are not supported by any cognizable justification. ..................................................................................................................... 18

    IV.    The Balance of the Equities Favors Injunctive Relief and Irreparable Harm is Presumed. .................................................................................................................................. 21

CONCLUSION.................................................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)..................................................................................18

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
  480 U.S. 102 (1987)...........................................................................8, 9, 11

*Bensusan Restaurant Corp. v. King*,
  126 F.3d 25 (2d Cir. 1997).........................................................................10

*Bush v. Hillsborough County Canvassing Bd.*,
  123 F. Supp. 2d 1305 (ND Fla. 2000).........................................................13

*Credico v. N.Y. State Bd. of Elections*,
  751 F. Supp. 2d 417 (E.D.N.Y. 2010) ...........................................18, 19, 21, 22

*Credico v. New York State Bd. Of Elections*,
  2013 US Dist. LEXIS 109737 (EDNY 2013), 10-cv-4555-(RJD)-(CLP)...........................20

*Daunt v. Benson*,
  956 F.3d 396 (6th Cir. 2020) (Readler, J., concurring) .........................................17

*Democratic Nat'l Comm. v. Hobbs*,
  948 F.3d 989 (9th Cir.2020) .......................................................................13

*Elsevier, Inc. v. Grossman*,
  77 F. Supp. 3d 331 (SDNY 2015) .............................................................10, 11

*Exxon Mobil Corp. v. Schneiderman*,
  316 F. Supp. 3d 679 (SDNY 2018)..................................................................9

*Gallagher v. N.Y. State Bd. of Elections*,
  2020 U.S. Dist. LEXIS 138219 (SDNY 2020)....................................12, 14, 16, 17

*Green Party v. N.Y. State Bd. of Elections*,
  389 F.3d 411 (2d Cir. 2004).......................................................15, 17, 19, 21

*Green Party v. NY State Bd. of Elections*,
  389 F3d 411 (2d Cir. 2004)..........................................................................19

*Harman v. Forssenius*,
  380 U.S. 528 (1965)...................................................................................12

*Hirschfeld v. Bd. of Elections*,
    799 F. Supp. 394 (SDNY 1992)...........................................................20

*Jones v. United States Postal Serv.*,
    2020 U.S. Dist. LEXIS 172430 (SDNY 2020) ........................................1

*Kermani v. N.Y. State Bd. of Elections*,
    487 F. Supp. 2d 101 (NDNY 2006) .....................................................21

*Lab Verdict v. Lab Equip*,
    436 F. Supp. 3d 1181 (S.D. Ind. 2020) ..................................................8

*Lerman v. Bd. of Elections*,
    232 F3d 135 (2d Cir. 2000).................................................................19

*Lynch v. City of New York*,
    589 F.3d 94 (2d Cir. 2009).................................................................11

*Mastrovincenzo v. City of New York*,
    435 F.3d 78 (2d Cir. 2006).................................................................11

*McDonald v. Board of Election Comm'rs*,
    394 U.S. 802 (1969) ...........................................................................15

*Medina v. City of Osawatomie*,
    992 F Supp 1269 (D Kan 1998) .........................................................15

*New York v. Trump*,
    2020 U.S. Dist. LEXIS 177083 (D.D.C. 2020) .......................................8

*Northeast Ohio Coal. v. Husted*,
    696 F.3d 580 (6th Cir. 2012) .............................................................12

*O'Brien v. Skinner*,
    414 U.S. 524 (1974).................................................................1, 15, 16

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) .........................................................14, 15

*Pitts v. Black*,
    608 F. Supp. 696 (SDNY 1984)..........................................................22

*Price v. N.Y. State Bd. of Elections*,
    540 F.3d 101 (2d Cir. 2008)....................................................13, 14, 18

*Reynolds v. Sims*,
    377 U.S. 533 (1964)..............................................................................1

*Rossito-Canty v. Cuomo*,
  86 F. Supp. 3d 175 (E.D.N.Y. 2015) ....................................................................12

*Schulz v. Williams*,
  44 F.3d 48 (2d Cir. 1994) ............................................................................13, 21

*Storer v. Brown*,
  415 U.S. 724 (1974) ............................................................................................18

*Telebyte, Inc. v. Kendaco, Inc.*,
  105 F. Supp. 2d 131 (EDNY 2000) .....................................................................10

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ............................................................................................19

*United States v. Stamps*,
  2018 U.S. Dist. LEXIS 195970 (EDNY 2018) (Cogan, J.) .............................9, 10

*Vanasco v. Schwartz*,
  401 F. Supp. 87 (SDNY 1975), aff'd 1976 U.S. LEXIS 921 (1976) ....................22

*Williams v. Salerno*,
  792 F.2d 323 (2d Cir. 1986) ..........................................................................13, 22

*World-Wide Volkswagen v. Woodsen*,
  444 U.S. 286, 292 (1980) .....................................................................................8

*Yang v. Kellner*,
  __ F. Supp. 3d __, 2020 US Dist. LEXIS 79331 (SDNY May 5, 2020), *aff'd
  sub. nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020) ............................. *passim*

*Yang v. Kosinski*,
  960 F3d 119 (2d Cir. 2020) ...........................................................................14, 20

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ..............................................................................................1

**Statutes**

Uniformed and Overseas Citizens Absentee Voting Act (42 U.S.C. § 1973ff, et
  seq.) ............................................................................................................... *passim*

**Other Authorities**

CPLR § 302 ..........................................................................................................10

Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed. 1990) ...........................12

National Conference of State Legislatures, Electronic Transmission of Ballots
(Sep. 5, 2019)...................................................................................................6

Newberg on Class Actions § 24:83 (4th ed. 2002) .......................................................12

U.S. Const. amend. I ..............................................................................14, 17, 21, 22

## PRELIMINARY STATEMENT

As the Supreme Court has long recognized, the right to vote is *the* "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). This jurisprudential and political touch point has become so well accepted that the qualification that preceded the declaration in *Yick Wo* – that voting is a "privilege merely conceded by society according to its will, under certain conditions" – sounds unfathomably foreign. *Id*. *Compare, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society."). In short: "Where that right is constitutionally guaranteed and exercised by citizens through free and fair elections protected by government authority, democratic rule thrives. Conversely, impairing the franchise, or imposing undue burdens on the ability of voters to cast ballots for their elected leaders, necessarily threatens democracy and erodes the underpinnings of a republican form of government." *Jones v. United States Postal Serv.,* 2020 U.S. Dist. LEXIS 172430 (SDNY 2020).

