**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Mathew Harley, Damali L'Elie, Michael Maniates Emily McGrath, Susan Lahey, N.H. Quaide Williams Jessica Roitman, Katie Von Holzen, Benjamin Cole and Ryan Burruss, *individually, and on behalf of all others similarly situated,*<br><br>**Plaintiffs,**<br><br>v.<br><br>Peter S. Kosinski, Andrew Spano, and Douglas Kellner *in their official capacities as Commissioners of the New York State Board of Elections,* Todd D. Valentine and Robert A Brehm *in their official capacities as Co-Executive Directors of the New York State Board of Elections, et al.,*<br><br>*Defendants.* | **Docket No. 20-cv-4664-BMC**<br><br>**DEFENDANT OHIO SECRETARY OF STATE FRANK LAROSE'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Defendant Ohio Secretary of State Frank LaRose hereby responds to Plaintiffs' Motion for

Preliminary Injunction and for the reasons set forth herein, respectfully requests that Plaintiffs'

complaint be dismissed and their motion be denied. The reasons for the opposition are set forth in

the attached Memorandum.

Respectfully Submitted,

DAVE YOST
Ohio Attorney General

*/s/ Heather L. Buchanan*

HEATHER L. BUCHANAN (OHIO 0083032)
RENATA Y. STAFF (OHIO 0086922)
Assistant Attorney General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Renata.Staff@OhioAttorneyGeneral.gov
Heather.Buchanan@OhioAttorneyGeneral.gov

*Counsel for Defendant Frank LaRose, in his official capacity of Ohio Secretary of State*

**TABLE OF CONTENTS**

Table of Authorities ..............................................................................................................iv

Memorandum In Support ......................................................................................................1

I.      Introduction............................................................................................................1

II.     Factual Background ................................................................................................3

        A.      UOCAVA voting in Ohio. ..........................................................................3

        B.      Voting and returning a UOCAVA ballot. ....................................................5

III.    This Matter Is Not Properly Before This Court ....................................................6

        A.      Plaintiffs' Complaint against Secretary LaRose must be dismissed
                for lack of personal jurisdiction. ................................................................6

                1.      Legal standard. ...............................................................................6

                2.      Plaintiffs' allegations do not demonstrate sufficient contacts
                        with the State of New York to invoke personal jurisdiction
                        over Secretary LaRose. ...................................................................7

                3.      Secretary LaRose does not have meaningful contacts, ties, or
                        relations with the State of New York such that the exercise
                        of personal jurisdiction would be fair and reasonable. ................12

        B.      Plaintiffs' Complaint must be dismissed because venue is not proper
                in this District...........................................................................................15

        C.      Alternatively, Plaintiffs' claims against Secretary LaRose should be
                severed. .....................................................................................................16

IV.     Plaintiffs Have Not Demostrated Entitlement To A Mandatory Preliminary
        Injunction. ...........................................................................................................19

        A.      Legal standard. .........................................................................................19

        B.      The Court should follow the *Purcell* doctrine and decline to change
                election rules on the eve of the General Election. ....................................20

        C.      The balance of hardships weighs against granting the injunction. ...................23

        D.      Plaintiffs have not shown any harm, much less the required "strong
                showing" of irreparable harm. .................................................................26

E.   Plaintiffs fail to show substantial likelihood of success on the merits of their constitutional claims.................................................................27

V.   Conclusion ....................................................................................................38

Certificate Of Service ................................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Andino, et al. v. Middleton, et al.*,
  592 U.S. ____ (2020) (Oct. 5, 2020) .........................................................................21

*Arizona Democratic Party, et al., v. Hobbs*,
  2020 U.S. App. LEXIS 31677 (Oct. 6, 2020) ...........................................................21

*Aviner v. "Five J" Jewelers Precious Metals Industry*,
  S.D.N.Y. 99 Civ. 1800 (KMW), 1999 U.S. Dist. LEXIS 22193 (Oct. 18,
  1999) .........................................................................................................................8

*Best Van Lines, Inc. v. Walker*,
  490 F.3d 239 (2d Cir. 2007)....................................................................................8, 9

*Burdick v. Takushi*,
  504 U.S. 428 (1992)..............................................................................................27, 28

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)..............................................................................................12, 15

*Bush v. Gore*,
  531 U.S. 98 (2000)....................................................................................................37

*Cacchillo v. Insmed, Inc.*,
  638 F.3d 401 (2d Cir. 2011)......................................................................................20

*Capitol Records, LLC v. VideoEgg, Inc.*,
  611 F.Supp.2d 349 (S.D.N.Y. 2009)........................................................................10

*Chloe v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010).......................................................................................8

*Credico v. New York State Bd. of Elections*,
  E.D.N.Y. No. 10 CV 4555 (RJD), 2013 U.S. Dist. LEXIS 109737 (June 19,
  2013) .......................................................................................................................18

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005).......................................................................................15

*Deskovic v. City of Peekskill*,
  673 F. Supp. 2d 154 (S.D.N.Y. 2009).......................................................................18

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
  722 F.3d 81 (2d Cir. 2013)..........................................................................................7

iv

| **Cases** | **Page(s)** |
| --- | --- |

*Elsevier, Inc. v. Grossman*,
77 F.Supp.3d 331 (S.D.N.Y. 2015). ECF 13-1, #211 ...............................................................11

*Esshaki v. Whitmer*,
813 F.App'x 170 (6th Cir. May 5, 2020)...............................................................23

*Exxon Mobil Corp. v. Schneiderman*,
316 F.Supp.3d 679 (S.D.N.Y.2018). ECF 13-1, #210 ...............................................................14

*Faiveley Transport Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009)...............................................................26, 27

*Falcone v. Underwriters at Lloyd's London*,
E.D.N.Y. No. 13-CV-5950(JS)(AKT), 2013 U.S. Dist. LEXIS 177017 (Dec.
17, 2013) ...............................................................17, 19

*First Horizon Bank v. Moriarty-Gentile*,
E.D.N.Y. No. 10-CV-00289 (KAM)(RER), 2015 U.S. Dist. LEXIS 165695
(Dec. 10, 2015) ...............................................................10

*Gallagher v. N.Y. State Bd. of Elecs.*,
No. 20 Civ. 5504, 2020 U.S. Dist. LEXIS 138219 (S.D.N.Y. Aug. 3, 2020) .............29, 30, 36

*Griffin v. Roupas*,
385 F.3d 1128 (7th Cir. 2004) ...............................................................28

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408, 104 S.Ct. 1868 (1984)...............................................................7

*Hernandez v. New York State Bd. of Elections*,
S.D.N.Y No. 20-cv-4003, 2020 U.S. Dist. LEXIS 146934 (Aug. 14, 2020)...........................27

*Ill. Bd. of Elecs. v. Socialist Workers Party*,
440 U.S. 173 (1979)...............................................................27

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945)...............................................................12

*JCorps Internatl., Inc. v. Charles & Lynn Schusterman Family Found*,
No. 19-3123, 2020 U.S. App. LEXIS 30898, (Sep. 28, 2020) ...............................................13

*Kermani v. New York State Bd. of Elections*,
487 F.Supp.2d 101 (N.D.N.Y. 2006)...............................................................26

*League of Women Voters v. LaRose*,
No. 2:20-cv-1638, 2020 U.S. Dist. LEXIS 91631 (S.D. Ohio Apr. 3, 2020) ...........................32

**Cases**                                                          **Page(s)**

*Libertarian Party of Conn. v. Merrill*,
No. 3:20-cv-467, 2020 U.S. Dist. LEXIS 113922 (D. Conn. June 27, 2020) .........................29

*Libertarian Party v. Lamont*,
2d Cir. No. 20-2179, 2020 U.S. App. LEXIS 31315 (Oct. 2, 2020) ......................................18

*MacDermid, Inc. v. Deiter*,
702 F.3d 725 (2d Cir. 2012)...............................................................................................13

*Mareno v. Rowe*,
910 F.2d 1043 (2d Cir. 1990)................................................................................................8

*Mays v. LaRose*,
951 F.3d 775 (6th Cir. 2020) ..................................................................................... *passim*

*McDonald v. Bd. of Elec. Comm'rs*,
394 U.S. 802 (1969)...........................................................................................................32

*McNaughton v. Merck & Co.*,
S.D.N.Y. No. 04-CV-8297, 2004 U.S. Dist. LEXIS 30287 (Dec. 17, 2004) .........................17

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) ..................................................................................... *passim*

*Ohio Democratic Party v. LaRose*,
10th Dist. Franklin Nos. 20AP-421, 20AP-428, 2020-Ohio-4664 (Ohio App.
Sep. 29, 2020) ...................................................................................................................25

*Ohio Democratic Party v. LaRose*,
Nos. 20AP-421, 20AP-428, 2020 Ohio App. LEXIS 3523 (Ohio Ct. App.
Sept. 29, 2020) ..................................................................................................................32

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
609 F.3d 30 (2d Cir. 2010)...................................................................................................6

*Phillips v. Girdich*,
408 F.3d 124 (2d Cir. 2005)................................................................................................37

*Price v. N.Y. State Bd. of Elections*,
540 F.3d 101 (2d Cir. 2008)................................................................................................17

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) (per curiam)................................................................................... *passim*

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
___ U.S. ___, 140 S.Ct. 1205 (2020)..................................................................................20

**Cases**                                                                                    **Page(s)**

*Schmitt v. LaRose*,
    933 F.3d 628 (6th Cir. 2019) ...................................................................................28

*Silberberg v. Bd. of Elections of N.Y.*,
    216 F. Supp.3d 411 (S.D.N.Y. 2016).......................................................................22

*Storer v. Brown*,
    415 U.S. 724 (1974)................................................................................................28

*Telebyte, Inc. v. Kendaco, Inc.*,
    105 F.Supp.2d 131 (EDNY 2000) ..........................................................................10

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 659 (2d Cir. 2013).......................................................................................7

