UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

Mathew Harley, Michael Maniates, :
Emily McGrath, Susan Lahey, N, H. Quaide :
Williams, Jessica Roitman, Katie Von Holzen, :
Benjamin Cole and Ryan Burruss, individually and :
on behalf of all others similarly situated, :
                                   Plaintiffs,: :

                   -against-                    :     20-cv-4664 (BMC)

**New York** :
Peter S. Kosinski, Andrew Spano, and :
Douglas Kellner, in their official capacities as :
Commissioners of the New York State Board of :
Elections, Todd D. Valentine and Robert A. :
Brehm in their official capacities as Co-Executive :
Directors of the New York State Board of :
Elections, :
                                             :

*Et al.*, :
                             Defendants.: :

                                            ::

------------------------------------------------------------X


### NEW YORK STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

                            LETITIA JAMES
                            Attorney General of the State of New York
                            *Attorney for the New York State Defendants*
                            28 Liberty Street
                            New York, New York 10005


JANE R. GOLDBERG
Assistant Attorney General
  *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 4

    A.    The Functions of the State and Local Boards of Elections ........................................ 4

    B.    New York Law Requires Ballot Secrecy and Protects the
          Integrity of the Voting Process ............................................................................... 4

    C.    New York Law Concerning Absentee Ballot Voting for Overseas Voters ................. 6

    D.    Plaintiffs' Claims ................................................................................................... 8

STANDARD OF REVIEW .................................................................................................... 10

ARGUMENT ........................................................................................................................ 11

  I.    PLAINTIFFS LACK STANDING TO SUE THE NEW YORK
       STATE DEFENDANTS ............................................................................................ 11

  II.    PLAINTIFFS HAVE SUED THE WRONG PARTIES ................................................ 14

  III.    PLAINTIFFS HAVE NOT ESTABLISHED A CLEAR
        LIKELIHOOD OF SUCCESS ON THE MERITS ...................................................... 16

    A.    Plaintiffs Have Not Established a Clear Likelihood of Success on their First
        Amendment Claim .................................................................................................. 16

    B.    New York's Mail Requirement Is Reasonable and Non-Discriminatory ................... 17

    C.    New York's Mail Requirement Serves Compelling State Interests ........................... 18

    D.    Plaintiffs' Proposals Are Not Reasonable Alternatives ............................................ 22

    E.    Plaintiffs Have Not Established a Clear Likelihood of Success on their Equal
        Protection Claim ..................................................................................................... 24

  IV.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM ................... 28

V.    THE PUBLIC INTEREST WEIGHS AGAINST ALTERING
THE ELECTION RULES ON THE EVE OF THE ELECTION ................................. 29

CONCLUSION ............................................................................................................................ 31

# TABLE OF AUTHORITIES

**CASES**                                                                                                                     **PAGES**

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
No. 08-cv-5689, 2012 WL 868691 (S.D.N.Y. Mar. 13, 2012)...............................................28

*Anderson v. Celebrezze*,
460 U.S. 780 (1983)...........................................................................................................16

*Andino v. Kylon Middleton*,
No. 20A55, 592 U.S. ___ (Oct. 5, 2020) (staying a preliminary injunction
issued on September 18, 2020)..........................................................................................29

*Benisek v. Lamone*,
138 S. Ct. 1942 (2018)........................................................................................................10

*Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.*,
437 Fed. App'x 57 (2d Cir. 2011)........................................................................................28

*Brooklyn Brands LLC v. Lieberman*,
No. 18-CV-7245, 2018 WL 10246003 (E.D.N.Y. Dec. 23, 2018).........................................29

*Burdick v. Takushi*,
504 U.S. 428 (1992)...........................................................................................................16

*Bush v. Gore*,
531 U.S. 98 (2000).........................................................................................................26, 27

*City of Los Angeles v. Lyons*,
461 U.S. 95 ........................................................................................................................13

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)...........................................................................................................13

*Elmsford Apartment Assocs., LLC v. Cuomo*,
No. 20-CV-4062, 2020 WL 3498345 (S.D.N.Y. June 29, 2020) ..........................................10

*Ex Parte Young*,
209 U.S. 123 (1908)...........................................................................................................14

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
841 F.3d 133 (2d Cir. 2016)...............................................................................................10

*Gelb v. Bd. of Elections of City of N.Y.*,
224 F.3d 149 (2d Cir. 2000)...............................................................................................24

i

*Hernandez v. N.Y. Bd. of Elections*,
  20-cv-4003, 2020 WL 4731422 (S.D.N.Y. Aug. 14, 2020) ...............................................19

*Jones v. United States Postal Serv.*,
  2020 WL 5627002 (Sept. 21, 2020)................................................................................15, 28

*Kelly v. New York Civil Serv. Comm'n*,
  632 F. App'x 17 (2d Cir. 2016) ........................................................................................14

*Kosmider v. Whitney,* 34 N.Y. 3d 48
  (2019)………………………………………………………………………….......................18

*Krull v. Oey*,
  No. 19-cv-0142, 2019 WL 1207963 (N.D.N.Y. Mar. 14, 2019) .....................................27

*Majorica, S.A. v. R.H. Macy & Co.*,
  762 F.2d 7 (2d Cir. 1985)..................................................................................................29

*Murray v. Cuomo*,
  1:20-cv-0371, 2020 WL 2521449 (S.D.N.Y. May 18, 2020)............................................28

*Pope v. Cty. of Albany*,
  687 F.3d 565 (2d Cir. 2012)..............................................................................................10

*Price v. New York State Bd. of Elections*,
  540 F.3d 101 (2d Cir. 2008)..............................................................................................16

*Purcell v. Gonzalez*,
  529 U.S. 1 (2006)..........................................................................................................11, 29

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
  140 S. Ct. 1205 (2020)..................................................................................................11, 29

*Reynolds v. Giuliani*,
  506 F.3d 183 (2d Cir. 2007) (no vicarious liability under § 1983).........................................15

*Romeu v. Cohen*,
  265 F.3d 118 (2d Cir. 2001)..........................................................................................23, 24

*Silberberg v. N.Y. State Bd. of Elections*,
  272 F. Supp. 3d 454 (S.D.N.Y. 2017)..............................................................18, 19, 20, 23

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016)......................................................................................................11

*Tiraco v. New York State Bd. of Elections*,
  963 F. Supp. 2d 184 (E.D.N.Y. 2013) .............................................................................24

*Town of Lockport, New York v. Citizens for Comm. Action at the Local Level, Inc.*,
    430 U.S. 259 (1977)..............................................................................................25

*Veasey v. Perry*,
    135 S. Ct. 9 (2014)..............................................................................................10

**CONSTITUTIONAL PROVISIONS**

First Amendment ........................................................................................2, 16, 23

First and Fourteenth Amendments..............................................................................16

New York State Constitution..........................................................................4, 15, 18

United States Constitution
    Article III ............................................................................................2, 11, 27

**STATE STATUTES**

New York's Election Law ................................................................................ passim

**FEDERAL STATUTES**

52 U.S.C. 20302 *et seq*...........................................................................6, 7, 12, 14, 24

Help America Vote Act
    § 3011 (a)(2), 52 U.S.C. § 21081 ............................................................................5

Internal Revenue Code
    § 7502..............................................................................................................8

**STATE REGULATIONS**

9 N.Y.C.R.R. pt. 6210.11 (g)..........................................................................5, 21

9 N.Y.C.R.R. pt. 6210.18 (a) .............................................................................6

9 N.Y.C.R.R. pt. 6219.......................................................................................6, 24

9 N.Y.C.R.R. pts. 6209.10(c) and 6210.2(c) ..............................................................5

9 N.Y.C.R.R..
    § 6210.9 (a) (2) ...............................................................................................4

