**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *Harley, et al.,* | Docket No. 20-cv-4664-BMC |
| Plaintiffs, | |
| v. | |
| *Kosinksi, et al.,* | |
| Defendants. | |

## GEORGIA SECRETARY OF STATE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF

CHRISTOPHER M. CARR
Attorney General
BRYAN K. WEBB
Deputy Attorney General
RUSSELL D. WILLARD
Senior Assistant Attorney General
CHARLENE S. MCGOWAN
Assistant Attorney General

Office of the Georgia Attorney General
40 Capitol Square SW
Atlanta, GA 30334

*Counsel for the Georgia Secretary of State*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND...............................................................................3

    I.   Georgia's Absentee Ballot Procedures............................................3

    II.  Plaintiffs' Factual Allegations.........................................................7

ARGUMENT AND CITATION OF AUTHORITIES.............................................8

    I.   The Court Lacks Jurisdiction over the Georgia Secretary of State..................8

    II.  The Georgia Plaintiffs Lack Standing. ..........................................12

    III. The Georgia Plaintiffs' Claims are Moot. ......................................15

    IV. Plaintiffs Fail to Satisfy the Preliminary Injunction Standard. .......................16

        A.  Plaintiffs are not likely to succeed on the merits of their First and Fourteenth Amendment Claim under the *Anderson/Burdick* framework....17

        B.  There is no likelihood of irreparable harm...................................23

        C.  The balance of equities and public interest weigh heavily against an injunction. .......................................................................25

CONCLUSION..................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Celebrezze*, 460 U.S. 780 (1982) ........................................................17

*Andino v. Middleton*, No. 20A55, 2020 U.S. LEXIS 4832 (U.S. Oct. 5, 2020)........3

*Beacon Enters., Inc. v. Menzies*, 715 F.2d 757 (2d Cir. 1983) ...............................10

*Burdick v. Takushi*, 504 U.S. 428 (1992) ................................................................18

*Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, No. CIV-88-984E, 1988 WL 125193 (W.D.N.Y. Nov. 18, 1988) ......................................................................16

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.,* 696 F.3d 206 (2d Cir. 2012) ......................................................................................................16

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...............................................12

*Curling v. Kemp*, 334 F. Supp. 3d 1303 (N.D. Ga. 2018) .......................................25

*DCCC v. Ziriax*, No. 4:20CV211, 2020 WL 5569576 (N.D. Okla. Sept. 17, 2020) ...........................................................................................................................21

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214 (1989)...........22

*Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009)............24

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007) .... 16, 23

*Green v. Mortham*, 155 F.3d 1332 (11th Cir. 1998)................................................22

*In re Kurtzman*, 194 F.3d 54 (2d Cir. 1999) ...........................................................15

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)..............................................8, 11

*Jacobson v. Fla. Secretary of State*, No. 19-14552, 2020 WL 5289377 (11th Cir. Sept. 3, 2020) ................................................................................................ 13, 14

*Little v. Reclaim Idaho*, No. 20A18, 2020 WL 4360897 (U.S. July 30, 2020) .........2

*Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020) ............................................................20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................................12

*Marvel Characters, Inc. v. Kirby*, 726 F. 3d 119 (2d Cir. 2013)..............................10

*Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020).......................................................21

*McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802 (1969)..................................19

*Merrill v. People First of Ala.*, 207 L. Ed. 2d 1113 (2020).......................................2

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) .................................12

*New Georgia Project v. Raffensperger*, No. 20-13360, 2020 U.S. App. LEXIS 31405 (11th Cir. Oct. 2, 2020)............................................................ 2, 20, 26, 27

*Purcell v. Gonzalez*, 549 U. S. 1 (2006) ...................................................... 2, 25, 27

*Red Earth LLC v. United States,* 657 F.3d 138 (2d Cir. 2011)................................16

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) .2, 21

*Rosario v. Rockefeller,* 410 U.S. 752 (1973)...........................................................21

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .....................................................24

*Storer v. Brown*, 415 U.S. 724 (1974) ....................................................................22

*Tex. Democratic Party v. Abbott*, 140 S. Ct. 2015 (2020).........................................2

*Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) ...............................2

*Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020) ................................................. 2

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) .................. 17, 18, 22

*Walden v. Fiore*, 571 U.S. 277 (2014) ............................................................. 8, 11

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ......................................................... 17, 25

*Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020) ...................................................... 16

## Statutes

52 U.S.C. § 20302 ...................................................................................................... 3

NY CLS CPLR § 302 .......................................................................................... 10, 11

O.C.G.A. § 21-2-384 .................................................................................................. 5

O.C.G.A. § 21-2-386 ................................................................................................ 4, 5

## **INTRODUCTION**

This Court is without jurisdiction to enjoin the Georgia Secretary of State from following the State of Georgia's elections laws. Plaintiffs' sole asserted basis for personal jurisdiction over the Georgia Secretary of State in a New York forum is that absentee ballots in route to Georgia may or may not pass through an international mail facility in New York. Such tenuous contacts with this forum do not support personal jurisdiction under the New York Long Arm statute, and certainly offend traditional notions of fair play and substantial justice as a matter of due process. Accordingly, any injunction entered against the Georgia Secretary of State would be null and unenforceable.