Yet, because of conditions imposed by the global COVID-19 pandemic and through no fault of their own, Plaintiffs and potentially millions of voters abroad risk being disenfranchised *en masse* by the fact that their ballots are unlikely to reach State election officials before the applicable deadlines – if at all. Where circumstance and State election law, in effect, "den[y voters] any alternative means of casting their vote," the Constitution demands the government take steps to ensure voting is possible. *O'Brien v. Skinner*, 414 U.S. 524, 530 (1974). And the solution here is easy: States may simply accept email ballots or secure fax ballots through the Department of Defense. Thirty States already do so, safely, securely, and reliably. There is no legitimate government interest – at least so long as the pandemic continues – in Defendants declining to join them.

1

## **FACTUAL HISTORY**

Plaintiffs incorporate by reference the facts set out in Complaint – as well as the definitions used there – in the interest of time and space, and given the limited time available to brief this case.  Beyond those facts, Plaintiffs submit the following.

Overseas Americans (as defined, all Americans, whether military or not, who vote from abroad) are (rightly) very concerned this year that their ballots will not reach their local election offices in time to be counted (if at all) in this year's election because of global slowdowns in the mail system caused by the novel coronavirus 2019 pandemic.  Harley Dec. ¶¶ 7, 9-10; Von Holzen Dec. ¶¶ 5, 7, 9; Maniates Dec. ¶¶ 3, 6-7.  No matter when they send their ballots, the ballots may not arrive in time because of limited mail service.  And in several countries there is no mail service at all.[2]  All of these obstacles are out of the control of Overseas Americans.

Americans live abroad for a variety of reasons—often for work or to live near family. However, when they move abroad they do not give up their U.S. citizenship or their rights, including their sacred right to vote in elections.  United States citizens living abroad usually vote by absentee ballot because of the prohibitive cost of traveling back to the United States just to cast a ballot in person.  Though many Overseas Americans might prefer to vote in person, because they live far from their polling locations they may have to vote by absentee ballot. Harley Dec. ¶ 2; Roitman Dec. ¶ 2; McGrath Dec. ¶ 2.  As a starting point, in ordinary times, the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") (42 U.S.C. § 1973ff, et seq.) protects the right of voters who live abroad to do just that – including by requiring States to digitally transmit ballots *to* voters.

Overseas voters have a number of voting-related hurdles that voters who live in the

---

[2] *See* https://about.usps.com/newsroom/service-alerts/international/welcome.htm (listing countries without any current mail service).

United States do not:  they may live in different time zones (making it difficult to call their Local Election Office to get information about specific requirements for any given election) or they may live in countries or areas with poor infrastructure or limited postal service.  Bryan Dec. ¶ 23. A voter's job—for example, in the military—may require them to live in areas that are hostile to the presence of U.S. citizens.  Regardless, overseas voters maintain their rights as U.S. citizens and their voting status in the state where they vote.

On top of these hurdles, U.S. citizens who vote from abroad face additional challenges in successfully returning their ballot to their local Board of Elections in the United States.  Their ballot must be filled out correctly, travel through the mail systems of at least two countries, and delivered on time.  The process can be confusing to voters who have to navigate the requirements of their state, rigid timelines, changes in ballot styles, and so on, all without the assistance of the poll workers or Board of Elections officials who are relatively easier to interact with when they are in the same time zone as the voter.  Bryan Dec. ¶ 8.

Even voters who request their ballots prior to their state's deadlines are only required to receive these ballots 45 days ahead of each general election (as determined by the "MOVE" act, amending UOCAVA).  For the November General Election, that was September 19th this year. Bryan Dec. ¶ 21.  With the global postal mail slowdown, however, there can be delays of weeks between when a ballot is sent and when it is received.  Bryan Dec. ¶ 24.

In some States, voters can request an absentee ballot as late as the day before election day.  In the States here, the last day to request an absentee ballot are as follows:  in New York the last day is October 24, 2020; in Pennsylvania it is November 2; in Ohio it is October 31; in Wisconsin it is on October 29 for non-military voters and 5:00 pm on November 3 (for uniformed officers and eligible family); in Kentucky it is October 27; in Texas it is October 23;

and in Georgia there is no deadline for requesting a ballot at all.  Yet, there would be no way for

an Overseas American in any of these states to request a ballot on the last day that their state

allows them to and return it by postal mail (even if they sent it by courier in some States), which

is the only the way that their states allow.  This rule alone poses problems for Overseas

Americans in the best of times, who are required to mail their ballot back through the post, which

can take weeks to arrive.

Another problem that overseas voters encounter when sending voted ballots by mail has

been with the USPS International Service Centers (ISC), which through machine or human error

incorrectly processed correctly addressed ballots—some in envelopes provided by BOEs, all

marked with "official absentee balloting material"—with a yellow "Return to Sender" label (also

called a "NIXIE" because of the word that appears on the label).  This happened in both the 2016

and 2018 elections, primarily to ballots that were received at the ISC at John F. Kennedy

International Airport in Queens, New York.  NIXIEs are appearing already this year at an

unprecedented rate.  Bryan Dec. ¶¶ 13-18.  Once a voter receives a NIXIE, *theoretically* at least,

they can make another attempt to mail their ballot.  Practically speaking, however, because of the

time that would already be consumed by transit to and from the United States, an Overseas

American would have no realistic chance at re-sending a NIXIE'd ballot.