*Thompson, et al. v. DeWine*,
    959 F.3d 804 (6th Cir. 2020) .............................................................21, 24, 25, 33

*U. S. Bank Natl. Assn. v. Bank of Am. Natl. Assn.*,
    916 F.3d 143 (2d Cir. 2019).....................................................................................12

*UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc.*,
    660 F.3d 643 (2d Cir. 2011)....................................................................................19

*United States v. Stamps*,
    2018 U.S. Dist. LEXIS 195970 (E.D.N.Y. 2018)..............................................15, 16

*Walden v. Fiore*,
    571 U.S. 277 (2014).................................................................................................13

*Wilson-Phillips v. Metro. Transp. Auth.*,
    S.D.N.Y. No. 18-CV-417 (VEC), 2018 U.S. Dist. LEXIS 194201 (Nov. 14,
    2018) ........................................................................................................................17

*Yang v. Kosinski*,
    960 F.3d 119 (2d Cir. 2020)...........................................................20, 26, 30, 36

**Statutes**                                                                                 **Page(s)**

28 U.S.C. § 1391...............................................................................................................15

28 U.S.C. § 1406(a) ........................................................................................................15

42 U.S.C. § 1983..............................................................................................................8

CPLR § 302.......................................................................................................................7

**Statutes**                                                      **Page(s)**

CPLR § 302(a) ....................................................................................................8

CPLR § 302(a)(1) ........................................................................................8, 10, 11

CPLR § 302(a)(2) ...........................................................................................10, 11

CPLR § 302(a)(3) ...........................................................................................10, 11

CPLR § 302(a)(4) ...................................................................................................11

Ohio Rev. Code § 3501.04 ..................................................................................23, 24

Ohio Rev. Code § 3501.05(CC) ...............................................................................34

Ohio Rev. Code § 3501.05(M) .................................................................................33

Ohio Rev. Code § 3509.03 .......................................................................................34

Ohio Rev. Code § 3509.05 .......................................................................................37

Ohio Rev. Code § 3509.06(D) ...................................................................................5

Ohio Rev. Code § 3509.08(A) ..................................................................................35

Ohio Rev. Code § 3511.02(A)(1) ...............................................................................3

Ohio Rev. Code § 3511.04(B) .................................................................................4, 9

Ohio Rev. Code § 3511.05 .........................................................................................5

Ohio Rev. Code § 3511.09 .................................................................................. *passim*

Ohio Rev. Code § 3511.11(C) .....................................................................................6

Ohio Rev. Code § 3511.021(A) ...................................................................................4

Ohio Rev. Code § 3511.021(A)(1)-(2) .........................................................................3

Ohio Rev. Code § 3511.021(A)(4) .............................................................................6

Ohio Rev. Code §3511.021(B) ...................................................................................6

**Other Authorities**                                                                                     **Page(s)**

Fed. R. Civ. P 20(a) ..........................................................................................................18

Fed.R.Civ.P. 20(a)(2).............................................................................................16, 17, 18

Fed. R. Civ. P. 21 ..............................................................................................................17

U.S. Const., First Amendment .....................................................................................22, 28

U.S. Const., Fourteenth Amendment ........................................................................11, 17, 28

U.S. Const. art. I, § 4...........................................................................................................28

**MEMORANDUM IN SUPPORT**

## I.    INTRODUCTION

Plaintiffs seek a preliminary injunction that would require—for the first time ever and against clear Ohio law—Defendant Ohio Secretary of State Frank LaRose to accept overseas voters' ballots via email or fax. Plaintiffs' request should be denied.

As a threshold matter, this Court does not have jurisdiction over Secretary LaRose. At bottom, the conduct of Secretary LaRose of which Plaintiffs complain—routing absentee ballots through JFK Airport—rests on a fundamental misunderstanding of Ohio law. In Ohio, the Secretary of State does not mail any ballots, absentee or otherwise. It is Ohio's 88 county boards of elections that provide absentee ballots upon request to certain uniformed service members, their families, and overseas citizens under the Uniformed and Overseas Citizens Absentee Voters Act ("UOCAVA")[1] no later than 45 days before the general election. Plaintiffs fail to demonstrate that Secretary LaRose had *any* contact within this District to vest this Court with jurisdiction over him.

In particular, Plaintiffs fail to allege conduct that demonstrates that Secretary LaRose purposefully availed himself of the benefits and privileges of conducting business in the State of New York. He did not. As such, it is neither fair nor reasonable for Secretary LaRose to expect to be haled into court there. Try as they might, Plaintiffs cannot plead around their jurisdictional shortcomings.

If the Court determines that it can exercise jurisdiction over Plaintiffs' motion, the motion should be denied. Importantly, Plaintiffs bring this motion too late. Ohioans have already started

---

[1] "UOCAVA voter" is used throughout to refer to the collective group of uniformed service members, their families, and overseas citizens under the Uniformed and Overseas Citizens Absentee Voters Act. This is consistent with how these voters are referenced in relevant case law. *See, e.g., Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012), and *Mays v. LaRose*, 951 F.3d 775, 783 (6th Cir. 2020). "UOCAVA voter" encompasses the overseas citizens who are the subject of Plaintiffs' case.

voting in the Presidential General Election. UOCAVA voters began returning voted ballots on September 18. Non-UOCAVA voters started returning voted absentee ballots on October 6; in-person absentee voting began on the same day. Ohio's county boards of elections are already processing voted absentee ballots and attending to the innumerable other tasks required of them during the Presidential General Election.

Ohio's boards of elections have no system to process ballots returned via email or fax—regardless if the fax is from the Department of Defense, or directly from the voter. Mandating that boards implement a new, untested system to process ballots, at the worst possible time—during a Presidential General Election—would result in significant administrative burden, confusion, and chaos. The Court should follow *Purcell* and other recent cases that have declined to judicially-mandate changes to election procedure when the election is imminent.

Regardless of their delay, Plaintiffs fail to prove substantial likelihood of success on the merits of their constitutional claims. There is no evidence that the voting rights of an Ohioan have been burdened, much less disenfranchised, as Plaintiffs claim. There is no evidence that a ballot from a UOCAVA Ohio voter will not arrive in time, or that an Ohio voter has been or will be deprived of the opportunity to vote. The only evidence as to Ohio is "concern" from an overseas voter that his ballot might be delayed. But even this voter admits that if he mailed his voted ballot by the end of September, as was his intention, it should arrive a full week before Election Day. In fact, the voted ballot will still be counted even it arrives *ten day*s after Election Day.

At bottom, Plaintiffs' motion is based on multiple layers of speculation: whether mail will be delayed, where it will be routed, whether there are errors in processing. This level of speculation falls far short of the heightened scrutiny necessary for mandatory preliminary injunctive relief. Plaintiffs must show a clear or substantial likelihood of ultimate success on the merits and a strong

2

showing of irreparable injury. Concern that a ballot might not arrive in time does not meet that burden.

For these reasons, dismissal of Plaintiffs' action is mandated and their motion for preliminary injunctive relief should be denied. Alternatively, and assuming this Court has personal jurisdiction over Secretary LaRose (it does not), Plaintiffs' claims against Secretary LaRose should be severed because they fail to meet either of the required conditions for joinder of parties.

## II.    FACTUAL BACKGROUND

### A.    UOCAVA voting in Ohio.

Ohio has long-recognized the unique circumstances faced by UOCAVA voters and offers a variety of accommodations. *See Obama for Am. v. Husted*, 697 F.3d 423, 434 (6th Cir. 2012). These accommodations, which stem from the federal Uniformed and Overseas Citizens Absentee Voting Act and the Military and Overseas Voter Empowerment Act, "are tailored to address the problems that arise from being overseas" and "are based on highly relevant distinctions between service members and the civilian population." *Id*. They include allowing a UOCAVA voter to apply for an absentee ballot electronically and use of a single application for multiple elections. Ohio Rev. Code § 3511.021(A)(1)-(2). They also allow a UOCAVA voter to receive their ballot electronically and early—and over two weeks sooner than others voters. *Id*. Ohio's current accommodations meet the needs of its UOCAVA voters while balancing the state's interests in the orderly administration and security of its elections.

To receive an absentee ballot, a UOCAVA voter must apply for it in writing. Ohio Rev. Code § 3511.02(A)(1); Declaration of Matthew Tlachac ¶ 6. The UOCAVA voter can submit the written application to their county board of elections by mail, facsimile, or email. Ohio Rev. Code § 3511.02(A)(1). The application does not need to be in any particular form, *id*., but there are several forms available. A UOCAVA voter may use a Federal Postcard Application ("FPCA") or

3

the application form prescribed by the Ohio Secretary of State. *Id.* at (A)(2). Alternatively, a relative of a UOCAVA voter may apply for an absentee ballot on behalf of the voter by completing and submitting a form prescribed by the Ohio Secretary of State. *Id*. at (A)(3).

The application window is wide. A UOCAVA voter may submit an application for an absentee ballot starting January 1 of the year of the election for which the ballot is being requested or 90 days before the election, whichever is earlier. *Id.* at (C). The deadline for submitting an application is not until 12:00 p.m. (noon) on the third day before the election. *Id*. For the November 3, 2020 Presidential General Election, the deadline for requesting an absentee ballot is Saturday, October 31, 2020. Tlachac Dec. ¶ 10. As of October 6, 2020, Ohio county boards of elections had received 21,570 applications from UOCAVA voters. *Id.* at ¶ 25.

On the application, a UOCAVA voter may specify how they want to receive their absentee ballot, *i.e.*, by mail, facsimile, or email. Ohio Rev. Code § 3511.021(A). If the UOCAVA voter does not specify a preference, the county board of elections will issue the ballot by mail. *Id*. If a UOCAVA voter applies for an absentee ballot using an FPCA, the application serves as an application for an absentee ballot for every election in that year, unless the voter specifically notes that the application is only for a single election. *Id.* at (A)(2).