Defendants Peter S. Kosinski, Andrew Spano and Douglas A. Kellner, Commissioners of the New York State Board of Elections ("NYSBOE"), Todd Valentine and Robert Brehm, NYSBOE Co-Executive Directors, sued in their official capacities, (collectively "New York State Defendants") respectfully submit this memorandum of law, together with the accompanying Declarations of Andrew W. Appel, Professor of Computer Science at Princeton University, dated October 8, 2020 ("Appel Decl."); John W. Conklin, Director of Public Information for the NYSBOE, dated October 8, 2020; Susan Dzieduszycka-Suinat, President and CEO of U.S. Vote Foundation, dated October 8, 2020; Susan Greenhalgh, Senior Advisor for Election Security to Free Speech for People, dated October 8, 2020; Dr. David R. Jefferson, a computer scientist at the Lawrence Livermore National Laboratory and Board member of Verified Voting; Douglas A. Kellner, Commissioner and Co-Chair of the NYSBOE; Dr. Barbara Simons, Board Chair of the Verified Voting Foundation, dated October 8, 2020; and Penny M. Venetis, Clinical Professor of Law and Director of the International Human Rights Clinic at Rutgers Law School, dated October 8, 2020, in opposition to Plaintiffs' motion for a preliminary injunction (ECF Nos.13 through 13-10).

## PRELIMINARY STATEMENT

New York's Election Law requires that completed ballots for overseas voters must be returned by mail to their local boards of elections, "postmarked" no later than election day and received no later than thirteen days following a general election. This mailing requirement is consistent with New York's Constitution's requirement that secrecy in voting must be preserved. This neutral, longstanding rule is also designed to protect the security of New York's elections. Especially on the eve of an election, the Court should not set aside this important requirement of

New York's election law in favor of Plaintiffs' untested, unworkable, and dangerous injunctive relief.

Plaintiffs are ten overseas voters, only two of whom, Mathew Harley and Damali L'Elie ("New York Plaintiffs"), vote in New York. Plaintiffs claim to be concerned that because of the COVID-19 pandemic and poor postal service, both abroad and in the United States, their ballots may not arrive in time to be counted in the November 3, 2020 General Election. They seek a preliminary injunction that would require each of the States sued here to make significant changes to the conduct of the upcoming election by permitting them to transmit their completed ballots by email or fax. As set forth below, Plaintiffs cannot meet their high burden of showing an entitlement to such extraordinary relief, particularly on the eve of the election.

First, Plaintiffs lack standing to sue the New York Defendants. *See* Point I, *infra*. The non-New York Plaintiffs have no connection to New York, and the two New York Plaintiffs, Mr. Harley and Ms. L'Elie, cannot show an injury-in-fact that is fairly traceable to any conduct by the New York State Defendants. As set forth below, these Plaintiffs received their ballots in mid-September 2020 but have not yet even attempted to return them. Their assertions are speculative and subjective, and thus fail to raise a case or controversy as required by Article III.

Second, Plaintiffs have sued the wrong parties. *See* Point II, *infra*. There is no well-pled allegation of any act or omission by the New York State Defendants supporting Plaintiffs' constitutional claims. Their real complaints concern mail service in the countries in which they live and the handling of international mail by the United States Postal Service ("USPS"), operating through its Kennedy Airport International Service Center.

Third, Plaintiffs have not established a clear likelihood of success on the merits of their claims. *See* Point III, *infra*. Their First Amendment claim fails because the only burden imposed

by New York's election law is a reasonable, non-discriminatory requirement. Requiring return of overseas absentee ballots by mail is common to the election laws of many states. The burden of this rule is minimal, particularly since New York extends the deadline for receipt of overseas ballots until thirteen days after a general election. This year the deadline for receipt of overseas ballots is November 16, 2020. Further, the mail requirement directly furthers New York's important interest in protecting the integrity of elections and ensuring the secrecy of the ballot. Ballot secrecy protects against voter fraud and intimidation and is a core value embedded in New York's Constitution. New York also has a strong interest in not having voted ballots returned electronically so as to prevent against a myriad of cyber security threats that could risk undermining the integrity of the election, exposing voters' sensitive personal data, and opening the door to attacks on New York's election infrastructure.

Plaintiffs' Equal Protection claim similarly fails. First, Plaintiffs are not similarly situated to voters who reside in the United States, and courts recognize the validity of these distinctions in rejecting such challenges. Further, to the extent that Plaintiffs assert that New York Election Law violates the Supreme Court's "one person, one vote" jurisprudence, the claim fails because there is no evidence of actual arbitrary treatment that could justify application of this rule. To the contrary, the New York Plaintiffs' claims are speculative and based on misinformation.

Fourth, Plaintiffs cannot satisfy the requirement that they will be irreparably harmed in the absence of a preliminary injunction. Plaintiffs' lack of standing also negates their irreparable harm claim. But even if the Court were to find that the New York Plaintiffs had standing, they certainly have not come forward with evidence to meet their burden of demonstrating they will be harmed absent an injunction. Indeed, there are many steps they can or could have taken to ensure their

vote will count. Moreover, many of the concerns they express as to mail delivery delays have already been addressed in multiple nationwide injunctions halting USPS service changes.

Fifth, the public interest weighs decisively against granting the injunction because the relief requested would violate the well-established principle that courts should not modify election rules on the eve of an election—or worse, as would be the case here, *after* the election has already begun in many States. *See* Point V, *infra*. This principle is particular applicable here, where the relief sought would require election officials who are intensively preparing for the upcoming election to shift their efforts to the rushed implementation of a policy choice that New York has firmly rejected.

## STATEMENT OF FACTS

### A. The Functions of the State and Local Boards of Elections

Pursuant to the New York Election Law, elections in New York are administered by local boards of elections at the county level. In New York City, there is one local New York City Board of Elections, which has jurisdiction over the five boroughs. The 58 local boards of elections throughout New York open and count absentee ballots, in accordance with the express requirements of the Election Law. The NYSBOE's role in the canvassing process is limited to aggregating the results transmitted to it by the local boards of elections, pursuant to N.Y. Elec. Law § 9-202.

### B. New York Law Requires Ballot Secrecy and Protects the Integrity of the Voting Process

New York's Constitution requires ballot secrecy, providing in relevant part that "[a]ll elections by the citizens... shall be by ballot, or by such other method as may be prescribed by law, provided that secrecy in voting be preserved." N.Y. Const. Art. 2 § 7. Secrecy is also reflected in

New York's Election Law (e.g. N.Y. Elec. Law §§ 4-132 (c); 8-102 (1) (i); 8-407 (9); 17-130 (10)) and administrative regulations (e.g., 9 N.Y.C.R.R.. § 6210.9 (a) (2)). To prevent voter coercion and vote buying, New York even demands secrecy of the ballot when the person who marked the ballot wants to share its contents.  See N.Y. Elec. Law § 17-103 (10) (making it unlawful for a voter to "show[] his ballot after it has been prepared for voting, to any person so as to reveal its contents…").

In furtherance of ballot secrecy and the integrity of the voting process, New York Election Law requires that software on its voting machines be routinely analyzed to ensure that the machines are using an unchanged version of approved software. *See* N.Y. Elec. Law § 7-206(2); 9 N.Y.C.R.R. Parts 6209.10(c) and 6210.2(c). Further, and relevant to this case, N.Y. Elec. Law § 7-202(1)(t) requires that voting systems "not include any device or functionality potentially capable of externally transmitting or receiving data via the internet or via radio waves or via other wireless means." This public policy concern against allowing components of the process involved in vote tabulation from exposure to the internet is further expressed in 9 N.Y.C.R.R. Part 6210.11 (g):

> (g) The voting system and any computers or other peripheral devices shall be dedicated solely to election configuration, ballot configuration (layout) and vote counting functions, including tests listed in section 6210.2 of this Part pre-qualification and post-election testing. The system components used specifically for voting, such as any scanner, DRE or ballot marking device, shall not be capable of being networked: no modem, telecommunications nor wireless communications devices may be components of a voting system. Other components that are not physically or electronically connected to a scanner, DRE, ballot marking device or other component used specifically for voting may be configured as a closed network which can not be connected to any other internal or external network. Such closed network may be used for the preparation of ballot configuration (layout) and vote counting functions. Any EMS system configured as a closed network requires prior approval and testing by the State

> Board of Elections. No unapproved software or hardware may be installed or run at any time on any part of the voting system.