The Court's lack of personal jurisdiction over the Georgia Secretary of State is a threshold issue that should end the matter, and the Court should deny Plaintiffs' motion and dismiss the action for that reason alone. But Plaintiffs' motion fails for numerous other reasons. *First*, the two Georgia Plaintiffs lack standing. *Second*, the Georgia Plaintiffs' claims are moot because both of their absentee ballots have already been mailed—and one has been received and accepted. *Third*, Plaintiffs' motion fails to satisfy the legal standard for an injunction because they are not likely to succeed on the merits, face no irreparable harm, and cannot show that the public interest would be served by an injunction. *Fourth*, the Supreme Court's *Purcell* principle forecloses Plaintiffs' requested relief this close to the general election,

1

which would interfere with the ability of Georgia's elections officials to administer the election and only serve to inject chaos and confusion into an already challenging election year.

The Supreme Court has consistently cautioned against court-ordered experimentation with election processes, particularly when such experimentation is ill-defined and occurs in close proximity to the election itself. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U. S. 1 (2006) (per curiam). When other district courts have ordered injunctive relief in close proximity to elections this year, the Supreme Court and circuit courts across the country have repeatedly stayed those orders.[1] Just this week, the Supreme Court stayed a district court order enjoining South Carolina's witness requirements for absentee ballots, based in part on the *Purcell* principle that "federal courts ordinarily should not alter state election rules in the period close to an

---

[1] *See, e.g., New Georgia Project v. Raffensperger*, No. 20-13360, 2020 U.S. App. LEXIS 31405 (11th Cir. Oct. 2, 2020) (staying injunction altering Georgia's absentee ballot return deadline); *Merrill v. People First of Ala.*, 207 L. Ed. 2d 1113 (2020); *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020) (granting stay); *Thompson v. DeWine*, 959 F.3d 804 (6th Cir. 2020) (granting motion to stay injunction); *Thompson v. DeWine*, 207 L. Ed. 2d 1094 (2020) (denying motion to vacate stay); *Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) (granting motion to stay injunction); *Tex. Democratic Party v. Abbott*, 140 S. Ct. 2015 (2020) (denying motion to vacate stay).

election." *Andino v. Middleton*, --- S. Ct. ---, No. 20A55, 2020 U.S. LEXIS 4832, at *2-3 (Oct. 5, 2020) (Kavanaugh, J., concurring).

When the Court hears Plaintiffs' motion, Election Day will be *21 days* away. Voting has already begun—absentee ballots were sent to UOCAVA voters in mid-September, and those ballots have been received by voters and are currently being returned to county elections officials. Plaintiffs offer no evidence that UOCAVA ballots from Georgia voters will not be timely received and processed—only speculative concern and conjecture. The State of Georgia's policy decision to accept UOCAVA ballots by mail, which is permitted by the federal statute itself, is justified by the state's compelling interests in protecting the privacy and security of the ballot. Respectfully, this Court has no legal authority to second-guess the policy choices of another state, particularly this close to an election. Even if there were a sufficient legal basis for Plaintiffs' requested relief (and there is not), it is too late for Georgia's 159 counties to scramble to implement any effective remedy now. Plaintiffs' motion for injunctive relief should be denied.

## FACTUAL BACKGROUND

### I.    Georgia's Absentee Ballot Procedures

The federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 52 U.S.C. § 20302(a)(8), was enacted by Congress to allow military and overseas voters to vote by absentee ballot in federal elections in the states where

3

they maintained a residence. The law requires that absentee ballots be sent to these voters at least 45 days prior to a federal election. For the November 3, 2020 general election, Georgia's elections officials sent absentee ballots to military and overseas voters between September 15 through 19, 2020. (Declaration of Chris Harvey ¶ 5.) UOCAVA does not specify the manner in which absentee ballots must be returned, but leaves the issue up to the states.