Another possible avenue for sending ballots out of countries, and one that is one of the

only options for voters in countries that have suspended mail service, like Costa Rica, is

dropping mail at the US Embassy or Consulate and having them take the ballot in the diplomatic

pouch. However, this avenue of delivery is susceptible to the same delays in mail delivery, and

embassies are recommending that voters not use this option because it can take one to two

months—even longer than regular mail channels.  Bryan Dec. ¶¶ 25-27.[3]  In countries where there is no mail service, if mail via diplomatic pouch is taking 60 days, this means that voters have no way of returning their voted ballot (because the states are not required to send ballots out until 45 days before the election) other than to pay a costly private courier fee, in effect a poll tax.  Bryan Dec. ¶ 27.

The Federal Voting Assistance Program (FVAP) produced a report in 2018, called the Overseas Citizen Population Analysis (OCPA) report.[4]  Based on the number of UOCAVA ballots that were requested compared to the number of ballots returned, as well as a survey of voters (successful and not successful), they found that voting obstacles (confusing directions, difficulty with forms, etc.) were a major problem for voters.  FVAP also determined that if voting obstacles were removed, turnout rate would increase from 4.7% to 31.7%.  One particularly successful remedy in high-obstacle countries (where there are substantial obstacles to voting, such as an active war zone), was electronic request, receipt and return of ballots.

The Election Assistance Commission's Election Administration and Voting Survey (EAVS) 2018 Comprehensive Report ("EAVS Report")[5] notes that 46.4% of rejected mailed ballots that were rejected due to ballots arriving at their local election office too late to be counted making this "by far the most common reason for rejection."  *See* EAVS Report at 98.  Even with the protections of UOCAVA, in non-pandemic times, mail delays disenfranchised massive numbers of Overseas Americans.

Of course, when many of the documents (e.g., the Constitution) that protect the right to vote were drafted, the internet did not exist.  So, for obvious reasons, it was not contemplated as

---

[3] *See also, e.g.,* https://il.usembassy.gov/u-s-citizen-services/voting/send-your-ballot/.
[4] Full report available at https://www.fvap.gov/info/reports-surveys/overseas-citizen-population-analysis.
[5] Available at:  https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf.

a possibility for how voters might cast ballots.  However, the internet and telephone are now

ubiquitous in our lives and those options have been offered to voters in a majority of states.  *See*

"COVID-19 Updates," FVAP.gov (providing maps showing how each State accepts ballots,

ballot applications, and other voting documents).[6]  *See also*, National Conference of State

Legislatures, <u>Electronic Transmission of Ballots</u> (Sep. 5, 2019) (collecting information on how

various states allow electronic transmission of ballots, and listing the States here among the

"[n]ineteen states [that] do not allow electronic transmission").[7]

Even without the pandemic and its impacts on voting, at the national level, lawmakers

recognized that one of the main reasons that overseas voters' ballots were rejected was because

they arrived too late to be counted.  Bryan Dec. ¶ 11.  The Military and Overseas Voter

Empowerment (MOVE) Act (2009), an amendment to UOCAVA, addressed part of this issue by

requiring states to email blank ballots to any overseas voter who requests that it be sent to them

by email.  The MOVE Act left the decision of how overseas voters return their voted ballots up

to the individual states to determine. Bryan Dec. ¶ 28.  As of today, in a majority of States and

the District of Columbia, all overseas voters have the option to send in their voted ballots by

email or facsimile.

Some of these States have been allowing email ballot return by email or facsimile for

years.  For example, Nevada has accepted emailed return ballots since 2009.  *See,* <u>Procedures for</u>

<u>Absent Voting by Uniformed and Overseas Citizens</u>, Nevada Sec. of State.[8]  And there have

been no security issues that have caused the states that allow voters to return their voted ballots

by email or facsimile to change their laws to suspend these methods of voting.  Burch Dec. ¶ 20.

---

[6] *Available at* https://www.fvap.gov/covid-19.
[7] *Available at* https://www.ncsl.org/research/elections-and-campaigns/internet-voting.aspx.
[8] *Available at* https://www.nvsos.gov/sos/elections/voters/uniformed-overseas-citizens.

However, overseas voters who live in the States that do not allow email or fax return of ballots have no option but to send their ballot by mail (or private courier if they can afford this expense, the destination is not a post office box, and State law does not require a postmark). During a pandemic that has crippled the mail around the globe, this means that hundreds of thousands of voters in those states are disenfranchised because they have no way to return their ballot on time.  Bryan Dec. ¶ 34.

Emailed or faxed ballots are no different from paper ballots, except they are printed on different paper.[9]  There is always a paper trail.  If the local election official sends the ballot to the voter electronically, the voter prints the ballot out on paper and marks the ballot--or marks the ballot on their computer and then prints out the marked ballot.  If the ballot is sent to the voter by mail, the voter marks the mailed ballot.  Burch Dec. ¶¶ 12-15.

Aside from email, the Department of Defense – through the Federal Voting Assistance Program – maintains the "DoD Fax Service," which "allows election officials to transmit and receive election materials via toll-free fax to/from Service members, their eligible family members, and overseas citizens."  Fax & Email Guidelines, FVAP.gov.[10]  The same website even provides a cover sheet for voters to sign, and guidance for voters to ensure safe and successful transmission of their ballots.  *Id*.  Thus, to enfranchise Overseas Americans, the States here could simply begin accepting faxes from a Department of Defense fax number – and using those faxes the same way they use any other paper ballot.