To provide a UOCAVA voter with sufficient time to receive, vote, and return their absentee ballot, UOCAVA ballots are issued well in advance of an election. County boards of elections begin issuing ballots to UOCAVA voters who have so applied starting the 46th day prior to Election Day. Ohio Rev. Code § 3511.04(B). For the upcoming Presidential General Election, Ohio county boards of elections began issuing absentee ballots on Friday, September 18, 2020 to every UOCAVA voter who submitted a valid application by that date. Tlachac Dec. ¶ 7. And all

4

UOCAVA voters receive a complete ballot that includes all federal, state, and local candidate and issue contests that appear on the ballot in the voter's Ohio precinct. *Id* at ¶ 12.

### B.    Voting and returning a UOCAVA ballot.

Along with a ballot, a UOCAVA voter receives Instructions (Ohio Secretary of State Form 12-K), an Identification Envelope with Statement of Voter (Ohio Secretary of State Form 12-A), and a personal identification number for the voter to use to track the ballot (Ohio Secretary of State Form 12-J). Tlachac Dec. ¶¶ 11-15. The instructions advise a UOCAVA voter how to mark and return their ballot and how to complete the Identification Envelope with Statement of Voter (Ohio Secretary of State Form 12-A). Like a non-UOCAVA absentee voter, a UOCAVA voter must complete, sign, and return Ohio Secretary of State Form 12-A with the ballot in order for the ballot to be counted. *Id*. at ¶¶ 13, 15; Ohio Rev. Code § 3511.05. The county board of elections compares the information provided by the voter on the Ohio Secretary of State Form 12-A with the information contained in the county board of elections' records to ensure that the voter's date of birth, form of identification, and signature match what is contained in the county board of elections' records. Tlachac Dec. ¶ 14. If the voter's information and signature match, the ballot is counted. *Id*. But, if the information or signature does not match, the UOCAVA voter is notified of the issue by the quickest available means of communication and given an opportunity to fix it. *Id*.; Ohio Rev. Code § 3509.06(D).

A UOCAVA ballot does not need to be received by a county board of elections by Election Day in order to be counted. Instead, the UOCAVA voter must submit the voted ballot for mailing by 12:01 a.m. on the date of the election, and the voted ballot must be received by the county board of elections within ten days after the election. Tlachac Dec. ¶ 18; Ohio Rev. Code § 3511.09. For this Presidential General Election, a ballot must be received by November 13, 2020. Tlachac Dec. ¶ 18. Ohio offers a Centralized Ballot Tracking System for UOCAVA voters to track their ballots.

*Id*. at ¶ 20. A UOCAVA voter can track the status of his or her ballot using the personal identification number provided by the county board of elections to access the system and information regarding their ballot. *Id*.; Ohio Rev. Code §3511.021(B).

A UOCAVA voter cannot return a voted ballot electronically, such as email or fax. Tlachac Dec. ¶ 15; Ohio Rev. Code §§ 3511.021(A)(4), 3511.09. The Instructions that are received with the ballot remind a UOCAVA voter of this fact and state "[y]ou may not return your absent voter ballot to your polling place or transmit your ballot by electronic means (fax or email)." *Id*. If a UOVACA voter does return a voted ballot electronically via email or fax, the ballot cannot be accepted, processed, or counted.  Ohio Rev. Code § 3511.021(A)(4).

Neither a postmark nor postage is required to return a UOCAVA ballot by mail. If a UOCAVA voter is returning his or her ballot through the United States Postal Service ("USPS"), APO/FPO system, or a diplomatic pouch, the voter does not need to pay for or affix postage to the return envelope. Tlachac Dec. ¶ 17. And, a postmark is not required in order for a UOCAVA ballot to be counted. Ohio Rev. Code § 3511.11(C). A county board of elections must count an otherwise valid UOCAVA ballot regardless of whether it contains a timely postmark, a late postmark, or no postmark. Tlachac Dec. ¶ 19.

## III.    THIS MATTER IS NOT PROPERLY BEFORE THIS COURT

### A.    Plaintiffs' Complaint against Secretary LaRose must be dismissed for lack of personal jurisdiction.

#### 1.    Legal standard.

Plaintiffs fail to sufficiently allege –nor can they sufficiently allege– that personal jurisdiction exists over Secretary LaRose. When a defendant challenges personal jurisdiction, the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir.

2010), citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)). Jurisdiction may be general or specific. Where a defendant has "continuous and systematic general business contacts" with the forum state, *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 415, 104 S.Ct. 1868 (1984), the court may exercise "general" jurisdiction over any action brought against that defendant. *Id.* at 414, 104 S.Ct. 1868. Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum." *Id.* at 414, 104 S.Ct. 1868. Plaintiffs do not plead that this Court can exercise general jurisdiction over Secretary LaRose, nor can they: his principal place of business is in Ohio and his only activities are limited to election administration in that state.

As for specific jurisdiction, at the pleading stage, a plaintiff must make a *prima facie* showing that jurisdiction exists. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,* 722 F.3d 81, 84-85 (2d Cir. 2013). The Plaintiffs' *prima facie* showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (internal quotation marks omitted)). Plaintiffs fail to make this required showing.

### 2. Plaintiffs' allegations do not demonstrate sufficient contacts with the State of New York to invoke personal jurisdiction over Secretary LaRose.

Plaintiffs fail to allege that Secretary LaRose had any contact, let alone sufficient contact with the State of New York. In the absence of a federal statute providing for national service of process, for a district court to exercise personal jurisdiction "over a non-domiciliary in a case involving a federal question," the exercise of the jurisdiction must comport with both New York's long arm statute, New York Civil Practice Law and Rules ("CPLR") § 302, and the Due Process

7

Clause. *Chloe*, 616 F.3d 158, 163-166 (2d Cir. 2010); *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990). No federal statute provides for more expansive personal jurisdiction in this case over the Secretary LaRose because 42 U.S.C. § 1983 lacks a provision for service of process. 42 U.S.C. § 1983; *see also Aviner v. "Five J" Jewelers Precious Metals Industry*, S.D.N.Y. 99 Civ. 1800 (KMW), 1999 U.S. Dist. LEXIS 22193, at *5 (Oct. 18, 1999), at *5 (Oct. 18, 1999)) ("42 U.S.C. § 1983 makes no provision for national service of process) citing *Hodgson v. Mississippi Dep't of Corrections*, 963 F. Supp. 776 (E.D. Wis. 1997). Accordingly, "[i]If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Chloe*, 616 F.3d at 164. Here, Plaintiffs' claims fail at the first step.

While New York's long-arm statute, CPLR § 302(a), provides four bases for jurisdiction, Plaintiffs rely only on § 302(a)(1) as the source of personal jurisdiction over Secretary LaRose. ECF 13-1, #211. But, Plaintiffs offer nothing more than speculative and tangential connections between Secretary LaRose and New York, none of which are sufficient to establish personal jurisdiction in this District.

CPLR § 302(a)(1) provides that "a court may exercise personal jurisdiction over any non-domiciliary…who in person or through an agent…transacts any business within the state or contracts anywhere to supply goods or services in the state[.]" Because Secretary LaRose does not transact any business in New York, Plaintiffs fail to establish personal jurisdiction. Under CPLR § 302(a)(1), a court may exercise personal jurisdiction over a defendant if (1) the defendant "transacts business" in New York; and (2) the plaintiffs' cause of action arises from such a transaction. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007). A defendant must "purposefully avail" itself of the privilege of conducting activities within New York, and there

8

must be "some articulable nexus between the business transacted [in New York] and the cause of action sued upon." *Id*. at 249 (quoting *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citations omitted)). "A connection that is 'merely coincidental' is insufficient to support jurisdiction." *Id.* (citation omitted).

Plaintiffs' only basis for this Court's exercise of personal jurisdiction over Secretary LaRose is that Ohio's absentee ballots are mailed through the USPS, which *may* be routed through JFK Airport. ECF 1, #4, ¶¶ 8-10; ECF 13-1, #211-212. Plaintiffs' Complaint and Motion for Preliminary Injunction do not differentiate between the Defendants and generally allege that this Court has personal jurisdiction over all Defendants. *Id*. This is so, Plaintiffs allege, because "election officials in each State at issue here send thousands of ballots through John F. Kennedy International Airport ("JFK") to voters abroad, and thousands of ballots return through JFK." *Id*. Plaintiffs conclude that "all Defendants have sent and received likely thousands upon thousands of ballots through the International Service Center at JFK Airport (in this District)." ECF 13-1, #210. But, Plaintiffs do not and cannot allege that Secretary LaRose specifically directed any absentee ballots to New York, New York voters, or New York residents. Nor can they—Secretary LaRose does not have the statutory authority to do so. In Ohio, each county board of elections processes and mails absentee applications to UOCAVA voters under Ohio Revised Code § 3511.04(B). And, even assuming these allegations are true, the conduct complained of cannot vest this Court of jurisdiction over Secretary LaRose:  that Ohio's absentee ballots may be routed by the USPS through JFK Airport is far from establishing that Secretary LaRose *purposefully availed* himself of New York laws.

"Purposeful activities" are "volitional acts" by which a defendant "avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections

9

of its laws." *First Horizon Bank v. Moriarty-Gentile*, E.D.N.Y. No. 10-CV-00289 (KAM)(RER), 2015 U.S. Dist. LEXIS 165695, at *14 (Dec. 10, 2015) (citations and quotation marks omitted). "[P]urposeful availment" is the "overriding criterion" necessary to establish personal jurisdiction under § 302(a)(1). *Capitol Records, LLC v. VideoEgg, Inc.*, 611 F.Supp.2d 349, 358 (S.D.N.Y. 2009) (citations and quotation marks omitted). Plaintiffs' allegations as to Secretary LaRose's contacts to New York fall far short of this standard. Secretary LaRose did not actively seek or target New York or any of its voters with mailings. Any contact by Secretary LaRose with New York was not purposeful or volitional: that a piece of Ohio mail may be routed through a particular state cannot be the basis for personal jurisdiction. If this were the rule, then Secretary LaRose would be haled into court in every state where the USPS routes Ohio's absentee ballots.