And, as mandated by Section 3011 (a)(2) of the Help America Vote Act ("HAVA"), 52 U.S.C. § 21081, New York law requires that voters be able to independently verify their votes by means of a Voter Verifiable Paper Audit Trail ("VVAP"). A VVPAT audit is accomplished for paper ballot scanners by manually counting the paper ballots cast on a particular machine and comparing the manual vote totals from the ballots to those produced by the ballot scanner. New York randomly selects 3% of its voting systems for such an audit after each election, and, if there are discrepancies the audit is stepwise escalated to include more randomly selected machines. *See* N.Y. Election Law § 9-211; 9 N.Y.C.R.R. Part 6210.18 (a).

C. **New York Law Concerning Absentee Ballot Voting for Overseas Voters[1]**

Voting for overseas voters is governed by the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S. C. § 20102 *et seq*. ("UOCAVA"), which is incorporated into New York's Election Law at Articles 10 and 11. UOCAVA voters fall into one of three broad categories—(i) military voters and their dependents who vote a full New York ballot containing federal, state and local offices as applicable to their New York address (N.Y. Elect. Law § 10-102 *et seq.*), (ii) voters no longer residing in New York whose nexus with the United States is in New York and so vote a ballot that includes federal offices only (N.Y. Elec. Law § 11-200 *et seq.*), and (iii) voters who are overseas with intent to return who remain residents of New York entitled to vote the entire New York ballot but are also entitled to the federal law UOCAVA methods of ballot

---

[1] For the purposes of this Memorandum, reference will be made to the provisions of the New York Election Law that refer primarily to overseas voters rather than to military voters, as the two Plaintiffs who allege that they received their ballots from New York State do not allege they are military voters. Accordingly, there is no plaintiff with standing to challenge those aspects of New York's election law regarding military voters.

transmission and timeframes (9 N.Y.C.R.R. Part 6219). New York Law complies with federal law applicable to UOCAVA voters. *See* 52 U.S.C. 20302 *et seq*. Federal law does not require electronic return of ballots. Greenhalgh Decl. ¶ 25.

To request an absentee ballot, a UOCAVA voter may complete a Federal Post Card Application and return it to the local board of elections of their previous New York residence. An application by mail for an absentee ballot must be received this year no later than October 27, 2020 for voters who have previously registered. N.Y. Elec. Law § 11-204(4). Unlike other absentee voters, UOCAVA voters may receive their ballots by facsimile transmission or by electronic means if they so choose. N.Y. Elec. Law § 11-203.1.[2] This requirement is consistent with the Military and Overseas Voter Empowerment ("MOVE") Act passed in 2010, which was intended to facilitate voting for UOCAVA voters. *See* Greenhalgh Decl. ¶ 21. The MOVE ACT does not include the option of returning voted ballots over the internet because, as stated in the Declaration of Barbara Simons, "the authors understood that returning a voted ballot over the internet is fundamentally insecure." *Id*. at ¶ 3.

Pursuant to federal law, UOCAVA voters with a valid absentee application on file as of the 45th day before an election must be sent their ballot by the means of transmission they choose by that date. Under recently enacted state law (N.Y. Elec. Law §§ 10-108; 11-204), New York requires ballot transmission at least 46 days before the election. UOCAVA voters choose to ***receive*** a blank ballot by one of three means – mail, "email or online" or by fax. In addition, they are also allowed to vote by a Federal Write-in Absentee Ballot ("FWAB") as an alternative if they have

---

[2] As discussed above, there is no New York plaintiff who alleges he or she is a member of the military, and thus this Memorandum refers primarily to Article 11 of New York's Election Law, which addresses voting for overseas voters ("Special Presidential and Special Federal Voters") other than military voters. Article 10 sets forth the provisions applicable to members of the armed services.

not received an absentee ballot in enough time to meet the filing deadline. 52 U.S.C. § 20302(a)(3). UOCAVA voters must return their ballots by postal mail. N.Y. Elec. Law § 11-203(2). However, they may also return their ballots with assistance from a U.S. Consulate. N.Y Elec. Law § 1-106(3)(a). Return ballots by overseas voters must be "postmarked" no later than the day of the election and received no later than thirteen days following the election, which for the 2020 General Election is November 16, 2020. *See* N.Y. Elec. Law § 11-212. A "postmark" includes "any date recorded or marked in the manner described in section 7502 of the internal revenue code by a designated delivery service." *See* N.Y. Elec. Law § 1-106(3)); *See* https://www.irs.gov/filing/private-delivery-services-pds. UOCAVA voters may track their ballots through the NYSBOE's Military and Overseas Ballot Tracking Website to track when their ballot has been sent and received by the board of elections. *See* **https://nysballot.elections.ny.gov/.**

### D. Plaintiffs' Claims

Plaintiffs allege that they are citizens of the United States who live abroad, are registered to vote in one of seven states, and wish to vote by absentee ballot in the November 3, 2020 election. Compl. ¶¶ 12-20, 39.[3] They purport to file this lawsuit on behalf of all others similarly situated and seek class-wide relief. *See* Pls.' Mem. at 12.[4] As relevant to the claims against the New York Defendants, two plaintiffs, Matthew Harley and Damali L'Elie, allege that they are registered to vote in New York. Compl. ¶¶ 12-13.

Plaintiff Harley alleges he resides in Ireland, and that he requested and received his absentee ballot by mail. According to the NYSBOE's records, he requested an absentee ballot from

---

[3] As set forth below, those Plaintiffs who are not registered to vote in New York cannot assert claims against the New York State Defendants and, accordingly, their specific allegations will not be addressed in this Memorandum.
[4] Reference is to Plaintiffs' Memorandum of Law in Support of Their Motion for a Preliminary Injunction filed (Pls.' Mem.") Oct. 5, 2020. ECF No. 13-1.

the Kings County Board of Elections on or about February 11, 2020 and listed postal mail as his preferred method of transmission. A ballot was mailed to him on September 18, 2020. Conklin Decl. ¶ 4, Ex. A.[5] According to Mr. Harley, he has received his ballot. Harley Decl. ¶ 5. ECF No. 13-5. *See also* Conklin Decl. ¶ 6. Because of the pandemic, however, he is "concerned that his ballot will not be received in time to be counted in the November 3, 2020 election." Compl. ¶ 12; Harley Decl. ¶ 10. ECF No. 13-5. The USPS websites indicate no international mail service disruption between the United States and Ireland. Conklin Decl. ¶ 8.

Plaintiff L'Elie alleges she resides in Thailand. She does not state where in New York she is registered but appears to have registered with the Kings County Board of Elections effective July 27, 2020. Conklin Decl. ¶ 11. She indicated that her preferred method of transmission of the ballot was by email and was notified that the ballot was available to be downloaded by her on September 17, 2020. *Id.*, Ex. C. Ms. L'Elie requested a second application for an absentee ballot on September 9, 2020. Conklin Decl. ¶ 12.. There is no evidence that the email did not complete its transmission of the ballot, which was available to be downloaded fifty-nine days before her deadline to return it to her local board of elections. Conklin Decl. ¶¶11, 13. Ms. L'Elie expresses concern that her ballot would not be received on time because outgoing mail has been stopped in Thailand and because of slowdowns in USPS operations. Compl. ¶ 13. According to the USPS, there is currently no international mail service disruption between the United States and Thailand. Conklin Decl. ¶ 15.