In Georgia, military and overseas voters may choose to receive their absentee ballot either by regular mail or by electronic ballot delivery if a federal candidate is on the ballot. (Harvey Dec. ¶ 6.) The Federal Post Card Application (FCPA) allows military and overseas voters to register to vote and request absentee ballots for that year's primaries, runoffs, and general elections involving federal candidates by simply completing and returning the FPCA to the voter's county elections office by email, fax, or U.S. mail. (*Id.*) On the FPCA, voters indicate how they would like to receive their absentee ballot—by U.S. mail, e-mail, or fax. (*Id.*) The absentee ballots are then sent in the manner specified by the voter and at least 45 days prior to the election in compliance with federal law.

Under Georgia law, absentee ballots must be received by the voter's county elections office by 7:00 p.m. on Election Day. O.C.G.A. § 21-2-386(a). An exception to this general rule applies to UOCAVA voters, whose absentee ballots will be accepted if they are postmarked by Election Day and received within three days.

4

O.C.G.A. § 21-2-386(a)(1)(G). Accordingly, the instructions sent with the UOCAVA absentee ballots for the November 3, 2020 general election clearly state, "**All ballots postmarked by the date of the primary, election, or runoff will be counted if received within three days of the primary, election, or runoff election. Ballots are not accepted if returned by fax or email**." (Harvey Dec. ¶ 7.)

To assist UOCAVA voters with mailing their absentee ballots, the Secretary of State's office makes available a template for a postage pre-paid envelope that may be used if the absentee ballot is mailed through the U.S. Postal System. This includes all U.S. Military post offices overseas and through the diplomatic pouch available at U.S. embassies and consulates. (Harvey Dec. ¶ 8.) Because Georgia law requires that ballots be secret, absentee ballot packages sent to voters include two return envelopes: one simply marked "Official Absentee Ballot" in which the voter places their ballot, and an outer envelope on which the voter signs the elector's oath. (*Id.* ¶ 9.); *see also* O.C.G.A. § 21-2-384(b). Only the outer envelope has the voter's identifying information. (Harvey Dec. ¶ 9.)

Elections are administered at the county level in Georgia. (Harvey Dec. ¶ 3.) In a typical year, it is the counties who receive absentee ballot applications and who send absentee ballots to voters who request them, including military and overseas voters. (*Id.*) In 2020, because of the challenges facing counties due to COVID-19, the Secretary of State's office coordinated the printing and mailing of absentee

5

ballots through an approved vendor. (*Id.*). What has not changed, however, is Georgia's requirement that completed absentee ballots be returned to county elections officials, who will then process and count the ballots after the polls close on Election Day. (*Id.* ¶ 4.) The Georgia Secretary plays no role in receiving, processing, or counting absentee ballots. (*Id.*)

The Plaintiffs here seek an order requiring the Georgia Secretary to "accept and count ballots sent by Overseas Americans via email or other electronic means." (Doc. 1 at 28.) However, the State of Georgia has already attempted a pilot project to test whether UOCAVA voters could securely return their ballots electronically. (Harvey Dec. ¶ 11.) Working with a well-known election system vendor, the election officials were unable to develop a process that adequately supported voter privacy, voter verification through signature match, and security of the transmission. (*Id.*) Numerous issues were discovered that ultimately led the state to not move forward with the pilot project. (*Id.*) First, the security and accuracy of electronic ballot return systems is high risk and vulnerable to hacking or cyber-attacks. (*Id.*) Second, because elections officials are able to identify the person who sent a ballot via electronic return, voter secrecy cannot be maintained as required by Georgia law. (*Id.*) Finally, it is more difficult for elections officials to authenticate the identity of the voter via electronic ballot return. (*Id.*)

## II.    Plaintiffs' Factual Allegations

The factual allegations directed at the Georgia Secretary are limited. Plaintiffs provide no specific factual allegations with respect to their asserted basis for personal jurisdiction over the Georgia Secretary. Plaintiffs only vaguely assert, "upon information and belief, the election officials in each State at issue here send thousands of ballot through John F. Kennedy Airport ("JFK") to voters abroad, and thousands of ballots return through JFK."  (Doc. 1 ¶ 8.) There are no allegations of that the Georgia Secretary has any specific, personal contacts with the State of New York.

Plaintiffs' factual allegations relating to any injury suffered by Georgia voters is also thin. There are only two named Plaintiffs who are Georgia voters—Benjamin Cole and Ryan Burruss. Mr. Cole is a resident of Germany who votes in Georgia. (Doc. 1 ¶ 20.) He mailed his voted absentee ballot on September 16, 2020. (*Id.*) According to voting records, Mr. Cole's absentee ballot was received and accepted by the Houston County elections office on October 2, 2020. (Harvey Dec. ¶ 10.)