At the end of the day, countless voters' ability to vote is being compromised to the point of disenfranchisement by the combination of the COVID-19 pandemic, global postal mail

---

[9] Sending in a ballot by email or facsimile is not the same as "voting electronically."  Electronic voting is where a voter goes into a polling location, casts a ballot on a digital voting machine that counts the vote but does not create a paper trail.  Burch Dec. ¶¶ 12, 18.  Notably, email and fax voting are more secure than voting electronically.
[10] *Available at* https://www.fvap.gov/eo/overview/sending-ballots/fax-email.

slowdowns, persistent errors at JFK airport, and the requirement by the States here that voters must still return a paper ballot using traditional post.  Bryan Dec. ¶ 34.  Returning voted ballots by email or fax is as safe, if not safer, than sending ballots through the postal system.  Burch Dec. ¶ 22.  There is no reason, beyond a generic desire to enforce the law as written, not to let Overseas Americans vote.  That is not enough.

## **ARGUMENT**

### I.  **As a Threshold Matter, this Court Has Jurisdiction and Venue is Appropriate.**

Because jurisdiction is something that a Court must assure itself of, regardless of whether the parties raise it, Plaintiffs address jurisdiction upfront.  In deciding whether it has personal jurisdiction, a "court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief.  It must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.'" *Asahi Metal Indus. Co. v. Superior Court of Cal.,* 480 U.S. 102, 113 (1987), citing *World-Wide Volkswagen v. Woodsen,* 444 U.S. 286, 292 (1980).

Applying the *Asahi* factors to this case, the travel burden on defendants in this time of COVID-19 is almost entirely mitigated by the conduct of virtually all arguments and hearings electronically.  "[M]odern technology and transportation allow [a defendant] to litigate with relative ease anywhere in the United States." *Lab Verdict v. Lab Equip*, 436 F. Supp. 3d 1181, 1189 (S.D. Ind. 2020).  The interest of the forum state is signaled by the fact that New York State is the lead plaintiff in the case of *New York v. Trump,* 2020 U.S. Dist. LEXIS 177083 (D.D.C. 2020) to "enjoin the defendants" (including the United States Postal Service) "from enforcing" certain policies likely to delay election mail.  And, indeed, "the interstate judicial system's interest in obtaining the most efficient resolution of controversies" militates heavily in

8

favor of the Court retaining this case as directed against all defendants.  480 U.S. at 113.
Severing and dismissing the non-New York defendants is likely to preclude Plaintiffs from
proceeding at all with their attempt to protect their own votes and those of millions of other
Overseas Americans, due to the timing and the expense of proceeding in all the separate States.

In *Exxon Mobil Corp. v. Schneiderman,* 316 F. Supp. 3d 679 (SDNY 2018), applying the
*Asahi* criteria, a court in New York's Southern District held that New York jurisdiction was
proper over the Massachusetts attorney general.  The court noted that "[t]he litigation could,
however, be tailored to minimize disruption to Healey and her staff by, for example, conducting
depositions in Massachusetts.  Moreover, the conveniences of modern communication and
transportation ease what would have been a serious burden only a few decades ago … The other
*Asahi* factors weigh in favor of jurisdiction. New York is a convenient forum for Exxon and a
significant aspect of the wrongful conduct alleged in the Complaint occurred in New York."

Here, all Defendants have sent and received likely thousands upon thousands of ballots
through the International Service Center at JFK Airport (in this District).  As this Court observed
in a case involving similar use of mail through JFK, "[n]or is this venue's connection to the
events as tenuous as defendants claim … the allegedly fraudulent mail solicitations not only
traveled out of and into the United States through the United States Postal Service International
Service Center at JFK airport, but were delivered to thousands of alleged victims in the Eastern
District of New York."  *United States v. Stamps,* 2018 U.S. Dist. LEXIS 195970 at *6 (EDNY
2018) (Cogan, J.).  So too here.  As stated in the Declaration of Julia Bryan, Overseas Americans
are experiencing significant delays as their ballots pass through the JFK International Service
Center.  Bryan Dec. ¶ 16-18.  JFK is also inexplicably returning a significant and unprecedented
number of appropriately addressed ballots directed to local Boards of Election stamped

9

"Addressee Unknown" (a "NIXIE").  *Id.*  Indeed, because of the NIXIE issue and astonishingly slow processing speeds JFK has apparently gained the nickname "the Swamp of Despair" among international communities.  *Id.*  Given that all States involved here have partnered with the USPS to deliver and receive mail ballots from their absentee voters, and both send and receive massive volumes of absentee ballots through JFK's International Service Center, venue and jurisdiction are both appropriate in a case that – in large part – turns on what takes place in that Service Center.

The "long arm" statute of a forum state determines the reach of personal jurisdiction for a federal court.  *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997).  New York's long arm statute is found in the State's Civil Procedure Law and Rules ("CPLR") § 302.  Under § 302(a)(1), the Court has jurisdiction over any defendant who "transacts any business within the state or contracts anywhere to supply goods or services in the state."  Courts have consistently found mailings directed to the State confer jurisdiction.  For example, "mailing advertisements which offer goods for sale to New York addresses has been held to confer jurisdiction."  *Telebyte, Inc. v. Kendaco, Inc.,* 105 F. Supp. 2d 131, 135 (EDNY 2000); *see also, Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 344 (SDNY 2015) ("[C]ourts have explained that section 302 is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction … In the instant case, Plaintiff has alleged that at least one of the subscriptions purchased by PTI and at least one of the subscriptions purchased by Grossman were mailed to New York.").

Here, the States at issue have chosen to use the United States Postal Service to receive ballots from Overseas Americans.  To be sure, this is a common enough choice, but it also places the votes of countless Overseas Americans at the mercy of the JFK International Service Center

(which handles the majority of incoming mail from abroad in the United States).  That choice is a sufficient "transaction" to "invoke jurisdiction" – in exactly the same way that a single subscription is.  *Elsevier*, 77 F. Supp. 3d at 344.