Plaintiffs' reliance on inapposite authority does not alter this conclusion. *Telebyte, Inc. v. Kendaco, Inc.,* 105 F.Supp.2d 131, 135 (EDNY 2000), does not even address the prong of New York's long-arm statute that Plaintiffs argue confers personal jurisdiction here, § 302(a)(1). ECF 13-1, #211. Instead, *Telebyte* addresses unrelated prongs at §§ 302(a)(2) and 302(a)(3). *Telebyte, Inc.*, 105 F.Supp.2d, at 134 ("Telebyte contends that personal jurisdiction exists over Kendaco pursuant to two sections of New York's long arm statute: (i) commission of a tortious act within New York under CPLR § 302(a)(2), or (ii) commission of a tortious act outside New York with consequences within New York under CPLR § 302(a)(3)."). Here, of course, Plaintiffs make no allegations that Secretary LaRose committed any tortious act within or outside New York. This case is inapplicable here.

Regardless, even if applicable, it offers no help to Plaintiffs. In that case, even the intentional mailing of a brochure to a New York resident was insufficient to confer personal jurisdiction over a Washington company. *Telebyte*, 105 F.Supp.2d at 135. The court held that the

10

purpose of that brochure mailing, to allow plaintiff to resolve a trademark conflict, "cannot be considered a solicitation for products and services for the purposes of satisfying CPLR § 302(a)(2)." *Id.* Here, of course, Plaintiffs do not claim that Secretary LaRose intentionally targeted *any* mailings whatsoever to any New York address sufficient to confer jurisdiction.

Similarly inapposite is Plaintiffs' reliance on *Elsevier, Inc. v. Grossman*, 77 F.Supp.3d 331, 344 (S.D.N.Y. 2015). ECF 13-1, #211. There, plaintiffs alleged a fraudulent business scheme by which some of the subscriptions that defendants ordered as part of the alleged scheme were delivered to an address in New York. *Elsevier, Inc.*, 77 F.Supp.3d at 344. This activity, the court held, was both purposeful *and* substantially related to the claims against defendants. *Id.* at 345. But, again, Plaintiffs fail to allege such purposeful activity as to Secretary LaRose here. Because Secretary LaRose does not transact business within New York under § 302(a)(1), this Court cannot exercise personal jurisdiction over him.

The remaining bases for conferring long arm jurisdiction over Secretary LaRose are similarly foreclosed. Both § 302(a)(2) and (a)(3) confer personal jurisdiction in cases of tortious activity either within or outside the state. Plaintiffs do not allege that Secretary LaRose was physically present in New York or that he committed a tort. Finally, Plaintiffs do not allege that Secretary LaRose "owns, uses or possesses any real property situated within the state" such that he would be subject to jurisdiction under CPLR § 302(a)(4).

Because there is no basis for personal jurisdiction over Secretary LaRose under New York's long-arm statute, the Court need not reach the due process inquiry. And, if reached, the appropriate personal jurisdiction analysis is whether personal jurisdiction is proper under the Due Process Clause of the Fourteenth Amendment. It is not.

**3. Secretary LaRose does not have meaningful contacts, ties, or relations with the State of New York such that the exercise of personal jurisdiction would be fair and reasonable.**

The exercise of personal jurisdiction over Secretary LaRose would violate the Due Process Clause. A federal court may satisfy the constitutional requirements for specific jurisdiction by a showing that the defendant has "minimum contacts" with the forum state such that imposing a judgment would not "offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quotation and internal citations omitted). To establish these minimum contacts with the forum, a nonresident defendant must do some act by which it "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)). Although a defendant's contacts with the forum state may be "'intertwined with [its] transactions or interactions with the plaintiff or other parties . . .[,] a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.'" *U. S. Bank Natl. Assn. v. Bank of Am. Natl. Assn.*, 916 F.3d 143, 150-151 (2d Cir. 2019) (quoting *Walden v. Fiore*, 571 U.S. 277, 1123 (2014)). Indeed, it is "'insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction.'" *Id.* (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 337 (2d Cir. 2016)).

Here, the analysis is straightforward. Plaintiffs have not alleged a single activity performed by Secretary LaRose that is actually directed at the State of New York. Plaintiffs allege that Secretary LaRose has personal jurisdiction "because of the[ ] choice to commit ballot mail to Overseas Americans to the United States Postal Service, and through the JFK International Service Center." ECF 13-1, #212. But, Secretary LaRose does not mail absentee ballots—that statutory

12

obligation resides with Ohio's 88 county boards of elections. Regardless, Secretary LaRose did not actively seek or target New York or any of its voters with mailings.

Any mailings of absentee ballots by Ohio's county boards of elections, directed to UOCAVA voters, and incidentally routed through a particular city's airport by the USPS, a third party, is insufficient to establish jurisdiction in this District. Rather, a lawsuit "must arise out of contacts that the defendant *himself* creates with the forum." *Walden v. Fiore*, 571 U.S. at 284 (emphasis in original) (citation and quotation marks omitted). Secretary LaRose has created no such contacts with New York. Recently, and in a fact pattern with significantly more purposeful New York contacts that in the instant case, the Second Circuit Court of Appeals found that plaintiffs failed to establish the minimum contacts required for due process. In *JCorps Internatl., Inc. v. Charles & Lynn Schusterman Family Found.*, plaintiffs did not satisfy the minimum contacts requirement because "there are no allegations in the complaint or in [plaintiffs'] declaration that Defendants directly contacted New York-based individuals, solicited donations in New York, or held volunteering events in the state." 2d Cir. No. 19-3123, 2020 U.S. App. LEXIS 30898, at *7-8 (Sep. 28, 2020). Despite allegations of hacking into a New York account, the court held that plaintiffs "alleged no facts showing that [defendant] purposefully availed himself of the privileges of conducting computing activities in New York." *Id.; see also MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012) (due process permitted personal jurisdiction in Connecticut because defendant "knew that the email servers she used and the confidential files she misappropriated were both located in Connecticut" and so could be said to have "purposefully avail[ed] herself of the privilege of conducting computer activities in Connecticut"). To be sure, there is no evidence here to support any allegation that Secretary LaRose purposefully availed

13

himself of any activities in the New York, even assuming the USPS routed a piece of mail through a New York airport.

Further, Plaintiffs' causes of action do not arise out of forum-related activity. Plaintiffs' claims generally arise from the regulation by Secretary LaRose of elections *in the state of Ohio* (*see e.g.*, ECF 1, ¶¶ 70-72) and are insufficient to demonstrate purposeful availment of the privileges of conducting business in this forum. Here, Plaintiffs fail to establish any connection between Secretary LaRose and New York –and certainly not with respect to its particular claims against him.

Finally, this Court's exercise of personal jurisdiction over Secretary LaRose would not be fair or reasonable because he has done nothing to avail himself of the privilege of conducting activities in New York. These facts are in stark contrast to Plaintiffs' citation to *Exxon Mobil Corp. v. Schneiderman*, 316 F.Supp.3d 679, 697 (S.D.N.Y.2018). ECF 13-1, #210. The plaintiffs in *Exxon* supported their claims that the Southern District of New York had jurisdiction over the Massachusetts Attorney General with allegations that the AG attended a New York conference and press event, where she and "several other attorneys general formalized their conspiracy against Exxon at the March 29, 2016, conference, which they then announced as the AGs United for Clean Power." *Exxon Mobil*, 316 F.Supp.3d at 697. These allegations satisfied both New York's long-arm statute and the Due Process Clause. *Id.* Plaintiffs raise no such allegations here. Nor does a suit filed by the State of New York against the President and other federal officials in the District of Columbia have any bearing on the jurisdictional deficiencies in Plaintiffs' complaint. ECF 13-1, #209, citing *New York v. Trump*, 2020 U.S. Dist. LEXIS 177083 (D.D.C. Sep. 27, 2020).

Secretary LaRose has not and does not conduct activities in New York or direct his conduct at New York. In fact, the very purpose of the office of the Ohio Secretary of State is to regulate

14

the administration of elections *in Ohio*. Secretary LaRose had no reason to expect he would be haled into court in New York. *Burger King,* 471 U.S. at 474-75. He should not have been.

**B.      Plaintiffs' Complaint must be dismissed because venue is not proper in this District.**

"A civil action may be brought in . . . (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . [or] (3) if there is no district in which an action may otherwise be brought . . . any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. § 1391. "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Here, venue is not proper in New York; because this Court also lacks personal jurisdiction, Plaintiffs' Complaint should be dismissed.

"'Substantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432-433 (2d Cir. 2005). The focus of the substantial part of events inquiry is on the actions or omissions of the defendant. *Id.* at 432.

As demonstrated above, the conduct complained of in Plaintiffs' Complaint—interpretation and implementation of Ohio's absentee ballot laws—occurred exclusively in Ohio. And the impact of the alleged conduct (if any) only relates to Secretary LaRose's conduct in Ohio. Plaintiffs' citation to *United States v. Stamps*, 2018 U.S. Dist. LEXIS 195970 at *6 (E.D.N.Y. 2018), does not help their cause. ECF 13-1, #210. Unlike the Plaintiffs here, the prosecutors in that case plead significant "operative facts" that occurred in the Eastern District of New York in comparison to any other jurisdiction. E.D.N.Y. No. 18-cv-1106 (BMC), 2018 U.S. Dist. LEXIS

15

195970, at *6 (Nov. 16, 2018). This Court found that "the allegedly fraudulent mail solicitations not only traveled out of and into the United States through the United States Postal Service International Service Center at JFK airport, but were delivered to *thousands* of alleged victims in the *Eastern District of New York*." *Id.* (emphasis added). "More importantly," this Court noted, "the Government alleges that defendants received responses and payments from hundreds of victims *in this district* and cashed checks processed against bank accounts *in this district*." *Id.* (emphasis added). Indeed, "defendants do not allege that they sent a comparably number of solicitations to Arizona or any other jurisdiction." *Id.* (emphasis added).