Plaintiffs allege that the pandemic is affecting the ability of Plaintiffs and those similarly situated to "receive ballots and send them back," and they proceed to speculate that "if the relief

---

[5] Exhibits annexed to the Conklin Declaration have been redacted to protect the Plaintiffs' privacy. Unredacted copies will be made available to the Court and Plaintiffs' counsel.

requested below is not granted, is likely to disenfranchise millions of Overseas Americans seeking to vote in the November election." Compl. ¶ 50. In support of this legal theory, Plaintiffs rely on various news article to assert that many countries have suspended mail service with the United States due to the pandemic or lack of transportation and the U.S. Embassies in some countries have discouraged the use of diplomatic pouches. They further allege that overseas ballots that arrive at the USPS International Processing Center at JFK airport are returned in "significant numbers" for reasons the USPS cannot explain. *Id.* ¶¶ 50-54. Plaintiffs claim that ballots sent from overseas will "put an already endangered system under additional pressure . . . ." *Id.* ¶ 63. With respect to New York State, Plaintiffs allege that New York's Election Law "disenfranchises" Americans living abroad by requiring them to return their ballots by mail or in person. *Id.* ¶ 67, *citing* N.Y. Elec. Law § 11-203(2).

## STANDARD OF REVIEW

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Defense Council, Inc*. 555 U.S. 7, 24 (2008)). Plaintiffs bear the burden of showing their entitlement to such extraordinary relief. *See Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-CV-4062, 2020 WL 3498345, at *10 n.5 (S.D.N.Y. June 29, 2020). They must also show "reasonable diligence" in doing so. *Benisek*, 138 S. Ct. at 1944. Where, as in this case, Plaintiffs seek a mandatory injunction[6] that would change the status quo and affect governmental action taken in the public interest pursuant to statute, Plaintiffs must meet a heightened standard. They must demonstrate *all* of the following factors: (1) a clear or substantial likelihood of success on the merits, (2) irreparable harm

---

[6] *See* Compl. and Pls.' Mem. at 11-14, acknowledging that a preliminary injunction would provide Plaintiffs with substantially all the relief that they seek. ECF No 13-1.

in the absence of the relief sought, and (3) that the public interest weighs in favor of granting the injunction. *Id*. at 1944; *see Pope v. Cty. of Albany*, 687 F.3d 565, 570 (2d Cir. 2012); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016). This heightened standard applies because Plaintiffs seek to upend the status quo mere weeks before an election by overturning the provisions of New York's Election Law requiring the transmission of overseas absentee ballots by mail, and to permit them to transmit their ballots via email. *See* Plaintiffs' Notice of Motion for Injunctive Relief. ECF No. 13.

Critically, the U.S. Supreme Court has repeatedly cautioned that "courts must take careful account of considerations specific to election cases." *Veasey v. Perry*, 135 S. Ct. 9, 10 (2014). "Court orders affecting elections [can] result in voter confusion" and that, "[a]s an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 529 U.S. 1, 4-5 (2006); Indeed, in recent months the Supreme Court has repeatedly invoked *Purcell* to stay injunctions issued by District Courts that risked upending the orderly administration of elections. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020).

In sum, Plaintiffs cannot satisfy their heavy burden with respect to *any* of the essential criteria for the extraordinary relief they request, and, therefore, the Court should deny their motion for preliminary injunction.

## ARGUMENT

### I. PLAINTIFFS LACK STANDING TO SUE THE NEW YORK STATE DEFENDANTS

As a threshold issue, Plaintiffs cannot demonstrate they have standing to sue the New York Defendants in federal court pursuant to Article III of the United States Constitution. The requirements for Article III standing are well established, limiting the power of the federal courts to the resolution of "cases" and "controversies." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547

(2016). Thus, a party who invokes federal jurisdiction must demonstrate standing to sue by showing that he or she has (1) suffered an injury in fact, (2) that is traceable to the challenged conduct of the defendants, and (3) that is likely to be redressed by a favorable judicial decision. *Id.*

Here, as an initial matter, all but two of the Plaintiffs claim no connection with New York State. To the contrary, they each claim that they are registered to vote in other states. Compl. ¶¶ 14-21; Declarations of Plaintiffs Cole, Maniates, McGrath, Roitman, Von Holzen, and Williams (ECF Nos. 13-4, 6-10). These Plaintiffs claim no injury tied to the New York State Defendants (nor could they), and therefore have no standing to sue the New York State Defendants for any alleged injury they claim in connection with the transmission of their absentee ballots from overseas.

As to the Plaintiffs who claim that they vote in New York State, they also lack standing because they cannot establish an injury in fact that is traceable to any challenged conduct of the New York State Defendants.

### a.    Plaintiff Mathew Harley

Mr. Harley requested and received his absentee ballot by mail as he requested, from the New York City Board of Elections. Conklin Decl. ¶ 4. He is "concerned" that his completed ballot will not be received in time to be counted because of the pandemic, reports of slowdowns with the USPS and various statements by unnamed government officials. *Id.*, Harley Decl. ¶ 7. Notably, Mr. Harley fails to state when he received his ballot or when he mailed it back to the New York City Board of Elections. His ballot was mailed to him on September 18, 2020 by the Kings County board of elections, nearly two months prior to the election. Further, Mr. Harley does not indicate whether he also sought to utilize a Federal Write-in Absentee Ballot as authorized by the

UOCCAVA, 52 U.S.C. § 20302(a)(3). In any event, his allegations do not establish standing, as they are speculative, based on reports by unnamed sources and, with respect to the USPS, concern the potential actions or omission of an "'independent actor [] not before the court.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). Such allegations of possible future injury do not suffice to establish standing. *Id*. at 409.

Moreover, Mr. Harley's subjective "concern" does not suffice to establish an "actual" or imminent" injury. As the United States Supreme Court has stated, "[i]t is the *reality* of the threat . . . that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 (1983) (emphasis in the original). Finally, Mr. Harley could further alleviate his concern by using the NYSBOE's Military and Overseas Ballot Tracking Website to track when his ballot has been received.[7] As a UOCCAVA voter, his ballot must be postmarked by November 3, 2020 and received by the New York City Board of Elections no later than November 16, 2020. *See* New York Elec. Law § 11-212.

**b.      Plaintiff Damali L'Elie**

Ms. L'Elie alleges that she lives in Thailand and has already requested her absentee ballot from the State of New York but is "concerned that her ballot will not be receive in time to be counted . . . because outgoing mail has been stopped in Thailand and because of slowdowns sin the USPS." Compl. ¶ 13. She sent her ballot request via diplomatic pouch and has not received any word that it was received. *Id*. Her claims fail to establish standing because they are based on her subjective fear that she will not receive her ballot on time. She does not state when she requested the ballot or in what New York county she is registered. According to NYSBOE records,

---

[7] *See* https://nysballot.elections.ny.gov/TrackMyBallot/Search

however, Ms. L'Elie is a UOCAVA voter and in the NYSBOE's email system to be electronically emailed a ballot. NYSBOE records further show that a ballot notification email was sent to her on September 17, 2020, informing her that her ballot was ready for download  This notification email did not bounce back as undeliverable. Conklin Decl. ¶¶ 11-12, Ex. C. As of October 6, 2020, Ms. L'Elie had not downloaded her ballot. Conklin Decl. ¶ 11. She could have also alleviated her concerns by submitting a Federal Write-in Absentee Ballot as an alternative if she does not receive her absentee ballot in enough time to meet the filing deadline. 52 U.S.C. § 20302(a)(3). Further, there is no current disruption of international mail between Thailand and the United States. Conklin Decl. ¶ 15. According to one news source, *Post and Parcel*, Thailand had resumed international delivery services via four carriers as of the end of June 2020.[8] One of those carriers, EMS Global Network, of which EMS USA is a part, is one of the carriers that resumed service to the United States. EMS USA is part of the USPS[9] and provides services and information to overseas voters concerning election mail.[10]