Mr. Burruss is a resident of the Netherlands who also votes in Georgia. (Doc. 1 ¶ 21.) At the filing of Plaintiffs' Complaint on September 30, 2020, he had already sent his voted ballot by post via the U.S. Consulate in Amsterdam. Mr. Burruss cites no specific injury, other than his "concern" that his ballot will not reach his county elections office in time to be counted.

7

## ARGUMENT AND CITATION OF AUTHORITIES

**I.    The Court Lacks Jurisdiction over the Georgia Secretary of State.**

The Georgia Secretary lacks sufficient contacts with the State of New York for this Court to exercise personal jurisdiction over him. "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quotations omitted). "This is because a federal district court's authority to assert personal jurisdiction in most cases is linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Id*. (quoting Fed. Rule Civ. Proc. 4(k)(1)(A)). This is only part of the inquiry, however. Due process also "constrains a State's authority to bind a nonresident defendant to a judgment of its courts," and thus, a federal court's exercise of personal jurisdiction through a state's long arm statue must also "comport with the limits imposed by federal due process." *Id*.

Due process requires a nonresident to have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id*. (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). This inquiry "focuses on the relationship among 'the defendant, the forum, and the litigation.'" *Id*. at 284 (quoting *Keeton v. Hustler Magazine, Inc.*, 465

8

U.S. 770, 775 (1984)). Thus, "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Id*. "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, *not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State*." *Id*. at 286 (quotation omitted) (emphasis added).

New York's long arm statute provides the following with regard to personal jurisdiction over non-residents of the state:

(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

9

> 4. owns, uses or possesses any real property situated within the state.

NY CLS CPLR § 302(a)(1)-(4).

The Second Circuit has held that, for New York's long arm statute to apply, "it is essential that there be some act by which the defendant purposefully avails herself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Marvel Characters, Inc. v. Kirby*, 726 F. 3d 119, 128 (2d Cir. 2013) (quotation omitted). The Second Circuit has also recognized that "New York courts have consistently refused to sustain § 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York." *Id*. at 128-29 (emphasis added); *see also Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983) (holding that mailing of a cease-and-desist letter into New York was insufficient to give rise to personal jurisdiction under § 302(a)(1)).

Plaintiffs have not pleaded a sufficient basis for asserting jurisdiction over the Georgia Secretary under the New York long arm statute. The only basis for jurisdiction averred by Plaintiffs is that the Georgia Secretary mailed UOCAVA ballots from Georgia to voters residing in Germany—not New York—which may or may not have been sorted at an international mail facility at the JFK airport. This alleged conduct does not meet any of the criteria for personal jurisdiction over a non-resident under New York's long arm statute: the Secretary has not transacted

10

business in New York, he has not committed a tort in New York, and he does not own property in his official capacity in New York. *See* NY CLS CPLR § 302(a)(1)-(4).

Not only does New York's long arm statute not cover the Georgia Secretary's alleged conduct, it would violate the Georgia Secretary's due process rights for this Court to exercise jurisdiction over him. The Supreme Court has routinely said "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State," *Walden*, 571 U.S. at 284. This is certainly not the case here. The Georgia Secretary did not create contacts with New York by mailing absentee ballots to voters *in other countries*, as he obviously has no control over how the USPS delivers mail. His use of the USPS's services, which may involve a sorting facility in New York, is merely "a random, fortuitous, or attenuated contact[] he makes by interacting with other persons[.]" *Walden*, 571 U.S. at 286 (quotation omitted). Because there is simply no purposeful availment of the privilege of conducting activities within the forum State by the Georgia Secretary, exercising personal jurisdiction over the Georgia Secretary would violate his due process rights and "offend 'traditional notions of fair play and substantial justice.'" *Id*. at 283 (quoting *Int'l Shoe*, 326 U.S. at 316).

Because the Court lacks personal jurisdiction over the Georgia Secretary, the Court must deny Plaintiff's requested injunctive relief for this reason alone.

11

## II.     The Georgia Plaintiffs Lack Standing.

Plaintiffs' claims suffer from another fatal jurisdictional defect: lack of standing. Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. A party invoking federal jurisdiction bears the burden of establishing standing at the commencement of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As an irreducible constitutional minimum, Plaintiffs must demonstrate a "[1] concrete, particularized, and actual or imminent [harm]; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010); *see also Lujan*, 504 U.S. at 561. When, as here, plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (internal quotation marks omitted). The Georgia Plaintiffs fail to prove any of the requisite elements.