This Court has personal jurisdiction over all Defendants because of their choice to commit ballot mail to Overseas Americans to the United States Postal Service, and through the JFK International Service Center.  Moreover, all *Asahi* factors militate strongly in favor of the Court retaining jurisdiction.

## II.   A Mandatory Injunction Is the Appropriate Remedy to Redress the Deprivation of the Plaintiffs' Rights.

"In general, the district court may grant a preliminary injunction if the moving party establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus [(3)] a balance of the hardships tipping decidedly in favor of the moving party." *Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted). Where, as here, the injunction sought would essentially "provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," the movant must show a "'clear' or 'substantial' likelihood of success on the merits." *Yang v. Kellner*, __ F. Supp. 3d __, 2020 US Dist. LEXIS 79331, at *18 (SDNY May 5, 2020), *aff'd sub. nom. Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020), *quoting People ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).  Thus, a "district court may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits."  *Mastrovincenzo v. City of New York,* 435 F.3d 78, 89 (2d Cir. 2006), *citing No Spray Coal., Inc. v. City of New York,* 252 F.3d 148, 150 (2d Cir. 2001).

This case meets those exacting criteria.  As explained in more detail below, the
substantive legal theories here are meritorious and the challenged actions are unconstitutional as
applied.  "No right is more precious in a free country than that of having a voice in the election
of those who make the laws … The right to vote remains, at bottom, a federally protected right
… The federal protections of the right to vote also include those against interference from the
states." *Rossito-Canty v. Cuomo,* 86 F. Supp. 3d 175, 180-1 (E.D.N.Y. 2015) (quotation marks
and citations omitted).  "The right to vote freely for the candidate of one's choice is of the
essence of a  democratic society, and any restrictions on that right strike at the heart of
representative government." *Harman v. Forssenius,* 380 U.S. 528, 537 (1965).

Nor are there any substantive factual disputes. The voter-Plaintiffs will have their votes
rejected solely because the global COVID-19 pandemic has interfered with the operations of the
mails in their countries of residence and in the United States.  Most importantly, there is no
dispute that mail is slow in some countries, while entirely unavailable in others – and that even
more countries may have mail services cut off between now and Election Day.

As to the relief sought,[11] setting the rules in how votes are tallied and ballots are
distributed is a significant part of the Federal Courts' toolkit for redressing unconstitutional
rejection of votes (and likely the only possible remedy to such wrongs).  *Gallagher v. N.Y. State
Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219 (SDNY 2020) (injunction issued ordering
Defendant to accept unpostmarked ballots received two business days after election deadline);
*Northeast Ohio Coal. v. Husted*, 696 F.3d 580 (6th Cir. 2012) (affirming order "requiring the

---

[11] The claims here are styled as on behalf of all Overseas Americans, and "[t]he Court need not formally
certify a class in order to issue the requested preliminary relief." *Yang*, 2020 U.S. Dist. LEXIS 79331 at *42 n. 5,
*citing* Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to
classwide preliminary injunctive relief.") *and* Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed. 1990)
("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action
as a class suit.").

counting of certain … provisional ballots where poll-worker error caused the nonconformity”); *Bush v. Hillsborough County Canvassing Bd.*, 123 F. Supp. 2d 1305 (ND Fla. 2000) (Board could not reject mail in ballots lacking postmark); *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir.2020) (“Arizona's policy of wholly discarding, rather than counting or partially counting, out-of-precinct ballots, and H.B. 2023's criminalization of the collection of another person's ballot, have a discriminatory impact on American Indian, Hispanic, and African American voters in Arizona”). *See also, generally, Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 105-6 (2d Cir. 2008) (invalidating poorly justified state rule which excluded absentee ballots in a single type of election).

Finally, as discussed in more depth below, in cases about the right to vote, the injunction test largely collapses into a single question of whether the alleged act or omission is unconstitutional (at least where, as here, there are few real factual disputes). *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986). That is, an injunction requires a showing of “(a) irreparable harm and (b) likelihood of success on the merits.” *Id*. But voters “would certainly suffer irreparable harm if their right to vote were impinged upon.” *Id*. And so, an “injunction [is] properly issued [in a voting rights case] if the district court” finds a probability of success on the constitutional question. *Id*.

Put more simply: the showing of probability of success on the merits entails “[t]he typical remedy” of an injunction. *Schulz*, 44 F.3d at 61 (“permanent injunction was not an abuse of discretion, as it represented appropriate relief” for an unconstitutional restriction of access to the ballot). Ultimately, then, if the Court finds that Plaintiffs have made their clear showing of probability of success on the Constitutional questions, the balance of the equities is all but automatically tipped in their favor by the “‘strong interest in exercising the fundamental political

right to vote'" and fact that "[t]he public interest … favors permitting as many qualified voters to vote as possible." *Obama for Am. v. Husted,* 697 F.3d 423, 437 (6th Cir. 2012), *quoting Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006).  "There is a strong public interest in granting an injunction in this case. '[S]ecuring First Amendment rights is in the public interest.'"  *Gallagher v. N.Y. State Bd. of Elections,* 2020 U.S. Dist. LEXIS 138219 (SDNY 2020), *citing N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

### III.   Plaintiffs' Claims Will Succeed on the Merits Because, Without Immediate Action by the Defendants, Plaintiffs – and Others Similarly Situated – Will Be Disenfranchised