Plaintiffs here do not come close to raising similar allegations. Far from alleging any operative facts that occurred in this District, such as sending thousands of mail solicitations, receiving hundreds of payments, or cashing checks in this district, Plaintiffs only allege that absentee ballots *may* have been routed through JFK Airport by the USPS. This District is not an appropriate venue for Plaintiffs' claims against Secretary LaRose.

Because all of the alleged events giving rise to Plaintiffs' claims occurred in Ohio, venue is not proper in New York and Plaintiffs' Complaint should be dismissed.

### C.   Alternatively, Plaintiffs' claims against Secretary LaRose should be severed.

Because Secretary LaRose is not a proper party to this action, the claims against him should be severed under Fed.R.Civ.P. 20(a)(2). Parties may be joined as defendants in a single action if (1) "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences;" and (2) "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). As to the first requirement, "courts are to look to the logical relationship between the claims and determine 'whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one

16

lawsuit.'" *Falcone v. Underwriters at Lloyd's London*, E.D.N.Y. No. 13-CV-5950(JS)(AKT), 2013 U.S. Dist. LEXIS 177017, at *4-5 (Dec. 17, 2013) (citations and quotation marks omitted). As to the second requirement, "commonality, the overlap in questions of law or fact must be 'substantial' in order for joinder to be appropriate.'" *Wilson-Phillips v. Metro. Transp. Auth.*, S.D.N.Y. No. 18-CV-417 (VEC), 2018 U.S. Dist. LEXIS 194201, at *4-5 (Nov. 14, 2018) (citation omitted).

Both conditions must be met for joinder to be proper. *See McNaughton v. Merck & Co.*, S.D.N.Y. No. 04-CV-8297, 2004 U.S. Dist. LEXIS 30287, at *2-3 (Dec. 17, 2004) (holding that joinder of defendants was improper where only one of the two preconditions of Rule 20(a)(2) was met). Here, Plaintiffs fail to meet either of these conditions, as they must, to show that Secretary LaRose is properly joined as a defendant. Accordingly, the claims against him should be severed. Fed. R. Civ. P. 21 ("The court may also sever any claim against a party.").

First, Plaintiffs' claims do not arise out of the same transaction or occurrence. The seven state-specific election statutes that Plaintiffs challenge are different for every state, enacted under different circumstances, and at different times. More importantly, each election statute is tailored to address each respective state's unique election administration interests. Each state's statutory election regime, therefore, constitutes a separate transaction and occurrence for purposes of Fed. R. Civ. P. 20(a)(2).

This much is clear from the constitutional standard by which states' election regimes are often tested. Courts evaluate challenges to state election laws under the *Anderson-Burdick* framework. *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 108-109 (2d Cir. 2008). The level of scrutiny that courts apply depends on the severity of the burden state law imposes on First and Fourteenth Amendment rights. *Id.* "In weighing the 'character and magnitude' of a plaintiff's

17

asserted injury against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' courts take into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Credico v. New York State Bd. of Elections*, E.D.N.Y. No. 10 CV 4555 (RJD), 2013 U.S. Dist. LEXIS 109737, at *52 (June 19, 2013) citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Undertaking this analysis requires an evaluation of the burden on every specific plaintiff's right to vote. *See Libertarian Party v. Lamont*, 2d Cir. No. 20-2179, 2020 U.S. App. LEXIS 31315, at *17 (Oct. 2, 2020) (noting that "the evidence demonstrates that petitioning was possible even under the challenging conditions in the State of Connecticut[ ]" because Connecticut's laws "impose only a reasonable, nondiscriminatory burden.")

To be sure, the *Anderson-Burdick* inquiry requires a state-specific analysis weighing any injuries demonstrated by plaintiffs against each state's "precise interests." And, undoubtedly, the plaintiffs' "character and magnitude of the asserted injury" and the states' "precise interests" will likely diverge for every respective state to account for their state-specific election administration procedures. Accordingly, each of Plaintiffs' claims against each state's election laws will require a separate state-specific analysis. These claims are not "logically connected" such that they constitute the same transaction or occurrence under Fed. R. Civ. P. 20(a)(2).

For these reasons also, there is no common question of law or fact as required by the second prong of Fed. R. Civ. P. 20(a)(2). Here, there are no allegations of any factual overlap between and among any of the named Defendants. "In the absence of a connection between Defendants' alleged misconduct, the mere allegation that Plaintiff was injured by all Defendants 'is not sufficient [by itself] to join unrelated parties as defendants in the same lawsuit pursuant to Rule 20(a).'" *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 167-168 (S.D.N.Y. 2009) (quoting *Pergo, Inc. v. Alloc, Inc.*, 262 F. Supp. 2d 122, 128 (S.D.N.Y. 2003)). Plaintiffs allege that each

respective state's election laws unlawfully burdened them individually. There is no argument that the defendants acted in concert or together to engage in allegedly unlawful conduct.

Any argument that these claims arise from common facts as a result of the onset of the pandemic and allegations of increased return of election mail at JFK Airport (ECF 1, ¶¶ 8-10; 55-61), must fail. This District has squarely rejected similar generalized arguments in lawsuits seeking insurance coverage for property damage caused by Superstorm Sandy. *Falcone*, 2013 U.S. Dist. LEXIS 177017, at *5-6. The fact that one natural disaster damaged each of the plaintiffs' properties did not satisfy the commonality requirement: "[t]he claims involve entirely different factual and legal issues, including each property's respective condition and location before the storm, the value of the properties, and the extent of damage sustained." *Id.* (quotation and citation omitted).

Akin to this line of cases, with respect to each state, Plaintiffs will require different evidence relating to the character and magnitude of their injury as a result of each state's election law. Plaintiffs' claims will also require particularized evidence of the particular burden resulting from each respective state's law. Any burdens will have to be weighed against each state's particularized interest in its election regime. Because "the only material commonalities between Plaintiffs' claims" are that Plaintiffs are burdened by pandemic and mail conditions and that "Plaintiffs present similar legal theories against common defendants[,]" Plaintiffs fail to satisfy the common transaction or occurrence requirement. *Id.* at *6-7. Accordingly, and in the event this Court does not dismiss Plaintiffs' claims against Secretary LaRose, these claims should be severed.

## IV. PLAINTIFFS HAVE NOT DEMOSTRATED ENTITLEMENT TO A MANDATORY PRELIMINARY INJUNCTION.

### A. Legal standard.

In any case a preliminary injunction is an "extraordinary remedy." *UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011). But here, Plaintiffs ask for even more

19

than that—they ask for a mandatory injunction to change the status quo. Plaintiffs must therefore meet an even higher burden. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011). When "the movant is seeking to modify the status quo by virtue of a mandatory preliminary injunction (as opposed to seeking a prohibitory preliminary injunction to maintain the status quo), or where the injunction being sought will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits, the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits." *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020). A mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo*, 638 F.3d at 406. The movant must also show that the "balance of hardships tip[s] decidedly toward the party requesting the preliminary relief." *Id*.

> **B.**   **The Court should follow the *Purcell* doctrine and decline to change election rules on the eve of the General Election.**

Plaintiffs ask this Court to do what courts have been resoundingly unwilling to do and cautioned against:  change an election procedure right before an election, or as here, after voting has already started. It is well-settled that the public interest does not favor the alteration of election processes in the weeks leading up to an election. *Purcell v. Gonzalez,* 549 U.S. 1 (2006) (per curiam). This spring the Supreme Court stayed a district court's injunction that changed the status quo and extended the deadline by which absentee ballots in Wisconsin were to be mailed and postmarked. *Republican Nat'l Comm. v. Democratic Nat'l Comm.,* ___ U.S. ___, 140 S.Ct. 1205, 1207 (2020). The Court stated that it "repeatedly emphasized that lower courts should ordinarily not alter the election rules on the eve of an election." *Id*., citing *Purcell,* 549 U.S. at 4-5.

Precedent could not be clearer—or more recent—in this regard. Just this week the Supreme Court cited *Purcell* when it stayed yet another injunction issued on the eve of the election, this one enjoining South Carolina's requirement that an absentee ballot be witnessed. *Andino, et al. v. Middleton, et al.,* 592 U.S. ____ (2020) (Oct. 5, 2020). So too did the Ninth Circuit. In *Arizona Democratic Party, et al., v. Hobbs* the district court enjoined Arizona law that requires early voters to have signed their ballots by 7:00 p.m. *and* ordered Arizona to create and implement an entirely new procedure that would give voters who failed to sign their ballots up to five days after voting ended to correct the error. 9th Cir. Nos. 20-16759, 20-16766, 2020 U.S. App. LEXIS 31677 (Oct. 6, 2020). Staying the district court's order, the Ninth Circuit recognized that "the public interest is well served by preserving Arizona's existing election laws, rather than by sending Arizona scrambling to implement and to administer a new procedure for curing unsigned ballots at the eleventh hour." *Id.* at *8.

The Sixth Circuit recently applied similar logic when it stayed a district court order enjoining Ohio law as it relates to gathering and submitting petition signatures and requiring the State to develop and implement an entirely new online process for doing so. *Thompson, et al. v. DeWine,* 959 F.3d 804 (6th Cir. 2020). The court stated:

> The broader point is that the federal Constitution provides States-not federal judges-the ability to choose among many permissible options when designing elections. And because that's where the decision-making authority is, federal courts don't lightly tamper with election regulations. These concerns are magnified here where the new election procedures proffered by Plaintiffs threaten to take the state into uncharted waters. It may well be that the new method for fathering signatures and verifying them proposed by Plaintiffs (using electronic signatures gathered online by third parties and identified by social security number) will prove workable. But they may also pose serious security concerns and other, as yet unrealized, problems. So the decision to drastically alter Ohio's election procedures must rest with the Secretary of State and other election officials, not the court.

*Id*. at 812.