## II.     PLAINTIFFS HAVE SUED THE WRONG PARTIES

Another threshold issue concerning Plaintiffs' claims is that they have sued the wrong parties. The doctrine established by *Ex Parte Young*, 209 U.S. 123 (1908), permits a plaintiff to sue "state officers acting in their official capacities" only to "seek prospective injunctive relief to prevent a continuing violation of federal law." *Kelly v. New York Civil Serv. Comm'n*, 632 F. App'x 17, 18 (2d Cir. 2016). Here, Plaintiffs allege "upon information and belief" that "all Defendants, considered together, are the appropriate *ExParte Young* defendants because an order of the Court

---

[8] https://postandparcel.info/122785/news/e-commerce/thailand-post-resumes-international-
[9] https://www.ems.post/en/global-network/ems-operators/ems-united-states-america
[10] https://about.usps.com/what/government-services/election-mail/; *see also* https://www.thailandpost.co.th/un/article_detail/article/11/17151.

could direct them to implement the relief sought." Compl. ¶ 38. As a preliminary matter, there is no basis for "considering" all Defendants together as they are officials from seven states who have differing responsibilities under their various state laws.

Plaintiffs claim that the New York State Defendants "interpret New York law to forbid them from accepting electronically transmitted ballots, whether through fax or email." Compl. ¶ 68. But it is not the New York State Defendants' interpretation that is at issue, rather it is the clear command of both the New York State Constitution and the New York Election Law. In other words, as set forth below, the New York State Defendants act in accordance with New York State law and the New York Constitution to protect the secrecy and security of the ballot.

Plaintiffs' real complaints are with the acts and omissions of non-parties, *i.e.* (1) that the mail to the United States from the various countries in which they reside is slow or non-existent and (2) that the USPS, operating through its International Service Center at Kennedy Airport, either returns as undeliverable or unduly delays the delivery of mail from abroad. Compl. ¶¶ 55-63; Bryan Decl. ¶¶ 13-18. USPS—an arm of the federal government—is manifestly not an agent of the State of New York or the NYSBOE. *See Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) (no vicarious liability under § 1983). If Plaintiffs believe that USPS employees have intentionally or negligently violated their rights, they may pursue a claim against *that* entity. Indeed, the Hon. Victor Marrero recently issued a nationwide injunction against the USPS to prevent any such slowdowns in *Jones v. United States Postal Serv.*, 20 Civ. 6516, 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020). This injunction was based, in part, on the same allegations and evidence Plaintiffs rely upon here. *Compare id.* at *4 ("At the hearing, the Court heard testimony from Julia Bryan, a volunteer for Democrats Abroad[.]") *with* Bryan Decl. Finally, that Plaintiffs' claims really are directed as against the alleged conduct of the USPS is shown by their reliance on the operation of

the USPS International Service Center at JFK Airport as the purported grounds for venue lying in this District.  Compl. ¶¶ 8-11.

## III.    PLAINTIFFS HAVE NOT ESTABLISHED A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs seek an injunction overturning the requirement under New York Elec. Law § 11-203 that UOCAVA voters return their ballots by mail.  They suspect that their votes might not be counted if their ballots are not delivered on time because mail delays. As set forth below, Plaintiffs have not established the clear or substantial likelihood of success on the merits that is required to justify the extraordinary relief that Plaintiffs seek.

### A.  Plaintiffs Have Not Established a Clear Likelihood of Success on their First Amendment Claim.

When considering whether a state election law infringes on the Constitutional protection for voting rights, courts apply a test derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under this test, the court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiffs seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). If the court determines that "the plaintiffs' rights are severely burdened, the [challenged law] is subject to strict scrutiny." *Price v. New York State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008) (citing *Burdick*, 504 U.S. at 435). If, however, "the burden is minor, but non-trivial, *Burdick*'s balancing test is applied. Under this balancing test, the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests." *Id*. This review is "quite deferential, and [courts]

will not require 'elaborate, empirical verification of the weightiness of the State's asserted justifications.'" *Id.* (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997).

Here, notwithstanding Plaintiffs' incorrect insistence that strict scrutiny should apply, Pls.' Mem. at 16-17, the mail requirement is reasonable and non-discriminatory. *See* Dzieduszycka-Suinat Decl. ¶ 7 (mail-in voting is emphasized because it is a safe and secure method of enabling citizens to vote without endangering the integrity of the vote or privacy). Thus, the Court need only determine if the mail requirement serves an important state interest, and, if so, should uphold the challenged provision. But even if the Court were to apply strict scrutiny, New York's interests are compelling as they serve to protect the secrecy and security of the ballot and the integrity of the voting process. Moreover, Plaintiffs proposed alternative of email or fax ballot returns would subject New York's election infrastructure to numerous, significant risks. Accordingly, regardless of the level of scrutiny applied, the mail requirement is clearly constitutional.

## B. New York's Mail Requirement Is Reasonable and Non-Discriminatory

The burden Plaintiffs complain of is created by N.Y. Elec. Law § 11-203(2), which requires overseas voters to return their ballots by election day or by mail or mail equivalent. This policy choice is one that federal law permits. *See* 52 U.S.C. § 20302 *et seq.* It is consistent with the way in which non-overseas absentee ballots are returned because no New York absentee voter is permitted to use email or fax to return their voted ballot. Moreover, New York's mail requirement is reasonable in that it has one of the most generous deadlines among fifty states and five territories for the return of mailed UOCAVA ballots. Specifically, in only three states (Illinois, Michigan and California) all ballots to be validly returned beyond thirteen days. The return dates for all states and territories are listed on the website of the Federal Voting Assistance Program, https://www.fvap.gov/guide.

In the case of both New York Plaintiffs, ballots were sent to them as requested in September, almost two months before the deadline for the receipt of overseas ballots. Conklin Decl. ¶¶ 2. 11. Thus, the mail requirement is reasonable, non-discriminatory, and any burden it may impose is no more severe than that imposed on UOCAVA voters by the election laws of many states.[11] As set forth in the Dzieduszycka-Suinat Declaration, the current emphasis on voting by mail is "due to the well-established fact, based on years of practice across the country that this is a safe and secure method of enabling citizens to vote without endangering the integrity of the vote or exposing personally identifiable information about individual voters." *Id*. at 7.

**C. New York's Mail Requirement Serves Compelling State Interests**

*1. New York's Interest in Ballot Secrecy is a Compelling State Interest*

The requirement that completed absentee ballots be returned by mail is intended to and does in fact protect the secrecy of the ballot as required by Art. 2 § 7 of New York's Constitution, New York Election Law, and administrative regulation. Ballot secrecy is not an abstract concern. Secrecy of the ballot serves a compelling State interest in protecting voters from intimidation and fraud. *See Silberg v Bd. of Elections of N.Y.*, 272 F. Supp.3d 454 (S.D.N.Y. 2017); *Kosmider v Whitney*, 34 NY3d 48, 60-62 (2019) (providing history of ballot secrecy in New York and review of contemporary New York law on the subject). Notably, this State interest even supersedes the desire of a voter in publicizing her ballot. Thus, in *Silberberg*, the court upheld New York's long-standing prohibition against a voter showing his completed ballot:

> To protect not only the fundamental right of individual voters to cast a ballot in a manner that is not susceptible to coercion, intimidation or vote buying, but also the right of all voters, as well as candidates, to elections free of such pressures. The theory behind the law was that

---

[11] Although certain states have made the policy choice to permit overseas voters to fax or email their ballots, there are still nineteen states that require overseas voters to transmit their ballots back to the United States by mail. *See* https://fvap.gov/covid-19.

prohibitions against bribery and intimidation would have little effect if individual voters could voluntarily offer documentary proof of how they were voting to a briber or intimidator, whereas barring the voter from supplying such proof would discourage the coercive conduct by making the voter's compliance unverifiable.... The prohibition in § 17–130(10) against showing one's marked ballot to another person does not just protect the voter who may be tempted or pressured to share his or her marked ballot; it also protects all other voters and candidates from the distortion of elections by votes prompted by bribery or intimidation. It thus protects the integrity of the elective system and the right of all voters and candidates to honest elections.