First, the Georgia Plaintiffs have not alleged any particular injury to their right to vote that is "certainly impending." To the contrary, both Georgia Plaintiffs received their absentee ballots, completed them, and placed them in the mail. Benjamin Cole mailed his ballot on September 16, 2020, and by October 2, 2020, it had been received and accepted by elections officials in his home county. (Harvey

12

Dec. ¶ 10.) Because his ballot has been received and will be counted, Mr. Cole has not suffered *any* injury, and therefore lacks standing.

Ryan Burruss received his absentee ballot and mailed his voted ballot by post via the U.S. Consulate in Amsterdam. (Doc. 1 ¶ 21.) The only other fact alleged by Plaintiffs is that Mr. Burruss is "concerned that his ballot will not reach his local Board of Election in Georgia in time to be counted." However, this pure speculation is not supported by any factual allegations. As such, Mr. Burruss has failed to allege any concrete, particularized, and actual or imminent injury sufficient to establish standing.

Second, the Georgia Plaintiffs have not alleged an injury that is traceable to the actions of the Georgia Secretary or that can be redressed by the Plaintiffs' requested relief. Plaintiffs seek an order requiring the Georgia Secretary to accept UOCAVA absentee ballots via electronic means. However, the Georgia Secretary does not receive absentee ballots from voters—county elections officials do. *See* O.C.G.A. § 21-2-386(a). But Plaintiffs did not name the 159 county elections superintendents throughout the State of Georgia, who would not be bound by any order issued by this Court (even if jurisdiction over the Secretary were proper).

For these reasons, this case presents the same standing problem as in *Jacobson v. Florida Secretary of State*, No. 19-14552, 2020 WL 5289377 (11th Cir. Sept. 3, 2020). In this recent Eleventh Circuit decision, a group of plaintiffs sued the Florida

13

Secretary of State challenging a law governing the order in which candidates appear on the ballot, but they did not sue the county officials who were responsible for implementing that statute. When the district court enjoined the enforcement of the statute, the Eleventh Circuit reversed, holding that because "the [Secretary] didn't do (or fail to do) anything that contributed to [their] harm,' the voters 'cannot meet Article III's traceability requirement.'" *Id.* at *30-31 (quoting *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc)).  Accordingly, the action was dismissed for lack of standing.

Similarly here, the Georgia Secretary has not done nor failed to do anything that is fairly traceable to any actual harm the Georgia Plaintiffs are likely to suffer. Nor would any relief ordered by this court be sufficient to redress the Plaintiffs' asserted injuries. The only Georgia Plaintiff whose vote has not already yet been accepted averred that he mailed his ballot and it is in route to Georgia. It is unclear how any hastily conceived electronic ballot return system would benefit a voter whose vote ballot has already been mailed and cannot be faxed or emailed at this point.

Moreover, implementation of the electronic ballot return system would need to be effectuated by the 159 non-party Georgia counties, who "are not 'obliged … in any binding sense … to honor an incidental legal determination [this] suit produce[s]." *Jacobson*, 2020 WL 5289377 at *33 (quoting *Lewis*, 944 F.3d at 1302).

14

The Court can have no confidence that non-party counties would simply disregard state law requiring them to only accept UOCAVA absentee ballots by mail—a practice they have been following since the federal law has been in place—in favor of an order from this Court instructing them to accept ballots via email.  Instead, even assuming that *some* counties, who exercise state constitutional authority over the conduct of elections independent of control by the Georgia Secretary of State, might choose to implement the court's order that is simply not binding upon them, the fact that some if not the majority of Georgia's *one hundred-fifty nine* county election officials would not implement relief that was not binding as to them raises the real specter of disparate treatment and weight of votes as one moves across jurisdictions in Georgia.

## III.    The Georgia Plaintiffs' Claims are Moot.

Plaintiff Cole has already had his ballot accepted for the general election, and therefore his claim is moot. A case becomes moot "when it is 'impossible for the court to grant *any* effectual relief whatever to a prevailing party.'" *In re Kurtzman*, 194 F.3d 54, 58 (2d Cir. 1999) (citation omitted; emphasis in original). When a case becomes moot, federal courts lack subject matter jurisdiction over the action." *Id.* at 58.

Similarly, Plaintiff Burruss has already sent his ballot in the mail, and therefore he can no longer benefit from the relief Plaintiffs seek. Therefore, his claim

15

is moot as well. *See Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, No. CIV-88-984E, 1988 WL 125193, at \*2 (W.D.N.Y. Nov. 18, 1988) ("A claim is moot when the issue presented is no longer live or when the plaintiff no longer has a stake in its outcome.").

## IV.   Plaintiffs Fail to Satisfy the Preliminary Injunction Standard.

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). Ordinarily, a plaintiff seeking a preliminary injunction must show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.,* 696 F.3d 206, 215 (2d Cir. 2012).