When a case "call[s] upon" the Court "to consider the constitutionality of [an act or omission causing disenfranchisement] as applied[,] … [t]here is no 'litmus-paper test' to answer th[e] question" of constitutionality. *Yang v. Kosinski*, 960 F3d 119, 129 (2d Cir. 2020) (cleaned up), *quoting Anderson v. Celebrezze*, 460 U.S. 780, 789, (1983). Rather, the Court "conduct[s] a two-step inquiry that applies to election-related restrictions." *Id*. "First, [the Court] ascertain[s] the extent to which the challenged restriction burdens the exercise of the speech and associational rights at stake[:]  The restriction could qualify as 'reasonable [and] nondiscriminatory' or as 'severe.'" *Id*, *quoting Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Second, the Court applies scrutiny: a restriction is subject to the "*Anderson-Burdick* balancing test"[12] if the restriction is reasonable and nondiscriminatory and to "the more familiar test of 'strict scrutiny'" if the restriction is severe. Id. See also, *Price v. N.Y. State Bd. of Elections,* 540

---

[12] The *Anderson-Burdick* test, discussed below, provides that the Court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate, and then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment under this more flexible standard, [the Court] must determine both the legitimacy and strength of each of those interests and the extent to which those interests make it necessary to burden the plaintiff's rights." *Yang*, 960 F.3d at 129 (alterations adopted).

F.3d 101, 109 (2d Cir. 2008) ("[t]he standards for review are clear[:] If the plaintiffs' rights are severely burdened, the statute is subject to strict scrutiny. If the burden is minor, but non-trivial, Burdick's balancing test is applied."); *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419 (2d Cir. 2004).[13]

And to the extent that the Defendants assert that it is not a State's responsibility to ensure a mode of voting is actually viable, *O'Brien* – read, in particular, through *McDonald* – forecloses that argument. *See O'Brien v. Skinner*, 414 U.S. 524, 529 (1974), *discussing McDonald v. Board of Election Comm'rs*, 394 U.S. 802 (1969). *McDonald* squarely held that a State has no obligation to provide voters in prisons and jails with an absentee ballot. Yet, in *O'Brien*, the Supreme Court found that, by refusing to provide absentee ballots to voters – combined with proof that those voters could not vote otherwise – a State violated the Constitution. 414 U.S. at 530. The upshot is this: where significant numbers of voters face restrictions that *will* prevent them from voting, a State must provide them with *some* means of voting (assuming such means exist).

Thus, under either the strict scrutiny or *Anderson-Burdick* balancing, as applied, all Defendants' failure to address the known effects of the pandemic disenfranchising Plaintiffs is unconstitutional. And ultimately, the Court may effectively skip the first stage of analysis (determining the burden/level of scrutiny) given the lack of cognizable government interest: accepting DoD fax ballots is safe, secure, and simple. *Yang*, 960 F.3d at 129 ("in these circumstances, we need not decide whether the strict-scrutiny test applies here, since Plaintiffs

---

[13] Some courts (outside this Circuit) have theorized that neither strict scrutiny nor rational basis exists in *Anderson-Burdick* jurisprudence, but that the flexible *Anderson-Burdick* balancing test may bend to "approximat[e]" both standards. See, e.g., *Medina v. City of Osawatomie*, 992 F Supp 1269, 1275 (D Kan 1998). See also, *Obama for Am. v. Husted*, 697 F3d 423, 440 (6th Cir. 2012) (White, J., concurring in part, dissenting in part) ("Anderson-Burdick balancing test … is flexible enough to approximate the rational-basis test when appropriate, i.e., where the burden is slight, the required showing by the state is correspondingly light.") (emphasis added). This Second Circuit, however, seems to have foreclosed this alternative approach with some finality in *Yang*.

… are clearly or substantially likely to prevail on the merits of their claim even under the more flexible and less exacting standard").

      A.           The restrictions here require strict scrutiny.

The burden stage of *Anderson-Burdick* asks whether restrictions are reasonable and nondiscriminatory on one hand, or severe on the other. The burden here is both problematically discriminatory and severe.

        i.   *The burden is severe, standing alone.*

In terms of severity, the burden of having one's vote thrown out – or not even being able to cast it – after following exactly the instructions given by UOCAVA and each Defendant, is severe.  At the risk of stating the obvious, there can be no more severe burden on the right to vote than an "absolute bar to voting." *O'Brien v. Skinner*, 414 U.S. 524, 530 (1974).  And even only significant hurdles to voting have been held to trigger strict scrutiny, where – when applied more broadly – they will ultimately result in disenfranchisement.  Thus, in *Gallagher*, Judge Torres observed that the burden placed on voters when State law required a "large number of ballots [to] be invalidated, and consequently, not counted based on circumstances entirely out of the voters' control" was "exceptionally severe" and required strict scrutiny.  *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist. LEXIS 138219, at *47 (S.D.N.Y. Aug. 3, 2020).

In short, where a significant group of voters will either face an "absolute bar to voting," or at least significant impediments that are entirely beyond the voter's control, strict scrutiny is appropriate because the burden on the right to vote is severe.  *See O'Brien*, 414 U.S. at 530; *Gallagher,* 2020 U.S. Dist. LEXIS 138219, at *47.

        ii.  *The burden of the State laws requiring physical mail delivery falls very differently on Overseas Americans.*

In each State, the burden of being required to return a physical ballot through the mail

falls very differently on Overseas Americans than it does on Americans domestically.[14]  As

distinct from the pure First Amendment issues, the fact that Overseas Americans face such a

profoundly different set of issues in casting their ballots than domestic citizens do – and all the

State has to do is accept faxes through the Department of Defense to curb that issue – raises

questions that must be answered with searching scrutiny.  The "principle of one person, one vote

requires that courts seek to ensure that each person's vote counts as much, insofar as it is

practicable, as any other person's."  *Gallagher v. N.Y. State Bd. of Elections*, 2020 U.S. Dist.