21

The district court applied the same rationale in *Silberberg v. Bd. of Elections of N.Y.* when it refused to enjoin a New York statute prohibiting a person from showing a ballot that is prepared for voting to any other person. 216 F. Supp.3d 411 (S.D.N.Y. 2016). There, the plaintiffs sought to enjoin the law on First Amendment grounds, as it barred them from taking "selfies" with their ballots and posting the marked ballots on social media. *Id.* at 414. In denying the injunction the Court noted that although the statute had been on the books "longer than anyone has been alive," the plaintiffs waited until just 13 days before a presidential election to file the action. *Id.* at 415. Relying on Sixth Circuit precedent, the court stated that "'[w]hen an election is 'imminent' and when there is 'inadequate time to resolve factual disputes' and legal disputes, courts will generally decline to grant an injunction to alter a State's established election procedures." *Id.* at 420 (quoting *Crookston v. Johnson,* 841 F.3d 396, 398 (6th Cir. 2016) (quoting *Purcell,* 549 U.S. at 5-6). The court recognized that enjoining enforcement just days before the election "would seriously disrupt the election process," as poll workers had already been trained on existing law and any change to those processes would "wreak havoc on election-day logistics." *Id.* at 421. Before granting the extraordinary remedy of an injunction "'courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* at 422 (quoting *Winter v. NRDC, Inc.,* 555 U.S. 7, 24 (2008)). Balancing the competing interests presented, the court held that public interest in orderly elections outweighed plaintiffs' interest in taking and posting ballot selfies. *Id.*

Here, Plaintiffs seek to sow the same type of disruption rejected in *Silberberg*. And they are doing so entirely too late. Ohio Revised Code § 3511.09 (previously part the General Code) has been in effect and has required that UOCAVA ballots be returned via U.S. mail since 1947. Ohio General Code § 4785. SB9 122 v. 103. Nonetheless, Plaintiffs waited until *after* UOCAVA

22

ballots were printed (with return instructions) and mailed to challenge it. Simply put, Plaintiffs waited entirely too long to bring this action and there is insufficient time to create, out of whole cloth, a new procedure for accepting UOCAVA ballots via email and fax.

Though Plaintiffs do not seem to care about this precedent, this Court must. Courts have routinely—and very recently—rejected similar requests to disrupt the status quo so close to an election. And, they have rejected such requests when granting them would result in federal courts, rather than the states, dictating how to conduct elections. In *Esshaki v. Whitmer* political candidates challenged two Michigan laws that required a certain number of signatures to gain ballot access, claiming that Michigan's COVID-19 orders prevented them from collecting the requisite number. 813 F.App'x 170, 171 (6th Cir. May 5, 2020). The district court enjoined the ballot access provisions *and* re-wrote the requirements for gaining access. *Id.* On appeal, the Sixth Circuit upheld the core injunction, but reversed the district court's re-writing of Michigan's ballot access laws, stating "[s]imply put, federal courts have no authority to dictate to the states precisely how they should conduct their elections." *Id.* at 172. The court held that "[t]his compulsory aspect of the preliminary injunction was not justified….This is the States' constitutionally protected right." *Id.* It ruled that "the federal court cannot impose such specific manner-of-election requirements on a State without breaching the express delegation of authority in the Constitution." *Id.* at 172-173.

### C.     The balance of hardships weighs against granting the injunction.

The impact of Plaintiffs' delay cannot be understated. Plaintiffs are asking this Court to order Secretary LaRose to either establish an email system for accepting UOCAVA ballots, or to accept ballots through the Department of Defense Fax ballot system. ECF 1, #28, *Prayer for Relief,* ¶ b. But that is not how UOCAVA ballots are, or ever have been, accepted in Ohio, and there is no procedure or mechanism for implementing such a fundamental change now. Tlachac Dec. ¶¶ 35-38. That is, though Secretary LaRose is Ohio's chief election officer, Ohio Rev. Code §

3501.04, Ohio is a "bottom up" state, meaning that elections are administered at the local level by each of Ohio's 88 county boards of elections. Tlachac Dec. ¶ 5. Each board has its own fax and email network. *Id.* So, it is not (as Plaintiffs seem to suggest) that there is one email address or fax number to which UOCAVA ballots could be sent under Plaintiffs' plan. There are 88 of them.

Further, each board has already sent UOCAVA ballots that contain specific instructions to return the ballot *by mail.* Tlachac Dec. ¶ 15. To change those instructions now would require 88 boards of elections to create and implement an entirely new procedure for accepting emailed or faxed UOCAVA ballots *and* figure out a way to inform UOCAVA voters of the new procedure. *Id.*, ¶¶ 35-38. The public interest is never served by pushing boards into such uncharted waters at this late stage in the election cycle. *See Thompson,* 959 F.3d at 812. This says nothing of the voter confusion created by sending pre-printed mailing instructions to voters only to later contradict them with instructions for an entirely different process. *See Purcell,* 549 U.S. at 4-5 (recognizing that court orders can themselves result in voter confusion and the consequent incentive to remain away from the polls, a risk that increases as the election draws closer).

Further, this entirely new and unanticipated burden on Ohio boards would be on top of the countless other tasks that they must complete in the run-up to Election Day while absentee voting in-person and by mail is already underway in Ohio. Boards are processing absentee ballot applications. Tlachac Dec. ¶¶ 7-14. They are sending out absentee ballots. *Id*., ¶¶ 9-11. They are administering Ohio's 28 days of early-in person voting. *Id*., ¶ 22. In staffing the early voting area, boards must devote resources to crowd control, checking in and assisting voters, and monitoring electioneering activities. *Id.*, ¶ 23. And Presidential General Elections are the busiest elections for early in-person voting. *Id.*, ¶ 23. Boards are also recruiting and training poll workers (a particularly difficult task this year). *Id.*, ¶ 26. And, they are gearing up for Election Day. *Id.*, ¶¶ 26-34. Simply

24

put, the existing burden on boards is immense and in the context of *Ohio* election administration, Plaintiffs' requested relief is simply not do-able. *Id.*, ¶¶ 35-38. Plaintiffs cannot offer any evidence to the contrary. But even if they tried, none of Ohio's boards of elections—which would actually implement the requested relief—are before this Court.

But even if a board were present, Plaintiffs' requested relief should still fail because Ohio's Tenth District Court of Appeals *and* the Sixth Circuit Court of Appeals recently rejected similarly unreasonable requests. In *Thompson,* the Sixth Circuit reversed the district court's order which required Ohio to create and implement an entirely new online system for gathering and submitting petitions signatures. 959 F.3d at 806. And in *Ohio Democratic Party v. LaRose,* Ohio's Tenth District Court of Appeals reversed a trial court's order requiring Secretary LaRose to accept non-UOCAVA absentee ballot applications by email or fax. *Ohio Democratic Party v. LaRose*, 10th Dist. Franklin Nos. 20AP-421, 20AP-428, 2020-Ohio-4664, ¶ 1 (Ohio App. Sep. 29, 2020). In so doing, the court considered the unrebutted evidence of harm to the boards of elections, and as a result the general public, caused by issuing an injunction so close to the election. *Id.* The court noted that the injunction did not preserve the status quo, it disrupted it, which is precisely what the Supreme Court has warned courts not to do. *Id.*, ¶ 82, citing *Republican Natl. Commt. v. Democratic Natl. Commt.*, ____ U.S. ___, 140 S.Ct. 1205 (2020); *Purcell,* 549 U.S. 1 (per curiam).

Plaintiffs are asking this Court to disrupt the status quo that has existed since 1947 and to re-write Ohio law. They do so while exhibiting no understanding of how elections work in Ohio and the significant burden that their relief would impose on boards of elections and orderly election administration. UOCAVA ballots have been mailed. Early voting has started. Changing course in any direction now runs afoul of the Supreme Court precedent that was reaffirmed just this week. Their request for injunctive relief must be denied.

25

**D.      Plaintiffs have not shown any harm, much less the required "strong showing" of irreparable harm.**

Contrary to Plaintiffs' contention, they *must* demonstrate irreparable injury in the absence of preliminary injunctive relief. The "showing of irreparable harm" is the "single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). And, because Plaintiffs are seeking a mandatory preliminary injunction, they must make a "strong showing" of irreparable harm. *Yang*, 960 F.3d at 128. Even in the context of constitutional challenges, irreparable harm is not automatically presumed. Indeed, in *Yang*, where violation of constitutional rights related to the primary election were at issue, the court noted that the movant of a preliminary injunction "*must* establish" irreparable harm. *Id*. fn. 33 (emphasis added). Regardless, harm can only be presumed if the movant makes a clear showing of substantial likelihood of success on the merits. *See, e.g., Kermani v. New York State Bd. of Elections*, 487 F.Supp.2d 101, 107 (N.D.N.Y. 2006). As addressed in Section (E) below, Plaintiffs do not meet that burden.

The only evidence Plaintiffs offer as to Ohio is the declaration of Michael Fields Maniates. Mr. Maniates states that he intended to mail his ballot from Singapore to the U.S. on September 28. Maniates Dec. ¶ 3. If Mr. Maniates did mail his ballot on that date, or on any date until now, he has already voted and could not email or fax his ballot should the Court grant Plaintiffs' requested relief. Mr. Maniates would be unharmed should the injunction not issue.

Mr. Maniates also states that it could take four weeks for his ballot to be delivered from Singapore to the United States. *Id*. ¶ 5. Thus, if Mr. Maniates mailed his ballot on September 28, by his own calculation, his ballot will arrive on or about October 26, a full week before Election Day. With the 10-day cushion given to UOCAVA voters by the Ohio General Assembly, Mr. Maniates has an additional two-and-a-half weeks for his ballot to arrive. If Mr. Maniates did not

26

mail his ballot on September 28, but waited until a later date, or not at all, any harm is a result of his own delay.

While Mr. Maniates has "concerns" about his ballot arriving on time, concerns do not amount to a strong showing of irreparable harm. Any alleged harm related to what happens to Mr. Maniates' ballot is based on multiple layers of speculation: international mail *might* be delayed, mail *might* be routed through JFK Airport, JFK Airport *might* have processing errors, and ballots *might* not arrive in time.