The court in *Silberberg* found these State interests to be as compelling now as when the concept of required secrecy entered New York law 127 years ago. *See also Hernandez v. N.Y. Bd. of Elections*, 20-cv-4003, 2020 WL 4731422, at * 11 (S.D.N.Y. Aug. 14, 2020) (citations omitted). New York's public policy concerning privacy is also reflected in the penalties that a voter may incur if he or she showed a completed ballot. In New York, it is a misdemeanor to show a completed ballot to anyone or to solicit someone to show their ballot. N.Y. Elec. Law § 17-130(10).

In the absentee voting context, secrecy and security in voting is built into each step of the process. The voter places his or her official ballot, furnished to the voter by the board of elections, in a sealed "ballot envelope" which is signed by the voter (N.Y. Elect. Law §7-122 *et seq*.) If mailed to the board of elections, the ballot envelope is placed in a return mailing envelope (*id*.). The board of elections upon receipt of the ballot envelope logs the ballot as returned, a process which verifies that the ballot returned is from a voter who indeed requested one (N.Y. Elect. Law §§ 8-402 (7); 8-4-12; 9-209). The board of elections, among other things, also verifies that the voter's signature sufficiently matches the signature on file (Elect Law § 9-209 (1) (c)). Until the time of canvass, returned ballot envelopes are secured in bipartisan custody. When it is time to open and canvass the absentee ballots, New York law provides for a transparent, bipartisan process that preserves secrecy (N.Y. Elect. Law 9-209 (2)). The canvass as of right may be, and almost

always is, witnessed by stakeholders (N.Y. Election Law § 9-209 (1) (c)). After completing an inventory of ballots against the logs of the board, ballots are removed from their envelopes "without inspection," then comingled in a box or some equivalent, and then the anonymous ballots are examined and the votes thereon are tallied manually or by ballot scanners (N.Y. Elect. Law § 9-209 (2)).

A process that maintains ballot secrecy is not possible if ballots are returned by email because the attached ballot would necessarily have to be opened, printed and incorporated into the canvass process, thus making the name of the voter apparent to the election worker. *See e.g.*, N.Y. Elect. Law § 9-209**.** This is equally so if overseas voters returned ballots by DoD fax as Plaintiffs request, because they would expressly have to waive their right to a secret ballot.[12] *Cf. Silberberg*, 272 F. Supp. 3d at 470.

ii. *New York Has a Compelling Interest in the Security of the Voting Process*

As set forth in the Declarations of Professor Appel, Susan Greenhalgh, Barbara Simons and David Jefferson in opposition to Plaintiffs' motion for a preliminary injunction, there is a broad consensus within the scientific community that the return of ballots via the internet or by fax is not secure and creates a high-risk threat to the integrity of the election process and should not be used in voting now or in the foreseeable future. *See*, *e.g,.* Appel Decl. ¶¶3-9, Exs. B and C; Simons Decl. ¶¶ 4-9 (among the vulnerabilities of internet voting are the following: malware that attacks the computer or smart phone without the voter knowing; hacks on servers that can change, copy, or delete ballots sent over the internet; spoofing attacks; forgery or modification of emails; modification, replacement or discarding en route from the voter to the election official);

---

[12] The DoD fax transmission cover sheet may be found at
https://www.fvap.gov/uploads/FVAP/Forms/TransmissionCoversheet.pdf

Greenhalgh Decl. ¶ 10 (noting that after two decades and over $100 million spent by federal and state governments "in search of secure online ballot return methods, the effort was abandoned "because of overwhelming evidence that it could not be done securely). Ms. Greenhalgh further notes that "Congress has wisely declined to require or fund online voting for military and overseas voters . . . ." Greenhalgh Decl. ¶ 25; Jefferson Decl. ¶¶ 12-25 (stating that "*from a security point of view email voting and FAX voting are about the worst forms of voting ever proposed. Id*. p 12 (italics in original)). Phone networks are also part of the Internet and create a high vulnerability to hacking. Appel Decl. ¶¶ 6-9. Moreover, and contrary to Plaintiffs' representations,[13] there is no paper trail using email or fax. *Id*. ¶ 9. This deficit is significant because New York law require that voters be able to independently verify their votes by means of a paper audit trail (VVPAT). *See* N.Y. Election Law § 9-211; 9 N.Y.C.R.R. Part 6210.18 (a). An auditable trail ensures that the ballot the voter sends is the ballot that is received.. Lack of a verifiable audit trail in electronically returned ballots thus poses an insurmountable defect.

An auditable trail ensures that the ballot the voter sends is the ballot that is received. *Id*. at ¶ 43. Lack of a verifiable audit trail in electronically returned ballots thus poses an insurmountable defect. *Id*.

New York prohibits allowing any component of the process involved in vote tabulation being exposed to the Internet. *See* 9 N.Y.C.R.R. Part 6210.11(g). Further, New York takes numerous steps to ensure the integrity of New York's voting processes, including but not limited to isolating from the internet voting machines and the election management systems used to program voting machines and aggregate vote totals. *Id.*

---

[13] *See* the declarations of Julia Bryan (ECF No. 13-2) and Heidi Burch (ECF No. 13-3).

**D. Plaintiffs' Proposals Are Not Reasonable Alternatives**

As an initial matter, Plaintiffs theorize that the Court may "effectively skip" determining the burden on overseas voters because there is "no cognizable government interest." Pls.' Mem. at 15. New York and other states could just accept the Department of Defense's ("DoD") fax ballots, which they claim is "safe, secure, and simple." *Id.* Notwithstanding Plaintiffs' unsupported argument that the Court need not consider New York's interests, Plaintiffs' claims that they are severely burdened because they may be disenfranchised or barred from voting because of the pandemic and poor mail delivery, are harms not caused by the New York State Defendants. Indeed, Plaintiffs expressly state that they "will have their votes rejected solely because the global COVID-19 pandemic has interfered with the operations of the mails in their countries of residence and in the United states. *Id.* at 12. These harms are also not caused by New York's Election Law. The requirement that ballots from overseas voters be mailed is consistent with the requirement that all absentee ballots in general be mailed to protect New York's significant interests in ballot secrecy and security, which as set forth above, would be upended should the court issue an injunction.

Plaintiffs assert that their problems would be easily resolved if New York permitted the return of ballots as scanned attachments to emails. Contrary to the opinions of numerous experts as to the lack of security attendant to both Internet and fax transmission of ballots, Plaintiffs claim that "[s]ecurity risks as to emailed ballots are small", and "[i]n any event, the security risks do not add up to a cognizable government interest in disenfranchising Overseas Americans." Compl. ¶¶ 92-93. Privacy concerns are simply part of a trade-off the voters make when opting to email their ballots. *Id*. ¶ 94. But as set forth above, ballot secrecy is a longstanding core value in New York that has been recently affirmed as a compelling state interest. *See Silberberg*, 272 F. Supp. 3d at 470. And security is an express public policy. Moreover, Plaintiffs' claims that "[t]he additional

time and financial costs of implementing an email ballot return system are minimal, States could take advantage of the DoD Fax Service, and if the States had acted earlier, would still have the opportunity to assure that the Plaintiffs and all Overseas Americas can actually cast their ballots in the November election," have some mechanism for doing so, but have failed to act. *Id.* ¶¶101-105. Plaintiffs have not put forward any competent evidence to so easily set aside the significant public interests involved in New York's policy choice to require overseas ballots be returned by mail.