When, as here, the preliminary injunction will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, it should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Red Earth LLC v. United States,* 657 F.3d 138, 143 (2d Cir. 2011). *See also Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020) (when seeking a mandatory preliminary injunction, the movant must make a "strong showing" of irreparable

16

harm and demonstrate a "clear or substantial likelihood of success on the merits").

Additionally, the moving party must show that a preliminary injunction is in the

public interest, and that the balance of equities tips in his favor. *Winter v. NRDC,*

*Inc.,* 555 U.S. 7, 19-20 (2008).

Because Plaintiffs cannot satisfy any of the preliminary injunction factors,

their motion should be denied.

A.    **Plaintiffs are not likely to succeed on the merits of their First and Fourteenth Amendment Claim under the *Anderson/Burdick* framework.[2]**

Under the *Anderson/Burdick* test, courts are to "weigh the character and

magnitude of the burden the State's rule imposes on those rights against the interest

the State contends justify that burden, and consider the extent to which the State's

concerns make that burden necessary." *Timmons v. Twin Cities Area New Party*, 520

U.S. 351, 358 (1997).[3] *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1982). The

rigorousness of the Court's inquiry "depends upon the extent to which a challenged

___

[2] Plaintiffs also assert an equal protection claim in their Complaint, but fail to raise it as a basis for their requested injunctive relief in their motion. Because Plaintiffs have apparently abandoned that claim, at least as to the claim in their motion for preliminary injunction, the Georgia Secretary does not address it here.

[3] If the Court reaches the merits of Plaintiffs claim (and it should not), it is required to conduct the *Anderson/Burdick* analysis based upon the challenged laws of each state defendant and the allegations raised by the named plaintiffs from those states. Although Plaintiffs raise generalized arguments regarding the alleged burdens associated with overseas absentee voting by mail, the *Anderson/Burdick* framework is a fact-specific analysis and must be conducted for each state, not in a vacuum.

17

regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). When "those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (citations omitted). "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Timmons*, 520 U.S. at 358.

Election laws "invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. Therefore, it is error for courts to automatically apply strict scrutiny to elections regulations as Plaintiffs urge the Court to do here. To do so would effectively "tie the hands of States" as they seek "order, rather than chaos" in their elections. *Id.* After all, "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain integrity of the democratic system." *Id.* at 441.

Here, Georgia's requirement that UOCAVA ballots be returned by mail is a reasonable and non-discriminatory policy that is justified by the state's regulatory interest in maintaining the integrity and security of its electoral process. Accordingly, it should be upheld.

18

*1. Georgia's absentee ballot return requirements do not impose a severe burden on UOCAVA voters.*

Although Plaintiffs emphasize the importance of voting rights, there is no fundamental right to vote by absentee or mail-in ballot. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-09 (1969). Georgia's requirement that absentee ballots coming from overseas be delivered by mail is a longstanding, facially neutral law. There is nothing in the challenged law that imposes a severe or even moderate burden on voting—indeed, one of the Georgia Plaintiffs *already voted*. The other Georgia Plaintiff merely speculates about COVID-19's possible impact on timely postal delivery—an issue entirely outside of the Georgia Secretary's control and unrelated to any Georgia election law. The Georgia Plaintiffs have thus failed to adduce any factual evidence that Georgia's mail requirement has burdened their ability to vote.

The federal UOCAVA statute itself does not require states to accept absentee ballots via electronic means, which suggests that Congress did not consider mail delivery to be an unacceptable burden on overseas voters when it required states to mail ballots to those voters at least 45 days prior to the election (which contemplates time for the return of voted ballots by mail). Plaintiffs fail to cite to any case on point that supports their argument that a state's failure to allow electronic ballot return imposes a severe burden on voters.

19

Courts that have addressed similar challenges relating to states' absentee ballots laws have repeatedly rejected those challenges. For example, in *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020), the Seventh Circuit reversed a district court decision striking down a Wisconsin law prohibiting election officials from sending absentee ballots via email or fax to all but a few categories of voters. *Id.* at 676-77. The court held this was a reasonable restriction that was not unconstitutionally burdensome on the right to vote under *Anderson/Burdick*, and that Wisconsin had an interest in protecting the secrecy of the ballot and ensuring that ballots were able to be counted. *Id.* at 677.