LEXIS 138219, at \*56 (S.D.N.Y. Aug. 3, 2020) (alterations adopted, quotation marks omitted),

*citing Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 54 (1970).  Where "arbitrary

factors" – here, the fact of whether one lives abroad or not – ultimately determine "whether [a

person's vote] … [is] counted," the laws that create that situation are subject to strict scrutiny.

*See Gallagher*, 2020 U.S. Dist. LEXIS 138219, at \*61, *citing Bush*, 531 U.S. at 104-105.

  B.  <u>If not strict scrutiny, the restrictions here require analysis on the high end of Anderson-Burdick's sliding scale.</u>

  When it comes to burdens on the right to vote, the Second Circuit and the Supreme Court

alike have cautioned that there "is no litmus-paper test for separating those restrictions that are

valid from those that are invidious" and the "rule is not self-executing and [it] is no substitute for

---

[14] There is an open, academic question of how best to conceive of the relationship between *Anderson-Burdick* jurisprudence and equal protection jurisprudence – and at least one Circuit Judge has concluded that "in the Equal Protection setting, we would be wise to forego *Anderson-Burdick*."  *See, for example*, *Daunt v. Benson,* 956 F.3d 396, 423 (6th Cir. 2020) ("The temptation to overindulge in the *Anderson-Burdick* test has not gone unnoticed" and "we recently questioned 'whether the Supreme Court ever intended *Anderson-Burdick* to apply to Equal Protection claims,' as the Supreme Court has 'only applied the framework in the context of generally applicable laws.'") (Readler, J., concurring), *quoting Mays v. LaRose,* 951 F.3d 775, 783 n.4 (6th Cir. 2020).
  That said, Second Circuit cases treat such issues as intertwined – that is, if there is disparate treatment, it makes the unequally treated party's "situation even more difficult" and thereby makes the "burden" a "severe" one – and there is no reason to depart from that approach in this case. *See, e.g.*, *Green Party v. N.Y. State Bd. of Elections,* 389 F.3d 411, 419-22 (2d Cir. 2004).

the hard judgments that must be made." *Storer v. Brown,* 415 U.S. 724, 730 (1974).  *See also*,

*Yang,* 960 F.3d at 129, *quoting Anderson,* 460 U.S. at 789.  And, of course, the "results of this

evaluation [cannot] be automatic." *Anderson,* 460 U.S. at 789.

If a burden is not necessarily "severe," but still is a "weighty imposition on Plaintiffs' …

right[s]," *Anderson-Burdick*'s sliding scale requires much more than rational basis review. *Yang*,

2020 U.S. Dist. LEXIS 79331, at *32.  As Chief Judge Dearie explained in *Credico*:

> "That the plaintiffs' associational rights will not be severely burdened, however, does not
> end my inquiry. As the Second Circuit recently instructed in *Price*, while 'review in such
> circumstances will be quite deferential,' I must actually 'weigh the burdens imposed on
> the plaintiff against the *precise* interests put forward by the State' and 'take into
> consideration the extent to which those interests make it necessary to burden the
> plaintiffs' rights,' *Price* directs me to conduct more than just a rational basis review, and
> I am not to give much weight to 'flimsy' or 'extraordinarily weak' justifications proffered
> by the State."

*Credico v. N.Y. State Bd. of Elections,* 751 F. Supp. 2d 417, 422 (E.D.N.Y. 2010) (citations

omitted, emphasis added in *Credico*), *citing Price,* 540 F.3d at 108-11.

As explained above, even assuming the burden is not severe (it is), failing to take simple

and readily available steps that assure the timely receipt of Overseas Americans' ballots, when

the absence those steps mean it is very likely thousands of Overseas Americans cannot vote at

all, is – at a minimum – a "weighty imposition."  *Anderson-Burdick* requires such an imposition

to be balanced by real and precise justifications.  As explained below, the Defendants cannot

present such justifications here.

      C.     <u>Under any level of scrutiny, the restrictions are not supported by any
cognizable justification.</u>

Once a plaintiff shows a burden on the right of access to the ballot – even if that "burden

… is not large" – it becomes the State's responsibility to justify that burden.  *Price,* 540 F.3d at

112.  The Court should weigh "the precise interests put forward by the State as justifications for

the burden imposed by its rule."  *Anderson v. Celebrezze,* 460 U.S. 780, 789 (1983) (emphasis

added).  *See also*, *Green Party v. NY State Bd. of Elections,* 389 F3d 411, 421 (2d Cir. 2004); *Lerman v. Bd. of Elections,* 232 F3d 135, 149 (2d Cir. 2000); *and Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 664 (1994).  Moreover, the mere "fact that the defendants' asserted interests are 'important in the abstract' does not necessarily mean that its chosen means of regulation 'will in fact advance those interests.'" *Green Party* at 421, *quoting Lerman* at 149-50 ("we cannot uphold a statutory provision that substantially burdens political speech and association … without insisting that the defendants do more than simply posit the existence of the disease sought to be cured.") (cleaned up).

In analyzing the justification, the Court should "examine each justification in turn and consider whether they make it necessary to burden the constitutional rights of Plaintiffs." *Yang,* 960 F.3d at 134 (cleaned up), *citing Anderson,* 460 U.S. at 789.  Because of the ready availability of secure alternatives like the DoD Fax system, mechanical application of physical ballot requirements fails spectacularly to "in fact advance [the States' proffered] interests." *Id*.  Where the restrictions enacted fail to balance against the burden they pose, the restriction is unconstitutional.

Where the government does not actually assert an interest in seeing the law enforced in the specific circumstances at hand, there is no cognizable government interest.  That is, "[o]f course, while a State may have a general, and quite understandable, interest in seeing state laws enforced, to the letter, as written," to "accept that rationale and nothing more would be tantamount to a categorical rejection of any 'as applied' challenge." *Credico v. N.Y. State Bd. of Elections,* 751 F. Supp. 2d 417, 422 (E.D.N.Y. 2010).  Thus, "resorting only to" a general interest in seeing state laws enforced "carries no weight as a justification." *Id*.