Injury that is based on some "remote" or "speculative" event falls short of the strong showing required to prove entitlement to a mandatory preliminary injunction. *Hernandez v. New York State Bd. of Elections*, S.D.N.Y No. 20-cv-4003, 2020 U.S. Dist. LEXIS 146934, *39 (Aug. 14, 2020) (noting that while "elections are not risk-free endeavors," plaintiffs must show that threats to ballot accessibility "are more than 'remote' or 'speculative'"), citing *Faiveley*, 559 F.3d at 118. Plaintiffs here fail to show that any injury to Mr. Maniates, the sole Ohio plaintiff, goes beyond speculation. Because irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction," *Faiveley*, 559 F.3d at 118, and Plaintiffs have not come close to meeting the heightened standard necessary for mandatory preliminary injunctive relief, Plaintiffs' motion should be denied.

**E.      Plaintiffs fail to show substantial likelihood of success on the merits of their constitutional claims.**

***Anderson-Burdick standard.***  The right to vote is, of course, "of the most fundamental significance under our constitutional structure." *Ill. Bd. of Elecs. v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). But the right to vote does not entail the right to vote at any time and in any manner of a voter's choosing. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). The Constitution entrusts the states with the authority to prescribe "the Times, Places and Manner of holding

Elections," U.S. Const. art. I, § 4, and the Supreme Court has characterized this authority as "substantial." *Storer v. Brown*, 415 U.S. 724, 730 (1974). This makes sense. An unregulated election system breeds "chaos," encourages fraud, and undermines confidence in electoral outcomes. *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004). Accordingly, states "may without transgressing the Constitution impose extensive restrictions on voting." *Id.*

But regulations can go too far when they unduly burden the right to vote. *Mays v. LaRose*, 951 F.3d 775, 783 (6th Cir. 2020). To strike a balance between necessary electoral regulations and the right to vote, courts have developed a tiered system to evaluate election laws. When considering challenges to state election laws under the First and Fourteenth Amendments, the Court must first weigh the "character and magnitude" of the asserted injury to the rights protected by those amendments, *i.e.*, the right to vote. *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). The level of scrutiny applied to the challenged law depends on the magnitude of its burden on voting.

Once a court has established a regulation's burden on voting, it must select the appropriate level of scrutiny. Reasonable and non-discriminatory restrictions on voting receive what amounts to rational-basis review. *Mays*, 951 F.3d at 784. The "'State's important regulatory interests are generally sufficient to justify' these restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). On the other hand, a severe burden on voting, "such as exclusion or virtual exclusion from the ballot," receives strict-scrutiny review, and the regulation must advance a compelling State interest. *Schmitt v. LaRose*, 933 F.3d 628, 639 (6th Cir. 2019).

Many election laws fall somewhere in the middle. These laws impose a burden on voting that falls short of virtual exclusion but affects at least some voters' ability to vote. In these cases, the court must weigh the burden on voting against "the precise interests put forward by the State

28

as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Mays*, 951 F.3d at 784 (quotation marks omitted). Under this flexible form of intermediate scrutiny, the State's interest in "orderly election administration," when supported by evidence, justifies even a "moderate" burden on voting. *Id.* at 791.

 ***Burden on voting.*** Here, Plaintiffs cannot even establish a "moderate" burden on voting, much less a "severe" one. Articulating any burden on voting—whether moderate or severe— requires some *evidence*, and Plaintiffs have not produced or even alluded to any such evidence here. Perhaps because they have no evidence, Plaintiffs encourage the Court to "effectively skip the first stage of analysis (determining the burden/level of scrutiny)" under *Anderson-Burdick*. ECF 13-1, # 216. But the caselaw does not support Plaintiffs here:  the first step in *Anderson-Burdick* is to "look to the burden the State's regulation imposes on the right to vote." *Mays*, 951 F.3d at 784.

 A severe burden on voting means exclusion or virtual exclusion from the ballot. *Libertarian Party of Conn. v. Merrill*, No. 3:20-cv-467, 2020 U.S. Dist. LEXIS 113922, at *22 (D. Conn. June 27, 2020) (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016)). Accordingly, voting cases with severe burdens feature evidence that certain votes will not count or that candidates will not be included on the ballot. For example, a district court in the Southern District of New York found a severe burden on voting when plaintiffs pointed to concrete evidence that a New York law requiring absentee ballots to bear a postmark burdened the right to vote. *Gallagher v. N.Y. State Bd. of Elecs.*, No. 20 Civ. 5504, 2020 U.S. Dist. LEXIS 138219, at *47-48 (S.D.N.Y. Aug. 3, 2020). Specifically, in one congressional race, 1,135 of 8,285 (more than 13%) absentee ballots received within a week of Election Day were not postmarked, and due

to the New York law, would not have counted. *Id*. In another race, nearly 10% of ballots lacked a postmark. *Id*. at *48. With many absentee ballots at risk of not being counted, the district court characterized the postmark requirement's burden on voting as "exceptionally severe." *Id*. at *47. Similarly, the Second Circuit found a severe burden on voting when New York removed "ten out of eleven qualified candidates from the ballot, resulting in the cancellation of the election." *Yang*, 960 F.3d at 129. There, the ballot itself revealed that ten candidates had been excluded and that voters had no opportunity to express support for those candidates. Importantly, both *Gallagher* and *Yang* included evidence of actual exclusion from the ballot.

Demonstrating a moderate burden on voting under *Anderson-Burdick* does not require proof of exclusion from the ballot. But a plaintiff must still point to *evidence* that an election law burdens voters, leaving them with few alternative means to vote. Speculation does not suffice. For example, in *Obama for America v. Husted*, a case cited repeatedly by Plaintiffs here, the plaintiffs challenging the elimination of the final weekend of early in-person voting produced "extensive evidence that a significant number of Ohio voters will in fact be precluded from voting without the additional three days of in-person voting." 697 F.3d at 431. The plaintiffs produced unrebutted statistical studies showing that approximately 100,000 Ohio voters would choose to vote during the three-day period before Election Day and that those voters "have few alternative means of access to the ballot." *Id*. (quoting *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998)).

Even without the statistical evidence present in *Obama for America*, a plaintiff can still show a burden on voting through his own testimony that he will be unable to vote. For example, in *Mays v. LaRose*, the Sixth Circuit found that Ohio's deadline to request an absentee ballot imposed a moderate burden on the right to vote for certain voters. Specifically, the plaintiff

30

testified that he was arrested after the deadline to request an absentee ballot and held in detention through Election Day, giving him no practical opportunity to vote after his arrest. The absentee ballot deadline was nonetheless only a "moderate" burden on the plaintiff's right to vote because the plaintiff "had around four weeks before [his] arrest to vote early in-person . . . [and] over ten months before [his] arrest to request an absentee ballot." 951 F.3d at 786.

Here, Plaintiffs introduce two strands of evidence intended to establish the burden on voting: (1) evidence that overseas voters encounter obstacles to absentee voting throughout the United States and (2) evidence specific to registered Ohio voters living overseas. The vast majority of evidence falls within the first category and sheds no light on whether registered Ohio voters are burdened by Ohio Revised Code § 3511.09. And the evidence in the second category reveals no burden on voting at all.

In the first strand of evidence, Plaintiffs claim that the USPS International Service Center at JFK Airport stamps "Return to Sender" labels on absentee ballots of overseas voters. ECF 13-1, # 205. Plaintiffs cannot identify a single absentee ballot of an Ohio registered voter that was so stamped, and Ohio cannot be held responsible for the "Return to Sender" ballots of other states. Nor do the studies cited by Plaintiffs establish any burden on Ohio voters caused by Ohio Rev. Code § 3511.09. The Federal Voting Assistance Program's 2018 report includes no state-by-state data analysis and says nothing about the impact of Ohio laws on Ohio voters. ECF 13-1, # 206. Similarly, the Election Assistance Commission's Election Administration and Voting Survey for 2018 sheds no light on how many Ohio overseas voters' ballots were rejected for failing to meet the deadline. *Id*. The survey noted that—nationwide—the "most common reason for rejection was that a ballot was received after a state's deadline for UOCAVA absentee ballot receipt," but failed to provide state-by-state rejection numbers for tardiness, much less any numbers showing that

31

Ohio voters cannot return their ballots on time under § 3511.09. U.S. Election Assistance Commission, "Election Administration and Voting Survey 2018 Comprehensive Report," at 98, *available at* https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf. These generic, nationwide studies do not approach the Ohio-specific statistical evidence in *Obama for America*. 697 F.3d at 431 (reviewing statistical evidence specific to Ohio voters). Plaintiffs cannot rely on this evidence to show that Ohio Revised Code § 3511.09 imposes a burden on Ohio overseas voters.

The second strand of evidence—evidence specific to Ohio voters—consists of Mr. Maniates' declaration.[2] As addressed above, Mr. Maniates states that he plans to post his ballot "on or before 28 September 2020," and that he has "deep concerns" that his ballot will not arrive on time. Maniates Dec. ¶ 3, ECF 13-6, # 252. Unlike *Mays*, where the plaintiff testified that he had no avenue to vote, Plaintiffs offer no evidence that Mr. Maniates' ballot will not be counted. Instead, Plaintiffs simply state that Mr. Maniates is concerned that it will not. A voter's nebulous "concern" that his ballot will not arrive on time, when unsupported by any evidence, is not sufficient to show a burden on voting. *See, e.g.*, *Ohio Democratic Party v. LaRose*, Nos. 20AP-421, 20AP-428, 2020 Ohio App. LEXIS 3523, (Ohio Ct. App. Sept. 29, 2020) (finding no evidence of the magnitude of the burden on voting under *Anderson-Burdick* when plaintiff merely "expresses a fear" that his absentee-ballot application may take a long time to arrive at the board of elections); *League of Women Voters v. LaRose*, No. 2:20-cv-1638, 2020 U.S. Dist. LEXIS 91631, at *19-20 (S.D. Ohio Apr. 3, 2020) (finding no severe burden on voting when plaintiffs

---

[2] Maniates does not claim that he resides in a country that has suspended mail service with the United States. *See* Maniates Dec. And Plaintiffs put forward no evidence that Ohio registered voters residing in any of those countries are unable to vote. *See McDonald v. Bd. of Elec. Comm'rs*, 394 U.S. 802 (1969) ("[W]e cannot lightly assume, with nothing in the record to support such an assumption, that Illinois has in fact precluded appellants from voting.").

feared that the tight timeline for submitting absentee ballots for the 2020 primary would be insufficient for voters to complete the process). And because Plaintiffs offer no other evidence that Ohio voters are burdened by Ohio Revised Code § 3511.09, the burden on voting here is purely speculative.