In fact, transmitting ballots by electronic means carries significant security concerns, particularly in light of challenges presented by the COVID-19 pandemic. The measure of these concerns is amply spelled out in the Declarations submitted by the NYS Defendants, as set forth above in Point I.B.,ii and annexed exhibits. For example, in a letter dated April 9, 2020, for example, the directors of eight voting rights organizations (including the Brennan Center for Justice, Common Cause, and Verified Voting), urged Governors, Secretaries of State, and State Election Directors to "refrain from the use of any internet or voting app system and to consider expanding access to voting by mail and early voting in order to maintain the security, accuracy and voter protections essential for American elections in the face of this [the COVID-19 pandemic] public health crisis." *See* AAAS EPI Center Group Letter annexed to Simons Decl. as Ex. B. In sum, and contrary to what Plaintiffs seek here, it is abundantly clear that: (1) transmitting ballots via the Internet is not now or in the foreseeable future a secure solution for voting in the United States; (2) no blockchain technology can mitigate the profound dangers inherent in internet voting; and (3) information captured from voters exposes them to serious risk of identity theft and, from military overseas voters potentially providing adversaries with intelligence that could endanger the lives of service members and national security.

Because the mail requirement is a minimal burden that serves important State interests, Plaintiffs' First Amendment claim fails the *Anderson-Burdick* test. As set forth above, even if the Court were to apply strict scrutiny, Plaintiffs claims fail based on New York's compelling interest in the secrecy of the ballot and security of its voting system.

## E. Plaintiffs Have Not Established a Clear Likelihood of Success on their Equal Protection Claim

Generally, a plaintiff who brings a federal § 1983 action "to remedy errors in the election process allegedly violating the equal protection clause" must establish that "the state action constituted intentional or purposeful discrimination." *Tiraco v. New York State Bd. of Elections*, 963 F. Supp. 2d 184, 199 (E.D.N.Y. 2013) (quoting *Gold v. Feinberg,* 101 F.3d 796, 800 (2d Cir.1996)). *See also Gelb v. Bd. of Elections of City of N.Y.*, 224 F.3d 149, 154 (2d Cir. 2000). Thus, to state an equal protection claim, a plaintiff must allege that the [board of elections] intentionally discriminated against him or her, 'either by adopting out of [discriminatory] animus policies which are facially neutral but have a . . . discriminatory effect, or by applying a facially neutral policy in a . . . discriminatory manner.'" *Id*. (quoting *Rivera–Powell v. N.Y. City Bd. of Elections,* 470 F.3d 458, 470 (2d Cir.2006)). "'To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently.'" *Id*. (quoting *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 193 (2d Cir.1994)). In *Romeu v. Cohen*, 265 F.3d 118 (2d Cir. 2001), for example, the Second Circuit addressed a challenge similar to the one posed here. Plaintiff claimed that he was deprived of the right to vote for President when he moved to Puerto Rico. The UOCAVA does not provide for presidential voting rights to former residents of States residing in Puerto Rico. In upholding the statute, the Second Circuit held that Congress may distinguish between those U.S. citizens formerly residing in a State who live outside the U.S., and those who live in the U.S. territories. *Id.* at 124. Moreover,

the Court found that the distinction was not subject to strict scrutiny. *Id. See also Town of Lockport, New York v. Citizens for Comm. Action at the Local Level, Inc.*, 430 U.S. 259, 273 (1977) (recognizing that distinctive interests between different groups of citizens within a county was sufficient to defeat an equal protection claim).

In this case, Plaintiffs have not established a clear likelihood of success on an equal protection claim because overseas voters are not similarly situated to voters residing in New York and are distinguishable from New York voters who reside in New York by circumstance. This distinction is recognized by federal and New York State law and is evident in how these laws operate to protect the rights of UOCAVA voters. Plaintiffs are entitled to the methods for ballot transmission and timeframes set forth in the UOCAVA, which applies to military voters, voters who no longer reside in New York but whose nexus with the United States is in New York and vote only for federal offices, and voters who remain residents of New York. N.Y. Elec. Law §§ 10-102, *et seq*., 11-200 et seq., and 9 N.Y.C.R.R. Part 6219. Accordingly, unlike absentee voters in New York, overseas voters may receive their ballots by facsimile transmission or by electronic means if they chose to do so. *See* N.Y. Elec. Law § 11-203.1; Simons Decl. ¶ 3. This is a circumstantial accommodation not provided to voters generally. They are also allowed to vote by a federal write-in absentee ballot as an alternative if they have not received an absentee ballot in enough time to meet the filing deadline. 52 U.S.C. § 20302(a)(3). This type of ballot, unavailable to other voters, is designed to ensure that delays in receiving a ballot will not prevent a UOCAVA voter from voting. *See* N.Y. Election Law § 9-209 (2) (b) (i). Overseas voters can return their ballots with consular assistance.  See  https://www.fvap.gov/citizen-voter/overview.

Return ballots by overseas voters, properly postmarked as of election day, must be received no later than thirteen days following the election (November 16, 2020) to be counted. See N.Y.

Election Law § 11-212. This extended deadline does not apply to New York residents whose absentee ballots this year must be received this year no later than November 10, 2020. N.Y. Elec. Law § 8-412.[14] Overseas voters may track their ballots through the NYSBOE's Military and Overseas Ballot Tracking Website to track when the ballot has been received. ***See*** **https://nysballot.elections.ny.gov/**. All of these protections serve to distinguish overseas voters from voters who reside in New York in recognition of their unique circumstances and in aid of protecting their right to vote. In sum, overseas voters are not similarly situated to voters who reside in the United States, and New York law in recognizing those differences provides significant accommodations to overseas voters precisely to ensure their franchise.

Plaintiffs also assert that N.Y. Election Law § 11-203(2) runs afoul of the Supreme Court's "one person, one vote" jurisprudence as set forth in *Bush v. Gore*, 531 U.S. 98, 104 (2000) ("The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise."). *See* Pls.' Mem. at 17 (citing *Gallagher v. N.Y. State Bd. of Elections*, 20 Civ. 5504, 2020 WL 4496849, at *18 (S.D.N.Y. Aug. 3, 2020)). To be sure, once citizens have been granted the right to vote, the government "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05 (citing *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665 (1966)). Thus, in *Gallagher*, the court found that following the election there was "strong evidence that USPS locations in Brooklyn handled absentee ballots differently from the postal service locations in the other boroughs" and that "a significant number of Brooklyn ballots that should have been postmarked were not."

---

[14] *See also* https://www.elections.ny.gov/VotingDeadlines.html#AbsenteeDeadlines

*Id.* Based on this evidentiary record, the court concluded that the particular application of a generally valid law did not comport with equal protection. *Id.*

This case is very different. Plaintiffs' claims, unlike those in *Gallagher*, are not based on "strong evidence" of actual arbitrary treatment. Instead, their claims are wholly dependent on their speculation as to wide-spread and systematic delays in mail delivery of overseas absentee ballots, and they fail accordingly. First, they have not come forward with any reliable proof that the New York Plaintiffs cannot send their absentee ballots into the USPS mail stream via the postal service of their home countries. Second, they ignore the other options available to overseas voters to ensure that their vote is counted, such as the use of the Federal Write-in Absentee ballot or alternative methods of mail delivery. Finally, their assertion that the USPS handling of mail will be delayed in such a manner as to render New York's reasonable reliance on the mail system categorically unconstitutional fails as entirely speculative. Indeed, the assertion is further undermined by the numerous injunctions that have already been issued as against the USPS regarding the handling of election mail. This includes the injunction in *Jones v. United States Postal Serv.*, which was granted based on the very same evidence presented here of inconsistencies occurring at the USPS International Service Center at Kennedy Airport. In short, Plaintiffs have failed to demonstrate that New York State's generally applicable requirement that overseas voters return their ballots by mail is so inexorably arbitrary that it results in "valu[ing] one person's vote over that of another." *Bush*, 531 U.S. at 104-05. In important elections, trepidation as to the conduct of an upcoming election is understandable, but such concerns fall far short of demonstrating that a state's election law requirement of mail delivery fails to "satisfy the minimum requirement for nonarbitrary treatment of voters." *Id.* Therefore, Plaintiffs' equal protection claim fail.