Similarly, the Eleventh Circuit recently stayed a district court injunction that set aside Georgia's Election Day deadline for absentee ballots and required state elections officials to accept absentee ballots postmarked by Election Day and received within three days (essentially applying the rule for UOCAVA voters to all absentee voters in Georgia). *New Georgia Project*, 2020 U.S. App. LEXIS 31405, at *13-14. While the issue in that case was somewhat different because it involved the process by which voters in Georgia return their absentee ballots, the plaintiffs in that case made the same arguments as the Georgia Plaintiffs here that postal delivery delays could affect the timely delivery of mailed ballots. However, the court found that the district court erred in holding that the deadline imposed a severe burden on voting rights on the basis that "delays in the postal service *may* (not *will*) delay when

20

some voters receive their absentee ballots." *Id.* at *8. As the court noted, "[v]oters must simply take reasonable steps and exert some effort to ensure that their ballots are submitted on time." *Id.* Based on this minimal burden on voters, the court concluded that "Georgia's regulatory interest is more than enough to uphold its reasonable ballot-receipt restriction," and imposed a stay of the injunction. *Id.*

As the Supreme Court explained, voters bear the responsibility to return their ballots on time, and compliance with these requirements is not an unconstitutional burden on their right to vote. *See Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973); *Republican Nat'l Comm.*, 140 S. Ct. at 1207 (noting that voters who request a ballot at the last minute are suffering the typical burden of a "late-requesting voter," not an unconstitutional burden imposed by state law); *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) (a "generally applicable deadline that applied to all would-be absentee voters would likely survive the *Anderson-Burdick* analysis, even if it resulted in disenfranchisement for certain . . .individuals."); *DCCC v. Ziriax*, No. 4:20CV211, 2020 WL 5569576, at *18 (N.D. Okla. Sept. 17, 2020) ("An absentee voter is responsible for acting with sufficient time to ensure timely delivery of her ballot.").

2. *The State of Georgia has important interests in requiring that overseas absentee ballots be returned by mail.*

Balanced against lack of any evidence demonstrating that the Georgia Plaintiffs are burdened by having to mail their ballots in sufficient time, the State of

21

Georgia has a compelling interest in maintaining the integrity and security of its elections.[4] *See Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process."); *Green v. Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998) (noting that states have a compelling interest in "maintaining fairness, honesty, and order" in elections).

The State also has a generalized interest in the orderly administration of elections, which would be severely disrupted by having its long-standing elections laws enjoined while an election is *currently underway*. *See Storer v. Brown*, 415 U.S. 724, 730 (1974) ("as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process"); *Timmons*, 520 U.S. at 366 ("States also have a strong interest in the stability of their political systems.").

The State of Georgia has already experimented with Plaintiffs' proposal for electronic ballot return, and it was determined to be unworkable. The pilot program revealed numerous issues, including significant security risks that made it vulnerable

---

[4] The State has no evidentiary burden for this factor—it need only *identify* the interests that it seeks to further by its regulation. *Common Cause of Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009) (noting that the Supreme Court has never "place[d] an evidentiary burden on the state when defending a voting regulation").

to hacking and cyber-attacks. (Harvey Dec. ¶ 11.) Moreover, electronic ballot return would violate the right to secret ballot in Georgia, because elections officials are able to identify the person who sent a ballot via electronic return. (*Id.*) There are also authentication issues; it is more difficult for elections officials to authenticate the identity of the voter via electronic ballot return. These asserted interests are more than sufficient to justify Georgia's policy determination that overseas absentee ballots are most securely returned by mail.

The Georgia Secretary takes voting rights very seriously and has taken numerous steps to alleviate the burdens on military and overseas voters and protect their right to vote. Georgia's mail return requirement is not intended to impose unreasonable burdens on voters, but to protect their right to a secret and secure ballot that will be properly counted. This policy is reasonable and nondiscriminatory, and the state's asserted regulatory interests are sufficient to uphold the law. As such, Plaintiffs are not likely to succeed on the merits.

### B. There is no likelihood of irreparable harm.

Nor can Plaintiffs show irreparable harm. To satisfy this requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer "an injury that is neither remote nor speculative, but actual and imminent." *Pryor*, 481 F.3d at 66 (citation omitted). In this circuit, "irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Id. See also*

23

*Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). The Court may not presume irreparable harm; rather, the Plaintiffs "must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010).

For the same reasons the Georgia Plaintiffs cannot establish standing, they cannot show irreparable harm. The relevant issue is whether the named *Georgia Plaintiffs* face irreparable harm—Plaintiffs have not sought class certification and cannot rely upon unnamed Georgians living abroad to meet their burden. The Georgia Plaintiffs in this case have only asserted speculative, potential injuries, not the "actual and imminent" harm required. One Georgia Plaintiff has already had his absentee ballot accepted, and therefore he certainly does not face any irreparable harm. The other received and mailed his ballot in September, which should be sufficient time to arrive in Georgia by November 6, 2020. His expressed concern that the ballot will not arrive in sufficient time—without any supporting evidence— is the very type of "remote and speculative" injury that is insufficient to warrant the issuance of an injunction. *Faively*, 559 F.3d at 120 (vacating injunction where district court relied on "speculation" about risk of harm and where there was an "absence of evidentiary support of irreparable harm").