Where courts have faced this kind of non-justification – or justifications not tailored at all to the action the Defendant is taking – they have uniformly rejected them.  Most recently, in *Yang,* the Second Circuit took a hard look at what all parties conceded was a state interest of the highest order (at least, in the abstract):  "protecting the public from the health risks posed by COVID-19."  960 F.3d at 134.  Despite the obvious importance of that interest in the abstract, the Second Circuit took a fine comb to whether the measure employed – canceling a primary election to reduce in-person voting – advanced the interest asserted, finding that the justification was "overstated for at least two reasons":  in-person voting was likely to be significantly lower than in past years and the reduction of in-person voting largely occurred in places with less (but not no) risk of COVID-19. Id. at 135-6.  *See also*, *Credico v. New York State Bd. Of Elections*, 2013 US Dist. LEXIS 109737 at *71-72 (EDNY 2013), 10-cv-4555-(RJD)-(CLP) (state's anti-confusion "justification carries no weight in the context of this case, because the application of Section 7-104(4)(e) did not reduce clutter on the 2010 ballot and, if anything, enforcement of the Statute increased voter confusion."); *and cf. Hirschfeld v. Bd. of Elections,* 799 F. Supp. 394 (SDNY 1992) (finding it "seem[ed] unnecessary to examine the various statutory provisions claimed here to be relevant" because "if it is the Board's contention that on the facts above outlined the statutes of the state of New York give it the right to reject plaintiff's certificate of acceptance, it is equally clear that the statutes as so applied are unconstitutional.").

Here, any state interest in assuring, for example, the security of electronically transmitted information (an important interest in the abstract, to be sure) can be dealt with as thirty other states have – and indeed, can simply be imported wholesale given the existence of the DoD Fax system.  Since no state interest at all is advanced by refusing to allow Overseas Americans use of the DoD Fax system – or at least, no interest beyond "a general … interest in seeing state laws

enforced, to the letter, as written" (*Credico,* 751 F. Supp. 2d at  422) – application of the various physical ballot requirements during the pandemic is unconstitutional.

**IV.**   **The Balance of the Equities Favors Injunctive Relief and Irreparable Harm is Presumed.**

In ordinary cases, the grant or denial of an injunction may turn on factors beyond likelihood of victory on the merits.  In constitutional cases, however, a demonstration of the required likelihood of success entitles a party to a presumption that the equities balance in their favor.  That is, "[t]he typical remedy afforded when a statute is found to be facially unconstitutional is an injunction enjoining its enforcement."  *Schulz v. Williams,* 44 F.3d 48 (2d Cir. 1994) (provision of voters lists only to major parties was denial of equal protection to minority parties).  This rule holds particular weight in the election context:  "[i]n matters involving allegations or claims of First Amendment violations, irreparable harm may be presumed."  *Kermani v. N.Y. State Bd. of Elections,* 487 F. Supp. 2d 101 (NDNY 2006) (injunction granted against enforcement of Election Law section restricting outside expenditures in primary elections).  That is, because of the nature of elections, in this kind of case, "absent injunctive relief, [Plaintiffs'] First Amendment rights likely would be forever extinguished." *Yang,* 960 F.3d at 136 (2d Cir. 2020) (holding that extinguishing voting rights is "surely a 'significant' hardship that the Board has not adequately justified" and any costs to the Defendants are a "cost that [they] chose to bear when [they] assumed the responsibility of regulating and holding" the "election.") (alterations adopted).

Thus, injunctions issue in virtually every case to find a constitutional violation under *Anderson-Burdick* (and its predecessors).  *See, e.g.*, *Yang, supra* ("Courts in this circuit have consistently found irreparable injury in matters where voters have alleged constitutional violations of their right to vote"); *Green Party v. N.Y. State Bd. of Elections,* 389 F.3d 411 (2d

Cir. 2004) (injunction granted against Election Law section canceling status of previously enrolled parties which fail to get 50,000 votes in gubernatorial election); *Williams v. Salerno,* 792 F.2d 323 (2d Cir. 1986) (injunction granted against Board of Elections determination that college dorm could not constitute "residence" for voter registration purposes); *Pitts v. Black,* 608 F. Supp. 696 (SDNY 1984) (injunction against refusal to register homeless voters); *Vanasco v. Schwartz,* 401 F. Supp. 87 (SDNY 1975), aff'd 1976 U.S. LEXIS 921 (1976) (enjoining BOE rules which censored content of campaign materials); *Credico v. New York State Bd. of Elections,* 751 F. Supp. 2d 417 (EDNY 2010) ("Because violations of First Amendment rights are commonly considered irreparable injuries, I have no trouble concluding that plaintiffs have established that, in the event the injunction is not granted, they will suffer an irreparable injury") (cleaned up).

Even if more balancing were required, as detailed throughout Part III above, the Defendants have offered no justification with any weight for refusing to take simple steps facilitate the transmission of Plaintiffs' ballots.  *See, e.g., Credico v. N.Y. State Bd. of Elections,* 751 F. Supp. 2d 417, 422 (E.D.N.Y. 2010) (state interest in "seeing state laws enforced, to the letter, as written" without more "carries no weight as a justification.").  Given that Defendants have asserted no cognizable interest in *not* accepting ballots by email – or at least DoD fax – the balance of the equities decidedly tips towards Plaintiffs.

## <u>CONCLUSION</u>

For the reasons above, the Plaintiffs respectfully request the Court grant their motion for injunctive relief.

Respectfully submitted,

/s/
_____
J. Remy Green
Jonathan Wallace, *of counsel*
COHEN&GREEN P.L.L.C.
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com