Current difficulties—the ongoing COVID-19 pandemic and reported slowdowns in mail delivery times—do not alter the above analysis. Admittedly, "these are not normal times." *Thompson*, 959 F.3d at 809. "[A] disease beyond the control of the State" might add obstacles to voting. *Id*. at 810. But these difficulties do not "mean that Plaintiffs are *excluded* from the ballot" or prevented from voting. *Id*. Indeed, in *Thompson*, the Sixth Circuit rejected the contention that the pandemic creates burdens on voting where none existed before. *Id*. at 811 ("Requiring Plaintiffs to secure hundreds of thousands of signatures in support of their initiative is a burden. That said, Ohio requires the same from Plaintiffs now as it does during non-pandemic times. So the burden here is not severe.").

Offering only supposition, Plaintiffs claim that the burden on voting here is severe, or at least moderate. But speculation is not enough to establish any burden on voting, and speculation is all that Plaintiffs offer. Even assuming that there is some burden on voting, however, that burden is more than justified by Ohio's interests in the orderly administration of elections and reducing the strain on the boards of elections.

***State's interests.*** Plaintiffs mischaracterize Ohio's interest in Ohio Revised Code § 3511.09 as "a generic desire to enforce the law as written" and claim that Ohio has no further interests in following its own laws. ECF 13-1. # 209.

First, Secretary LaRose does not have "a generic desire to enforce the law as written;" he is statutorily bidden to do so. *See, e.g.*, Ohio Rev. Code § 3501.05(M) (requiring the Secretary of

33

State to "[c]ompel the observance by election officers in the several counties of the requirements of the election laws"), § 3501.05(CC) (requiring the Secretary of State to be "the single state office responsible for the implementation of [UOCAVA] in this state").

Second, Plaintiffs overlook Secretary LaRose's interest in the orderly administration of elections. There are several more specific interests that fall within this category: "preserving the integrity of the election process, maintaining a stable political system, preventing voter fraud, protecting public confidence, and reducing administrative costs." *Mays*, 951 F.3d at 787. All of these interests are "relevant and legitimate" in the context of administering elections. *Id.* (collecting cases).

At this late stage, Ohio's 88 boards of elections cannot take on additional processes or create new procedures. "[T]he list of responsibilities of the boards of elections is long, and the staff and volunteers who prepare for and administer elections undoubtedly have much to accomplish during the final few days before the election." *Obama for Am.*, 697 F.3d at 432-33. The following paragraphs summarize only a few of the boards' most important tasks between now and Election Day.

In the runup to an election, employees prepare non-UOCAVA absentee ballots for mailing. The boards have already received over 2.1 million applications for an absentee ballot for the upcoming election, and voters still have three weeks to request absentee ballots. Tlachac Dec. ¶ 25; Ohio Rev. Code § 3509.03. Processing and mailing absentee ballots are time-consuming endeavors. Each board of elections ensures that the information in the ballot application matches the information in the board's voter-registration system. Tlachac Dec. ¶ 14. If a match exists, the board then creates and mails an absentee-ballot packet containing the ballot, instructions, an identification envelope, and a return envelope. *Id.* ¶¶ 11-13. Boards also must count the absentee

34

ballots as they come in, examining the ballots for any deficiencies and notifying voters of these deficiencies. *Id.* ¶ 14. Absentee voting for jailed and confined voters requires additional board resources. Boards send bipartisan teams of employees to jails, nursing homes, and other confined voters to deliver ballots and return them to the boards. Ohio Rev. Code § 3509.08(A).

At the same time as they process regular absentee ballots, boards must process UOCAVA absentee ballots. Much of this processing follows the procedure for non-UOCAVA absentee ballots. Under current law, UOCAVA absentee ballots and regular absentee ballots arrive in the mail in the same identification envelopes. Tlachac Dec. ¶ 14. The identification envelopes for UOCAVA voters and non-UOCAVA voters include the same types of information, which must be compared to the information in the board's voter-registration system. *Id*. And like non-UOCAVA voters, boards must inform UOCAVA voters of any deficiencies in the identification envelopes by the quickest available means of communication, including telephone numbers and email. *Id*.

Beyond absentee ballots, boards have many additional duties in the days before Election Day, as addressed in Section (C) above. And the COVID-19 pandemic has only increased the boards' burdens. Secretary LaRose requires boards to establish safety protocols for receiving and processing absentee ballots, to procure masks, protective barriers, and sanitizing products for in-person voting, to configure all polling locations to allow for social distancing within each voting location, and to train precinct election officials on these safety precautions. Tlachac Dec. ¶ 26.

Plaintiffs here ask the Court to force Ohio's elections officials to create and implement an entirely new process for accepting UOCAVA ballots electronically with less than four weeks until Election Day. *Id.*, ¶¶ 35. As addressed previously, none of these processes currently exist, and Plaintiffs ask the boards to scale them up in less than four weeks. Boards would need to divert

staffing, equipment, and other resources to accept and process electronic absentee ballots from UOCAVA voters during the busiest portion of the election calendar.

*Balancing.* On the burden side, Plaintiffs offer the declaration of one registered Ohio voter who fears his ballot—mailed more than 45 days before the deadline—will not arrive in time to be counted. This falls well short of the sort of evidence establishing any burden, even a moderate one, in other election cases. *See, e.g., Gallagher*, 2020 U.S. Dist. LEXIS 138219, at *47-48 (showing that 13% of ballots would not count); *Yang*, 960 F.3d at 129 (showing that ten candidates were excluded from the ballot); *Obama for Am*, 697 F.3d at 431 (showing that 100,000 Ohioans would have few alternative means to vote without the last weekend of early voting); *Mays*, 951 F.3d at 780 (showing that the plaintiff was held in detention through Election Day). Without any burden demonstrated, Ohio Revised Code § 3511.09 falls into the category of reasonable and nondiscriminatory restrictions that receive rational-basis review. *See Mays*, 951 F.3d at 784 (quoting *Burdick*, 504 U.S. at 434).

On the other side of the ledger, the State has an interest in the orderly administration of elections and in easing the burdens on the boards of elections. Boards of elections would need to create a new process out of whole cloth in less than four weeks. Avoiding placing this untenable burden on the boards certainly qualifies as an "important regulatory interest" sufficient to justify Ohio Rev. Code § 3511.09. *Mays*, 951 F.3d at 784. And to the extent the Court somehow can construe Plaintiffs' speculative fears as a burden on voting, the State's interest in orderly election administration justifies that burden as well. *See id.* at 791 ("Thus, [Secretary LaRose] has shown that he State's interests [in orderly election administration] are important and weighty enough to overcome the moderate burden" that Ohio imposes on Plaintiffs.).

36

***Equal Protection.*** Finally, Plaintiffs' second count claiming violations of their equal protection rights warrants dismissal. First, Plaintiffs abandon this claim by failing to raise it in their preliminary injunction briefing.

Second, Plaintiffs offer no authority or argument to support their claim that a standalone equal protection analysis is appropriate to resolve a challenge to an election regulation. Rather, as Plaintiffs acknowledge, the Second Circuit analyzes election challenges under the Anderson-Burdick framework. ECF 13-1, # 218, FN14 (noting that "Second Circuit cases treat such issues as intertwined[.]"). Accordingly, Plaintiffs' Equal Protection claim fails for the same reason as their voting rights claim. Regardless, fatal to Plaintiffs' equal protection claims is that they simply cannot make the required showing that Ohio's laws for returning overseas absentee ballots treat similarly situated voters differently. *See, e.g., Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated."). Here, Plaintiffs offer no evidence that Ohio's laws unconstitutionally burden their right to vote, as addressed above. Nor can Plaintiffs show that they are treated differently from similarly situated voters. On this front, Ohio's laws treat absentee voters who do not vote in person equally by requiring the return of ballots by mail (with limited exceptions for hospitalized voters). Ohio Rev. Code § 3509.05. For this reason, Plaintiffs' reliance on the *Bush v. Gore*, 531 U.S. 98, 107 (2000) line of cases is inapposite. ECF 1, ¶¶ 123–26. That case law refers to "arbitrary and disparate treatment" by state action or law. *See, e.g., Bush*, 531 U.S. at 105. No such arbitrary or disparate treatment exists under Ohio law.

37

## V.     CONCLUSION

For the reasons set forth above, Defendant the Ohio Secretary of State Frank LaRose respectfully moves this Court to dismiss the claims against him for lack of personal jurisdiction and improper venue. Plaintiffs' Motion for Preliminary Injunction should also be denied.

Respectfully Submitted,

DAVE YOST
Ohio Attorney General

*/s/ Heather L. Buchanan*

HEATHER L. BUCHANAN (OHIO No. 0083032)
RENATA Y. STAFF (OHIO No. 0086922)
Assistant Attorney General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Renata.Staff@OhioAttorneyGeneral.gov
Heather.Buchanan@OhioAttorneyGeneral.gov

*Counsel for Defendant Frank LaRose, in his official capacity of Ohio Secretary of State*

38

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2020, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the court's system

/s/ Heather L. Buchanan
HEATHER L. BUCHANAN (0083032)
Assistant Attorney General