## IV.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

Plaintiffs will not suffer irreparable harm absent a preliminary injunction. While "[g]enerally an alleged violation of a constitutional right creates a presumption of irreparable harm," a plaintiff seeking "prospective injunctive relief . . . must show a likelihood of either future harm or continuing harm." *Krull v. Oey*, No. 19-cv-0142, 2019 WL 1207963, at *10 (N.D.N.Y. Mar. 14, 2019). A plaintiff seeking to satisfy the irreparable harm requirement must demonstrate that "absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.*, 437 Fed. App'x 57, 58 (2d Cir. 2011). As discussed above, the New York Plaintiffs do not allege any Article III injury, much less an injury causing irreparable harm. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, No. 08-cv-5689, 2012 WL 868691, at *2 (S.D.N.Y. Mar. 13, 2012) ("because . . . the plaintiff lacks standing, the plaintiff also has failed to establish irreparable harm"). Moreover, the speculative harms identified by both Mr. Harley and Ms. L'Elie are partially self-imposed. Their ballots were emailed to each of them in September, but they have yet to mail them back to their respective local Boards because of their subjective "concerns" about postal service. *See* Decl. ¶¶; Compl. ¶¶ 12-13; Harley Decl. ¶ 7. Their concerns have been addressed by the multiple nationwide injunctions halting USPS service changes, including the one recently issued in *Jones v. United States Postal Serv.*

Further, although the standard in this Circuit is that "alleged constitutional violations presumptively constitute irreparable harm," *Murray v. Cuomo,* 1:20-cv-0371*,* 2020 WL 2521449, at *9 (S.D.N.Y. May 18, 2020), a plaintiff's lack of diligence in filing the action and seeking injunctive relief can negate the attempted showing of irreparable harm. "Lack of diligence,

standing alone, may . . . preclude . . . preliminary injunctive relief, because it goes primarily to the issue of irreparable harm . . . .” *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985). *See also Brooklyn Brands LLC v. Lieberman*, No. 18-CV-7245, 2018 WL 10246003, at *1 (E.D.N.Y. Dec. 23, 2018) (denying emergency relief where the plaintiff waited “no less than six but as much as fifteen weeks to seek emergency relief”).

## V.   THE PUBLIC INTEREST WEIGHS AGAINST ALTERING THE ELECTION RULES ON THE EVE OF THE ELECTION

The balance of the equities and the consideration of the public interest weigh decidedly against the issuance of the relief sought. The Supreme Court has stated that “federal courts should ordinarily not alter the election rules on the eve of an election.” *Republican Nat’l Comm.*, 140 S. Ct. at 1207. *See also Andino v. Kylon Middleton*, No. 20A55, 592 U.S. ___ (Oct. 5, 2020) (staying a preliminary injunction issued on September 18, 2020). In *Andino*, Justice Kavanaugh specifically notes the federal judiciary should give states broad latitude to act or not to act in making changes in their electoral system to address the pandemic:

> ““When those officials ‘undertake [ ] to act in areas fraught with medical and scientific uncertainties,’ their latitude‘ must be especially broad.’” *Ibid*. (quoting *Marshall v. United States*, 414 U. S. 417, 427 (1974); alteration in original). It follows that a State legislature’s decision either to keep or to make changes to election rules to address COVID–19 ordinarily “should not be subject to second guessing by an ‘unelected federal judiciary,’ which lacks the background, competence, and expertise to assess public health and is not accountable to the people.” *South Bay*, 590 U. S., at ___ (slip op., at 2) (citing *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 545 (1985)).”

His concurrence also asserts the *Purcell* principles as a separate basis to stay the injunction in broad terms:

> “Second, for many years this Court has repeatedly emphasized the federal courts ordinarily should not alter state election rules in the period close to an election. See *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (*per curiam*). By enjoining South Carolina’s witness requirement shortly before the election, the District Court defied that principle and this Court’s precedents. See __F. 3d __, __-__(CA$ 2020) (Wilkinson and Agee, JJ., dissenting from denial of stay). viability of the Court’s long-standing precedent not to alter rules so close to an election).” *Id.*

The result should be no different here. The injunction requested by Plaintiffs is not in the public interest because it would alter the rules of an election that is now, as of the date of the filing of this brief, just 24 days away and counting. That is already closer to the election than the 33-day timeframe at issue in *Purcell,* where the Supreme Court vacated a lower court order altering election rules and warned that such late changes were likely to cause "voter confusion and consequent incentive to remain away from the polls." *Id*. at 4-5. *See also* Kellner Decl. ¶¶ 12-13 (describing the problems inherent in switching to new technologies and procedures for voting). As Commissioner Kellner states, "there is no existing process or procedure by which New York's 58 boards of elections – already burdened with the demands of implementing the unfolding election – can secretly or securely receive ballot attachments to emails and make them ready for canvassing. *Id*. ¶ 13. As Commissioner Kellner points out, "[t]he overwhelming consensus of computer scientists is that there is no technology that allows for the secure delivery of voted ballots by electronic means." *Id*. ¶ 14. *See also* Simons Decl. ¶ 5, Ex. B; Jefferson Decl. ¶¶ 12-25; Dzieduszycka-Suinat Decl. ¶ 10; Appel Decl. ¶¶ 3-7. Further, the relief requested here that all States permit the use of DoD faxes or email for the receipt of ballots from abroad is also contrary to the public interest because of the significant risks posed to personal privacy, possible identify theft, and security concerns. Appel Decl. ¶ 6-7. None of what Plaintiffs demand is in the public interest, particularly when the New York Plaintiffs received their ballots in mid-September but have not transmitted them to New York. Conklin Decl. ¶ 11. As described in greater detail in the Venetis Declaration, New Jersey's efforts to implement email and fax ballot return in the wake of Superstorm Sandy is a cautionary tale as to the myriad of problems that would ensue if Plaintiff's motion were granted – problems that will have the predicable effect of having votes not counted due to glitches and confusion. *Id*. ¶¶7-9. *See also* Kellner Decl. ¶¶ 7-8 (Concerning the NYSBOE's

recommendation to allow New Yorkers affected by the storm to vote anywhere in the state and have their ballot counted.). So too here, the last-minute change represented by the requested injunction would cause chaos, sow confusion, and would require a substantial diversion of resources at a time when the NYSBOE and local boards of elections are intensely preparing for the General Election.

## CONCLUSION

For the reasons set forth above, the New York State Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction, together with such other relief as the Court may award.

Dated: New York, New York
      October 9, 2020

                                                Respectfully submitted,

                                                LETITIA JAMES
                                                Attorney General
                                                State of New York
                                                *Attorney for New York State Defendants*

                                                By: /s/ *Jane R. Goldberg*
                                                Jane R. Goldberg
                                                Assistant Attorney General
                                                28 Liberty Street
                                                New York, New York 10005
                                                Tel.: (212) 416-6113
                                                Email: Jane.Goldberg@ag.y.gov