24

**C.     The balance of equities and public interest weigh heavily against an injunction.**

These remaining injunction factors—balancing the equities and public interest—are frequently considered "in tandem" by courts, "as the real question posed in this context is how injunctive relief at this eleventh-hour would impact the public interest in an orderly and fair election, with the fullest voter participation possible." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018), *aff'd in part, appeal dismissed in part*, 761 F. App'x 927 (11th Cir. 2019); *see also Purcell*, 549 U.S. at 4. The Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," paying "particular regard as well for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

Here, the public's interest in orderly and secure elections far outweighs Plaintiffs' hypothetical and speculative claim of injury. Voting is underway in Georgia and voters are returning their absentee ballots (including the Georgia Plaintiffs here). A court order mandating that the State of Georgia implement a new and untested electronic ballot return system in *less than three weeks* seriously threatens to undermine voter confidence in the integrity of the November election and cause voter confusion. And implementing a new electronic ballot return system at the eleventh hour would not just be difficult—it is impossible. (Harvey Dec. ¶ 12.) Such an undertaking would involve 159 Georgia counties implementing new

25

systems; testing for security; developing new policies for how electronic ballots will be received, stored, and counted; and training elections officials and their staff on these new policies and procedures.[5] All while they are simultaneously running an already challenging presidential election during a global pandemic.[6]

Even if the State of Georgia could implement a radical, last-minute shift in its absentee ballot policies and procedures across 159 counties, it is unclear how this change could be communicated with voters overseas. Georgia voters abroad have already received their absentee ballots with instructions that they must be postmarked by Election Day and received within three days. *See New Georgia Project*, 2020 U.S. App. LEXIS 31405 at *13 ("Staying the district court's order here will prevent voter confusion, especially since Georgia has already mailed absentee ballot with instructions that the Election Day deadline applies.") Both Georgia Plaintiffs have already mailed their ballots, and many, if not most, voters have likely done the same. There is no feasible way that Plaintiffs' requested relief could even be helpful to voters at this point.

---

[5] The Georgia State Election Board is responsible for promulgating rules and regulations for the administration of elections. It is inconceivable that they could draft appropriate rules applicable to electronic ballot return in time for counties to implement them.

[6] Adding to the counties' burden is Georgia's implementation of a new electronic voting system in 2020, which was approved by the legislature in part due to the same security concerns that led the state to reject electronic return of absentee ballots.

26

"An injunction here would thus violate *Purcell*'s well-known caution against federal courts mandating new election rules—especially at the last minute." *Id.* at *12 (citing *Purcell*, 549 U.S. at 4-5.). "Confidence in the integrity of the electoral process is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4. The Court should decline Plaintiffs' invitation to undermine confidence in the integrity of the electoral process by injecting chaos into the elections process at the eleventh hour.

## **CONCLUSION**

Because of the fatal jurisdictional defects, lack of support on the merits, and very real harm Plaintiffs' requested relief would cause in seven different states, the Court must deny Plaintiffs' motion and dismiss the case. Even if the Court is convinced by Plaintiffs' argument that electronic ballot return would be good for overseas voters, that is a policy decision to be made by the states, and there are sound reasons why Georgia and the other state defendants have declined to adopt Plaintiffs' preferred policy. As the Eleventh Circuit recently cautioned, the Constitution sets out the "sphere of decisionmaking" for federal courts, "and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." *New Georgia Project*, 2020 U.S. App. LEXIS 31405 at *14.

Respectfully submitted, this 9th day of October, 2020.

> CHRISTOPHER M. CARR
> Attorney General
> BRYAN K. WEBB
> Deputy Attorney General
> RUSSELL D. WILLARD
> Senior Assistant Attorney General
>
>
> /s/ *Charlene S. McGowan*
> CHARLENE S. MCGOWAN
> Assistant Attorney General
> Georgia Bar No. 697316
> Admitted *pro hac vice*
>
>
> Office of the Georgia Attorney General
> 40 Capitol Square SW
> Atlanta, GA 30334
> cmcgowan@law.ga.gov
> Tel: 404-656-3389
>
>
> *Counsel for the Georgia Secretary of State*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing **Response in Opposition to Plaintiffs' Motion for Injunctive Relief** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record for the parties via electronic notification.

Dated: October 9, 2020.

/s/ *Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General

29