1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - -   X

MATHEW HARLEY, et al.,          :

        20-CV-4664(BMC)

       Plaintiffs,          :

     -against-          :

        United States Courthouse
        Brooklyn, New York

PETER KOSINSKI, et al.,          :

        October 13, 2020
     Defendants.          :          12:30 o'clock p.m.

- - - - - - - - - - - - -   X

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE.

APPEARANCES:


For the Plaintiffs:          COHEN & GREEN
           1639 Centre Street, Suite 216
           Ridgewood, NY 11207

           BY: REMY GREEN, ESQ.

           JONATHAN WALLACE
           4011 23rd Avenue #3f
           Astoria, NY 11105


For New York:          JANE R. GOLDBERG
           STATE OF NEW YORK, OFFICE OF
           ATTORNEY GENERAL
           28 Liberty Street
           New York, NY 10005

For Pennsylvania:          ALEXANDER T. KORN
           PA OFFICE OF ATTORNEY GENERAL
           CIVIL LAW DIVISION, LITIGATION
           SECTION
           15th Floor, Strawberry Square
           Harrisburg, PA 17120

1   APPEARANCES:   (Continued)

2

3   For Ohio:                    HEATHER L. BUCHANAN
                                 OHIO ATTORNEY GENERAL'S OFFICE
                                 30 E. Broad St., 16th Fl
4                                Columbus, OH 43215

5

6   For Texas:                   TANYA M. ROBINSON
                                 OFFICE OF THE ATTORNEY GENERAL
                                 P. O. Box 12548
7                                Capitol Station MC-019
                                 Austin, TX 78711-2548

8
    For Kentucky:                TAYLOR AUSTIN BROWN
9                                KY STATE BOARD OF ELECTIONS
                                 140 Walnut Street
10                               Frankfort, KY 40601

11                               LANDRUM & SHOUSE LLP
                                 220 West Main Street, Suite 1900
12                               Louisville, KY 40202

13                               BY:  ROBERT K. WESTBERRY, ESQ.

14
    For Wisconsin:               GABE JOHNSON-KARP
15                               WISCONSIN DEPARTMENT OF JUSTICE
                                 DEPARTMENT OF JUSTICE
16                               17 West Main Street, PO Box 7857
                                 Madison, WI 53707-7857

17

18  For Georgia:                 CHARLENE S MCGOWAN
                                 OFFICE OF THE GEORGIA ATTORNEY
19                               GENERAL
                                 40 Capitol Square SW
20                               Atlanta, GA 30334

21

22  Court Reporter:              Charleane M. Heading
                                 225 Cadman Plaza East
                                 Brooklyn, New York
23                               (718) 613-2643

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.

25

3

1          THE CLERK:  Harley, et al. versus Kosinski, et al.,

2    docket number 20-CV-4664.

3          Counsel, please state your appearances starting for

4    the plaintiffs.

5          THE COURT:  When you give me your appearances,

6    please just give the people who you think might reasonably be

7    talking, not everyone who's on the line.  Okay?  Otherwise it

8    will take us all day.

9          MX. GREEN:  Very good, Judge.  This is Remy Green on

10   behalf of the plaintiffs.  I think I'm the only one who will

11   be speaking.  For the reporter, before my name, if you could

12   use the honorific "Mx.," M-X, instead of "Ms." or "Mr."

13         THE COURT:  Give me the honorific again, please?

14         MX. GREEN:  "Mx.," pronounced like stirring.

15         THE COURT:  How do you write it?

16         MX. GREEN:  M-X.

17         THE COURT:  Got it.  Okay.

18         MX. GREEN:  Thank you, Judge.

19         MS. GOLDBERG:  Your Honor, Jane Goldberg from the

20   New York State Office of the Attorney General for the New York

21   State defendants, the Commissioners to the Board of Elections

22   and the executive director.

23         THE COURT:  Okay.

24         MR. WESTBERRY:  Judge, Kent Westberry for Kentucky

25   Secretary of State.  Mike Adams and Ben Chandler who is chair

4

1   of the State Board of Elections.  On the call with me is

2   Taylor Brown who is general counsel with our Board of

3   Elections but I'll be doing the call.  Thank you.

4               THE COURT:  Mr. Westberry, can you turn up your

5   microphone a little bit?  You're a little bit faint.

6               MR. WESTBERRY:  Yes.  Yes.

7               THE COURT:  Thank you.

8               MR. WESTBERRY:  Better, Judge?

9               THE COURT:  Who's next?

10              Maybe I should call out the States' names.

11              THE COURT:  I have New York.  I have the plaintiff.

12              Anyone for Pennsylvania?

13              Okay.  Anyone for Ohio?

14              MS. BUCHANAN:  Good afternoon, Your Honor.  Heather

15  Buchanan for Secretary of State Frank LaRose.  Also present is

16  my colleague Renata Staff but I will be doing the speaking.

17              THE COURT:  Okay.  And Texas?

18              MS. ROBINSON:  Good morning, Your Honor.  This is

19  Tanya Robinson representing the Texas Secretary of State.

20              THE COURT:  Okay.  And I have Kentucky.

21              How about Wisconsin?

22              MR. JOHNSON-KARP:  Good afternoon, Your Honor.

23  Assistant General Attorney Gabe Johnson-Karp for the Wisconsin

24  Elections Commissioners.

25              THE COURT:  Mr. Johnson-Karp, you are a little bit

5

1   faint as well.  Perhaps if you can turn up your mic, I would

2   appreciate it.

3               MR. JOHNSON-KARP:  Is that better there?

4               THE COURT:  Yes.  Thank you.

5               Georgia?

6               MS. MCGOWAN:  Good afternoon, Your Honor.  This is

7   Charlene McGowan for the Georgia Secretary of State.

8               THE COURT:  Okay.  Let me just go back and see if

9   anyone from Pennsylvania has joined.

10              No Pennsylvania.

11              Okay.  Just a couple of things before we start.  The

12  way we're going to proceed is this.  I've got questions for

13  both plaintiffs and defendants.  I'll hear from the plaintiffs

14  first.  I will allocate 15 minutes for the plaintiffs to say

15  whatever they have to stay.

16              Mx. Green, I don't I don't want you to feel you have

17  to use all 15 minutes.  Okay?  Use as much as you think you

18  need but not more.

19              Each of the defendants, if they want to say

20  anything, will have 5 minutes each.  Same thing goes for you.

21  Please don't feel you have to use all of it as defendants'

22  positions are substantially overlapping.

23              It is very important for the court reporter that

24  when you start to speak, you identify who you are, all right,

25  so that she gets everything down accurately.

1            I also want to mention that under the rules of this

2    court, it is strictly forbidden to make any recording of this

3    argument.  That goes for the people who are participating as

4    lawyers for the parties.  It also goes for the public who may

5    be listening in on this.  There are severe consequences for

6    video or audio recording of this proceeding.  If you want a

7    copy of the transcript, that's certainly something that can be

8    purchased by you so don't hesitate to contact the court

9    reporter if you need that but do not make a recording of this.

10            Okay.  Having said that, Ms. Mix, I'm sorry,

11   Mx. Green, let me ask you, isn't it a stretch to say that

12   there's a constitutional right to have overseas people vote

13   electronically when both Amendments under which you're suing,

14   at the time they were enacted, there was no such thing as

15   electronic transmission?

16            MX. GREEN:  I understand the point, Your Honor.  I

17   think largely the answer to that is in the O'Brien case which

18   is when a state has the ability to provide something and not

19   providing it will result in a complete absence of the right to

20   vote, that there is some obligation to take those steps.

21            Now, the technology that exists now obviously is

22   profoundly different than what it was at the time of the

23   adoption of the Fourteenth Amendment, but that doesn't mean

24   that states get out of the need to take reasonably available

25   steps to ensure the right to vote.  I think it's, in many

1    ways, it's no different than, for example, the obligation to

2    provide notice online of changes in poll sites that I think

3    some courts have found because that is now how people provide

4    reasonable notice.

5              It's not a question of what technology existed.

6    It's a question of what steps are reasonable under the

7    circumstances.

8              THE COURT:  Okay.  I see your point on that but, of

9    course, we have an expression from Congress as to how much

10   states have to do with regard to overseas voters and that

11   expression is treat them the same way you do as your domestic

12   voters.

13             MX. GREEN:  Well, it's not quite that.  Right?  If

14   we talk about UOCAVA, there are obligations that go well

15   beyond what states have to do for their domestic voters in

16   UOCAVA.  Right?  So, for example, New York State does not

17   provide absentee ballots to its domestic voters 45 days before

18   the election.  They provide them significantly later than

19   that, but under UOCAVA, they have to provide them 45 days

20   before the election to, to voters abroad.

21             To answer the question more directly, I think,

22   obviously, what the federal government has done by statute

23   doesn't limit what the constitutional obligation would be any

24   more than what Congress has done by statute supersedes

25   irrelevant state law or -- sorry, I don't know that I phrased

1    that perfectly -- but they haven't federalized the entire area

2    just by passing UOCAVA.  So, right, there are still other

3    obligations and there's a reason we're not suing under UOCAVA.

4            THE COURT:  Right, but you're seeking to federalize

5    the entire area, are you not?  Isn't that essentially what

6    your claim is?

7            You figure the most progressive states in terms of

8    their technological dissemination of ballots and you're saying

9    that's the constitutional standard that all states have to

10   meet.

11           MX. GREEN:  Well, I think that perhaps overstates it

12   a little bit.  It's perhaps 30 states, but it's an as-applied

13   challenge so it doesn't federalize it for future elections.

14   It doesn't federalize it outside of a pandemic.  It just says

15   when the mail isn't running internationally and is otherwise

16   completely unreliable, there might be some further steps and,

17   in fact, the constitution requires you to take certain steps.

18           THE COURT:  Have you given me sufficient proof for

19   me to find that, in fact, the mail is not running

20   internationally?  I mean, we know as a matter of fact that

21   with regard to the Kentucky plaintiffs, they got their

22   ballots, they voted them and they're in.

23           MX. GREEN:  Right.

24           THE COURT:  So how do I find that the problem with

25   the international mail is such that, in fact, they aren't

1  working and this will not work?

2     MX. GREEN:  So let me address that in two parts.

3     The first part is I think we absolutely provided

4  sufficient proof that there are places where the mail is

5  simply not running.  If you just go to United States Postal

6  Service website which we noted in our papers, there are

7  countries where no mail is coming in.  And so for those states

8  or, I'm sorry, for those countries, there is no mail.  But --

9     THE COURT:  Remind me which of those countries your

10  plaintiffs reside in?

11     MX. GREEN:  I think we have somebody from Thailand

12  and I believe that was on the list, but I know that we did not

13  achieve perfect coverage here.

14     THE COURT:  So under your theory, the idea is that

15  each state needs to accommodate the mail system of every

16  foreign country?

17     MX. GREEN:  If it can be done easily, securely and

18  without too much burden, I think the answer is yes.

19     THE COURT:  Okay.

20     MX. GREEN:  But to the second point, to the extent

21  there is, and I'm stepping a little outside the question here,

22  but to the extent that there is a claim that perhaps has been

23  mooted, the traditional rules in a class action would permit

24  us to substitute a plaintiff if a claim has been mooted out

25  and I would just ask for 24 hours so we can find somebody that

1    fits whatever criteria the Court needs a plaintiff with.

2         THE COURT:  Well, okay.  We're close enough to the

3    election.  I'm not sure how much time I can give you to start

4    substituting plaintiffs as it is, right?  I mean that's a

5    problem.

6         MX. GREEN:  Understood, Your Honor.

7         THE COURT:  Okay.  What else do you have to tell me?

8         MX. GREEN:  So beyond that, I think, as the Court

9    already hinted, there are really two questions in the case.

10   There is a proximity question, kind of a Purcell question, are

11   we too close to the election to act, and there's the

12   constitutional question which is what obligations do states

13   have during the pandemic to take steps to protect the right to

14   vote.

15        To answer the first question, as I think we

16   discussed in our papers, Purcell itself certainly doesn't say

17   anything on this point.  Purcell itself keys into voter

18   confusion and the concomitant incentive to stay away from the

19   polls that would come with such voter confusion and I don't

20   think that there, there is any, there is any real confusion

21   that would stem from allowing people to use a preexisting form

22   that, the federal write-in absentee ballot form submitted by

23   the pre-DoD fax system that's already interfaced with 30 other

24   states.

25        THE COURT:  Do we need the DoD's consent to use

1    their system?

2                MX. GREEN:   I do not believe so.

3                THE COURT:   It's available to anybody who wants to

4    use it?

5                MX. GREEN:   That is my understanding of it.

6                THE COURT:   Okay.

7                MX. GREEN:   That it's available to any state that is

8    willing to accept ballots by fax.

9                THE COURT:   Okay.

10               MX. GREEN:   And, you know, it's really just a

11   transmission, right?  It takes an e-mail from a voter that

12   attaches a ballot and they fax it to Boards of Elections.

13               THE COURT:   But they don't fax it, right?  I mean

14   nobody faxes these days.  You're talking about essentially an

15   e-mail transmission of a fax.

16               MX. GREEN:   I believe that's correct although I

17   think one of -- to address the there-is-no-paper-trail

18   objection that I think I've seen in some of the papers, I

19   think that the right way to do this, receiving those faxes,

20   might be to actually put a fax machine there and print things

21   out.

22               THE COURT:   You know, I don't even know the answer

23   to this.  Are fax machines still sold?  If I go to Best Buy,

24   can I get a fax machine?  Nobody does that anymore because

25   you've got your printer that is capable of scanning documents

1    and sending them by e-mail.

2             MX. GREEN:  Right.

3             THE COURT:  The last time I saw a fax machine, I

4    don't know when it was.  My faxes come into my Outlook box.

5    That's how I get faxes.

6             MX. GREEN:  I can tell you, when I was at a big

7    firm, I had a partner who had a fax machine in his office.  I

8    don't know when he bought it, but he insisted on us checking

9    the fax machine for him late at night.

10            THE COURT:  I'm not asking you to date yourself but

11   how long ago was that?

12            MX. GREEN:  It was five, six years, not even that.

13            THE COURT:  Five or six years?

14            MX. GREEN:  You are right, Judge, but I think the

15   machines do exist.  Certainly, it is not difficult to set up a

16   printer to automatically print things that come in a certain

17   way.  You could simulate a fax machine, at a minimum.

18            THE COURT:  Yes.

19            MX. GREEN:  But to the point, to get back to the

20   point after I did not date myself too much, I hope, Purcell

21   itself does not suggest that there is a hard and fast

22   deadline.  What does maybe suggest that is a series of rulings

23   on the Supreme Court's stay docket often called the shadow

24   docket that are entirely unreasoned and do not have opinions.

25   I don't think that that's the right way to send guidance to

1    the lower courts and I think intentionally when they don't

2    publish an opinion, they're not trying to send guidance to the

3    lower courts.

4          THE COURT:  Well, it's certainly not binding

5    precedent but doesn't it suggest that Purcell has been moving

6    in the direction of discouraging these kinds of motions so

7    close to the election?  Collectively, all those state denials

8    or state grantings, depending on what's being done, doesn't it

9    suggest that?

10          MX. GREEN:  Well, I mean, it certainly suggests that

11   there are a number of votes on the Supreme Court that we don't

12   know that might feel that way, but I think when the Supreme

13   Court wants to set precedent, it has to write a decision and

14   until it does, it hasn't overruled the actual rule in Purcell,

15   and I think that lower courts are required to apply the rule

16   that the Supreme Court has actually articulated which keys to

17   voter confusion and incentive to stay away from the polls.

18          THE COURT:  You don't see possible confusion if I

19   were to order today all six or seven of the states on this

20   phone call within the next three weeks to implement some kind

21   of procedure that allows for electronic voting?

22          I mean, they can barely do their absentee ballots by

23   regular mail to their own people.  There's been enough

24   controversy over that, right, without bringing in the foreign

25   citizens and say, Oh, we've got to have special rules for

1   them.

2          MX. GREEN:  Well, Your Honor, I think that it's

3   important then that the phrase in Purcell is not board of

4   election confusion.  It's voter confusion.

5          The fact that the Boards of Elections might not be

6   able to do their jobs even without doing this I don't think

7   has much relevance to what the constitutional rights are.  It

8   certainly suggests that perhaps we, the federal courts should

9   be doing more as a policy matter regardless of the Purcell

10  principle if we are seeing this kind of endemic failure that

11  you're suggesting, but I don't think that Board of Election

12  confusion is part of the test.  At least --

13         THE COURT:  No, I agree with you, I agree with you,

14  but I can easily see voters being confused about the same

15  things that are confusing the Board of Elections in the states

16  that have had problems with absentee ballots.  Right?  I mean,

17  where do I go?  Is my drop box there?  Is it over here?

18  Voters can get confused by that.

19         MX. GREEN:  Right.  And I think that that, that

20  ultimately speaks to the Court, if it issues relief, can

21  address that kind of confusion by being precise in the relief

22  it issues and, you know, could key it to, for example, a voter

23  receiving a NEXIE from JFK is allowed to replace that ballot

24  with a ballot by e-mail or a voter who in a country where the

25  mail is not running is allowed to, but kind of keeping it

1   confined to voters that will not otherwise have any right to

2   vote would, would certainly address any voter confusion.

3           Then also, on the constitutional question -- I think

4   I've spoken for already longer than you've given me.

5           THE COURT:  I'm going to give you another couple of

6   minutes because I asked a lot of questions.

7           MX. GREEN:  I had hoped to actually listen to your

8   direction, but on the constitutional question, I think that we

9   are very much in a world governed by O'Brien and O'Brien, as

10  read through the decision in McDonald.  So McDonald is a

11  decision that basically says, absolutely, there is no

12  constitutional right to an absentee ballot.  And O'Brien and

13  the other cases decided around O'Brien including Quesby,

14  including -- there's another one that I'm not remembering the

15  name of, but there's a series of decisions within five years

16  of McDonald that say, yes, McDonald said that there's no right

17  to an absentee ballot and the reason is because the plaintiffs

18  there did not prove that they wouldn't be able to vote in the

19  absence of an absentee ballot.  So what O'Brien and the cases

20  around it ultimately say, and these are still good law, is

21  that if you can prove that there is a danger that voters will

22  not be able to vote, the states have to do something about it.

23          And so with that, that's what I've got to say.

24  Thanks, Judge.

25          THE COURT:  Thank you.

16

1          Is it too much to expect that the defendants have

2    talked among themselves and established some kind of priority

3    as to who is going first?  Is that too much?

4          MS. GOLDBERG:  Probably.

5          MR. WESTBERRY:  Yes, we didn't have enough time.

6          THE COURT:  Okay.  I understand.

7          Let me ask who wants to go first.  Any volunteer can

8    raise your hand in the picture and I'll see it.

9          MS. GOLDBERG:  Your Honor, since I'm a New York

10   native, I'm happy to go first.

11         THE COURT:  It's not surprising the New York lawyer

12   would be the most aggressive.

13         MS. GOLDBERG:  First of all, I want to say that I'm

14   joined in this conference by Commissioner Kellner and by

15   counsel Brian Quail for New York State Board of Elections who

16   can provide any technical expertise I do not have.

17         I would like to say in the first place that counsel

18   for plaintiff has very narrowly interpreted Purcell and there

19   are, in fact, two Circuit courts that have interpreted it so

20   much more broadly and followed, and I'm sorry to look at my

21   notes but, basically, I'll give two Georgia cases and one

22   Eleventh Circuit case.

23         The New Georgia Project versus Raffensperger which

24   was decided October 2nd talked about the Supreme Court's

25   mantra around Purcell and that really, basically, had to do

1    with not just voter confusion, but much more broadly with the

2    ability of the states to actually prepare for and do the

3    election.

4            The second case came down yesterday or the day

5    before, the 11th, I think, and that was Curling versus

6    Raffensperger which was 147 pages.  I did not read all of it

7    but the end of it talks about following Purcell because the

8    capacity of how the election systems and poll workers much

9    less the Secretary of State's office turned on a dime and

10   switched to a full scale hand-marked paper ballot system is

11   contradicted by an entire messy electoral record of the past

12   years.

13           Now, in that case, the voters had an electronic

14   system or have one and wanted to switch back to a paper

15   system.  This case was decided October 11th and they said

16   implementation would take long-term planning and advanced poll

17   worker training.  So the court denied the preliminary

18   injunction on that.  They did grant it as to some technical

19   aspects of the computer.

20           Then there's an Arizona decision, DNC v. Hobbs,

21   which had to do with deadlines for --

22           THE COURT:  Ms. Goldberg, let me ask you something.

23   If I enter the injunction the plaintiffs have asked for, if I

24   tell to you do it, are you saying your clients are going to

25   risk contempt because it simply physically can't be done?

1        MS. GOLDBERG:  I would assume we would probably ask

2    for a stay and take an appeal.

3        THE COURT:  Okay.  And then if they don't get the

4    stay on the appeal, what are they going to do?

5        MS. GOLDBERG:  I do not know.  It's three weeks out.

6    First of all, there's already voting going on in New York,

7    there's absentee voting going on already.  I might add just as

8    an aside -- well, two asides.  One is that our New York

9    plaintiffs have had their ballots in hand since about

10   September 17th.  One of them lives in Thailand and from my

11   research, my independent research as well as this declaration

12   that we submitted, there has been mail going from Thailand to

13   the United States since about the beginning of July of 2020.

14       THE COURT:  Do you know if you got this citizen's

15   ballot?

16       MS. GOLDBERG:  We have not -- as of this morning,

17   no, neither of them.

18       THE COURT:  That would have been nice, right?

19       MS. GOLDBERG:  I'm sorry, Your Honor?

20       THE COURT:  That would have been a nice fact for

21   you, for you to say to me you just got the ballot?

22       MS. GOLDBERG:  One of them had mailed -- I mean, by

23   the way, one of them, the man, Mr. Harley, actually, who lives

24   in Ireland, we asked to have his ballot transmitted to him by

25   mail and it was transmitted and received by him on

1   September 17th at which point he had nearly two months to mail

2   it back.

3           Ms. Lahey asked for her ballot by e-mail and it's

4   been sitting -- there are two ballots because she asked for a

5   second one because she didn't think the first one came.

6   They've been in her inbox since about September 18th, 17th or

7   18th.  So all she's had to do was download it and mail it

8   back.  It hasn't happened.  It would have been a very nice

9   fact for me.

10          So, anyway, I don't think Purcell should be capped

11  in the way that the plaintiff is suggesting it is and, yes,

12  there is impossibility.  I don't know how many more plaintiffs

13  at this point can be easily done.  I think we submitted a

14  sufficient number of declarations that talk about, no, this is

15  not easily done.  After Superstorm Sandy, New Jersey tried to

16  implement it and it was a mess.

17          We not only provided the Court with the declaration

18  to that effect but any number, hundreds of pages of documents

19  attached to that declaration to show what a mess it was and

20  what a disaster it was.  Secure, no.

21          THE COURT:  You need to wrap up, Ms. Goldberg,

22  because I've given you your five minutes.

23          MS. GOLDBERG:  I used my five minutes already?

24          THE COURT:  You have, but I'll give you another

25  minute to wrap up.

1          MS. GOLDBERG:  Just simply that all of the testimony

2     about how insecure internet voting is, including Your Honor's

3     point about there's no fax machines, go to the point that

4     there's nothing that can be done that won't jeopardize the

5     security of the voting system in this country as well as the

6     secrecy of the ballot which is a core value for New York.

7          Thank you, Your Honor.

8          THE COURT:  You triggered one more question.

9          What about plaintiff's proposal to use the DoD

10    system?

11         MS. GOLDBERG:  Well, as I understand it from the

12    declaration that was submitted, I can't remember which witness

13    at this point, the DoD, and I did look this up, issued

14    something about two years ago stating that they are limiting

15    access to that, there was too much usage of it, and they have

16    instructed voters who can vote otherwise to do so.

17         THE COURT:  Okay.  Thank you.

18         MS. GOLDBERG:  You're welcome.  Thank you.

19         THE COURT:  All right.  Who would like to go next?

20         Mr. Westberry.

21         MR. WESTBERRY:  Thank you, Judge.  Kent Westberry

22    for the Kentucky defendants.

23         Judge Cogan, as you correctly pointed out just a

24    little while ago, we learned on Friday afternoon that the

25    Netherlands plaintiff who votes out of Kentucky, Ms. Roitman,

1  did, in fact, receive her ballot.  Her ballot got back to the

2  Fayette County Clerk.  We wrote you a submission and submitted

3  a declaration from the County Court Clerk to that effect.  We

4  simply think that that makes her claim moot at this point and

5  we had some authority with it.

6          The only other thing, Judge Cogan, I wanted to say

7  is something that we said in our brief that constitutionally,

8  it's for the states to regulate the time, place and manner of

9  their elections.  That's express constitutional delegation and

10  we said it in our brief and just wanted to reiterate that

11  point again.

12          Then finally, on personal jurisdiction, it falls

13  pretty far short, I think, what plaintiffs are trying to argue

14  in this court starting with the old international issue and

15  following through its progeny.  Under that theory, we have a

16  big UPS hub in Louisville.  Any package that clears the

17  worldwide hub out by the airport might confer jurisdiction,

18  likewise, Fed Ex in Memphis and on and on.  We think that's a

19  real stretch and they don't satisfy minimum jurisdiction.

20          That's all I have, Judge.

21          THE COURT:  Okay.  Thank you very much.

22          Anyone else?

23          MR. JOHNSON-KARP:  Your Honor, this is Gabe

24  Johnson-Karp from Wisconsin.  Can you hear me okay?

25          THE COURT:  I can hear you.  I can't see you but I

22

1    can hear you.  I have a big circle with your initials in it.

2    That's as much as I can see but I hear you fine.

3            MR. JOHNSON-KARP:  Okay.  Well, on an e-mail, I've

4    been, I guess, nominated by some of my colleagues to address

5    the jurisdictional issue which our colleague from Kentucky has

6    generously said doesn't quite get us there.  I think we don't

7    even need to get anywhere else, Your Honor.

8            Jurisdiction is so plainly lacking here as to all of

9    the out-of-state defendants.  We don't have any even

10   allegations, much less any evidence of any of these

11   out-of-state defendants sending actively anything into

12   New York.

13           Each of the cases that the plaintiffs had cited

14   illustrate why jurisdiction is lacking here.  This isn't a

15   case where somebody is sending something into New York, to

16   conduct business in New York or communicating with individuals

17   in New York about something happening there.  This is --

18           THE COURT:  Don't your clients know when they drop

19   something in the mailbox that's destined for Europe, that it's

20   going to go through New York?

21           MR. JOHNSON-KARP:  It might also, as my colleague

22   said, go through Kentucky or it might go through any of the

23   other states, Your Honor.  We don't know and there's no

24   evidence here.

25           I'll speak for Wisconsin, in particular.  The

1   evidence here shows that our single voter requested an

2   electronic, so there was absolutely no transmission through

3   JFK from Wisconsin in this case, and I think that's the case

4   for many of my colleagues and, certainly, there's no proof.

5   I'll let each of them speak to the specific jurisdictional

6   deficiencies, but I think we don't even need to get to any of

7   these other questions that have been raised.

8           The Purcell doctrine of mootness, I'll just point

9   out that the Wisconsin plaintiff has sent her ballot back and

10  that's in Wisconsin right now.  So there's no, there is no

11  issue of mootness as to Wisconsin.

12          THE COURT:  You're saying that the Wisconsin

13  plaintiff's ballot has been received back in Wisconsin?

14          MR. JOHNSON-KARP:  That's correct, Your Honor.  The

15  Town of Winneconne clerk has confirmed that the only Wisconsin

16  plaintiff, that her ballot has been received.

17          THE COURT:  Okay.

18          MR. JOHNSON-KARP:  I would just briefly, if the

19  Court were to move beyond the jurisdictional deficiencies,

20  underscore what we've heard from our colleague in New York,

21  that there are serious difficulties in implementing the sort

22  of relief that the plaintiffs are asking for here.

23          In Wisconsin, there just is no system of accepting

24  facts or e-mail ballots.  Our elections administrator, Meagan

25  Wolfe, submitted a declaration that's at Docket 37-1

1    explaining that we just do not have the infrastructure to

2    simply turn on a switch and accept faxed or e-mailed ballots

3    even with this DoD system in place.

4            So it's not matter of an injunction issuing and, all

5    of a sudden, ballots can be transmitted via fax or e-mail.

6    There would need to be testing, there would need to be

7    security measures in place and as other people have noted

8    today, we are in the midst of voting.  This is not something

9    that would have any roll-out time.  We are three weeks away

10   from absentee voting being finished, not starting, so the

11   implementation would be almost impossible, I think.

12           Just one more point as to the specifics of

13   Wisconsin.  Here, the six Wisconsin elections commissioners

14   have been sued, however, Wisconsin has an extremely

15   decentralized voting system, election system with 1,850

16   elections officials who are each responsible for the mailing

17   and receiving of ballots within their jurisdiction.  These are

18   not --

19           THE COURT:  That's almost as many brands of cheese

20   that come out of Wisconsin.

21           MR. JOHNSON-KARP:  I think there might be more

22   cheese, Your Honor, but two things we take seriously,

23   Your Honor.

24           The point being the implementation of any injunction

25   would have to take place at this extremely local level and

1  that would increase the likelihood of uneven application on

2  this timeline.

3          So if the Court were to reach this question of the

4  balancing of the equities in the public interest, those would

5  weigh strongly against an injunction here but as I said, I

6  think we really don't need to get there.  Jurisdiction is

7  lacking, personal jurisdiction is lacking, and there are also

8  the mootness issues and the standing issues that we've

9  discussed in the briefs.

10          So we would just ask that the Wisconsin defendants

11  be dismissed or, at the very least, that the injunction be

12  denied as to them.

13          THE COURT:  All right.  Thank you, Mr. Johnson.

14          MR. JOHNSON-KARP:  Thank you, Your Honor.

15          THE COURT:  Anyone else?

16          MS. MCGOWAN:  Your Honor, this is Charlene McGowan

17  from the State of Georgia and the Georgia Secretary of State.

18          THE COURT:  Yes.

19          MS. MCGOWAN:  I would like to join in the

20  jurisdictional arguments that my colleague from Wisconsin

21  raised.

22          We concur with that, that personal jurisdiction is

23  also lacking over the Georgia Secretary of State for the same

24  reasons.  He doesn't fall under the long arm statute.

25  Plaintiffs haven't set forth any fact that would fall under

1    the long arm statute nor would it comport with due process.

2         Even if the Court could enter an injunction here if

3    it had personal jurisdiction, there are certain reasons that

4    it should not enter the relief that the plaintiff requests and

5    many of the other representatives from the state defendants

6    have touched on these issues and the most important one is the

7    Purcell principle and the fact that this would not be in the

8    public interest.

9         I think this is one of those cases where the

10   plaintiffs should be careful what they wish for because I

11   think more harm than good could possibly come out of their

12   requested relief.  We are similar to Wisconsin in that Georgia

13   does administer their elections at the county level.  So

14   everyone in Georgia, there's 159 counties who have to

15   implement some sort of system.  I do not know if they do have

16   the technical capabilities to receive electronic ballot

17   access.

18        I will note one unique feature of the Georgia

19   system.  We're implementing a new system of electronic voting

20   here in our state which just adds to the challenges that we're

21   already facing in this difficult year, but every ballot has to

22   be scanned into a scanner, whether absentee or in person.  I

23   don't know whether a printed ballot that was e-mailed or faxed

24   could even be read by our scanners.  So there's a very real

25   possibility that votes would not even be counted if they were

1  transmitted that way.

2          THE COURT:  Okay.  All right.  Any other defendants?

3          MR. KORN:  Your Honor, can you hear me?

4          THE COURT:  I can hear you but all it says for you

5  is "Guest," so I don't know who you are.  Now I can see you.

6          MR. KORN:  Okay.

7          THE COURT:  But I still don't know who you are.

8          MR. KORN:  Okay.  My name is Alex Korn, K-O-R-N.

9  I'm a Deputy Attorney General of the Pennsylvania Office of

10 the Attorney General and I'm here on behalf of the

11 Pennsylvania defendants.

12         THE COURT:  You joined late.

13         MR. KORN:  I attempted -- I was in the lobby for a

14 while so, yes, I was unable to get in.  My apologies.

15         THE COURT:  Just in case you missed anything, you

16 have five minutes.

17         MR. KORN:  Thank you.

18         And Mx. Green, I would just like to say I think you

19 and I were associates at the same law firm so I know the

20 partner you were referring to about the fax.  So I will just

21 preface that.

22         MX. GREEN:  It's good to see you.

23         MR. KORN:  You as well.  You as well.

24         On the issues, I just, again, Pennsylvania would

25 also join in the argument regarding personal jurisdiction.

1          There is a point I'd like to emphasize as well with

2   respect to standing but before that, there is mootness which

3   is the ballot by the one Pennsylvania plaintiff, the plaintiff

4   who is registered to vote in Pennsylvania, has been received

5   in her county as well.  So those claims would be moot for the

6   same reasons in Pennsylvania.

7          On the issue of standing with respect to the

8   Pennsylvania plaintiff, the Pennsylvania constitution states

9   that absentee voting shall be provided in a manner determined

10  by the legislature and this has all been done.  The

11  Pennsylvania absentee voting regime has been established

12  pursuant to specific Pennsylvania statutes that say ballots

13  must be provided by mail.  The Pennsylvania named plaintiffs

14  have nothing to do with writing those statutes and if the

15  Court were --

16          THE COURT:  What is the implication of that?  The

17  legislature can say here's what's required but if I were to

18  find that doesn't comply with the constitution, what does it

19  matter that that's what the legislature said?

20          MR. KORN:  Well, I think that goes to the point,

21  Your Honor, about the federalization of this which is these

22  are voters living overseas and Congress has been the one who

23  has been establishing or not establishing, but determining the

24  absentee voting rules for these voters and the specific

25  statute at issue that was drafted by Congress and used in

1  Ms. Green's brief, she said, leaves the decision of how

2  overseas voters return their voted ballots up to the

3  individual states to determine.

4         So it's circular, in essence.  The Federal

5  Government says, you know, has established the rules for

6  absentee voting and they specifically say the state can

7  determine how the ballots should be received and on that

8  point, there is no constitutional right to an absentee ballot

9  and there is absolutely no constitutional right to submit a

10 ballot through electronic means.

11        And, Your Honor, to your point as well about what

12 does that mean in terms of the statute, it also goes to

13 redressability.  If it is -- if the only three named

14 defendants aren't the individuals who received these ballots,

15 they have no authority to compel or order anyone to receive

16 these ballots.  All they can do is issue guidance and make

17 sure that the counties are following the Pennsylvania laws.

18 What the plaintiffs in this case are essentially asking

19 Your Honor to do is rewrite those laws.

20        So that's the point on redressability.  I see no

21 case, certainly none cited by the plaintiffs, where a court

22 has entered that type of relief.

23        THE COURT:  Please wrap up, Mr. Korn.

24        MR. KORN:  And then -- Your Honor, nothing further.

25 Thank you.

1            THE COURT:  Any other defendants?

2            MS. BUCHANAN:  Your Honor, this is Heather Buchanan

3    from Ohio representing Ohio Secretary of State Frank LaRose.

4    Your Honor, I just wanted to make a quick point.

5            Your Honor, we filed a notice of supplemental

6    authority I believe over the weekend --

7            THE COURT:  I saw.

8            MS. BUCHANAN:  -- regarding a case that came out

9    Friday night.  It unfortunately came out right after we filed

10   our brief with the Court and I just wanted to bring that case

11   to the Court's attention for two reasons briefly.

12           The first is that this court, the Sixth Circuit,

13   applied Purcell specifically.  Not only are we looking at

14   cases for changing the rules on the eve of the election, we're

15   looking at the consequences of changing the rules after voting

16   has started and that's what we have here and the Court pointed

17   that out specifically that there are dangers in that.

18           The second point from that case, quickly,

19   Your Honor, is that the court pointed out the consequences and

20   the dangers in mandating a new system that has never been

21   used, never tested, it would require a complete change of

22   process for the Boards of Elections and what the dangers are

23   in mandating that so quickly before Election Day.

24           Your Honor has that case.  I just wanted to make

25   those points regarding that case that came in on Friday.

1          THE COURT:  All right.  Thank you.

2          And Texas, Ms. Robinson?

3          MS. ROBINSON:  Thank you, Your Honor.  This is Tanya

4     Robinson, Assistant Attorney General for the State of Texas.

5          I'm just going to echo the arguments of all of these

6     able counsel and we're happy to stand on the pleadings that we

7     have submitted.  If the Court has any specific questions that

8     I can address or if I can otherwise be of assistance in this

9     hearing, I'm happy to do that now.  Otherwise, I will keep

10    this hearing under an hour if I'm able to.

11         THE COURT:  Okay.  Thank you very much.

12         Have I heard from all defendants who want to speak?

13         Okay.  Mx. Green, I'm going to give you five minutes

14    to reply as I said I would.  Maybe I'll give you a little more

15    because I have some questions again.

16         First, what I'd like you to address is the mootness

17    issue with regard to at least some of the defendants and, you

18    know, you suggested an answer before.  You said, well, you

19    know, we can always find a new plaintiff, but more than

20    whether there's actual mootness, I want you to address the

21    fact that doesn't the fact that people in at least some of the

22    defendant states have gotten and returned their ballots really

23    undercut the case?

24         MX. GREEN:  Absolutely, Your Honor.

25         So the answer to that is perhaps twofold.  Right?

1    If we're talking pure standing, it's measured at the time of

2    filing, not later.  Mootness is a separate question and I

3    think that there's an amount that the Purcell arguments and

4    the mootness arguments really bump up into each other and

5    possibly produce an answer that you can't litigate these cases

6    at all which I don't think is quite right.  But --

7              THE COURT:  Let me ask you about that.  I mean,

8    COVID became a factor no later than last mid-April.  Right?

9    That's when the world shutdowns began at the latest and this

10   case could have been brought earlier if there was going to be

11   a problem.

12             MX. GREEN:  I think that there's an amount that

13   that's right although I mean, in April, no one thought we

14   would be doing this in October and November.

15             THE COURT:  That's right.  Nobody expected the

16   Spanish Inquisition.

17             MX. GREEN:  Yes.  Well, I should have included more

18   Monty Python cites in my brief then but, you know, New York,

19   for example, renews its statute of limitations suspension

20   monthly.  It's not -- right?  We haven't predicted that this

21   is going to go on.  It's really been a month by month and day

22   by day thing in terms of how people are viewing this.

23             So one thing that certainly was going on in the

24   background is all the states were being lobbied very heavily

25   and a number of states did go and switch their systems, but

1    Your Honor's point is taken that, theoretically, you know,

2    this could have been filed probably in early August when we

3    had a better sense of it.

4         At the same time, there are speculativeness and

5    standing problems that exist at that point.  Right?  There

6    were certainly arguments in the briefs that suggested you

7    could not bring a case at all until you'd actually been

8    prevented from voting and for the plaintiffs here, right, one

9    of the issues is that they had no idea and that there was one

10   plaintiff whose ballot was stuck at JFK and eventually broke

11   free and moved forward.

12        To the other, you know, to the other point --

13        THE COURT:  Yes.  The other question I had, you

14   didn't address it when you started out, not that you have to

15   because it's a defense, is personal jurisdiction.

16        MX. GREEN:  Right.  As to personal jurisdiction -- I

17   think the venue question is much harder, but for personal

18   jurisdiction, I think that it would be -- JFK handles more

19   than 50 percent of the international mail that comes out of

20   this country and returns to this country.  As many courts have

21   observed across the United States in the Postal Service

22   litigation that I've been part of, every state is in

23   partnership with the Postal Service for returning absentee

24   ballots.  It is a critical part of their election

25   infrastructure and it's part of how they think of things.  So

1   the fact that their election partner transmits more than

2   50 percent of their international mail through New York, I

3   think, gives a sufficient context for jurisdiction.

4           Venue is a harder question, but I think that venue

5   is appropriate here because if we were to -- and you have to

6   do this in these cases.  Imagine what litigating this case

7   over three years what we would normally do would look like.

8   You would take discovery, you would inspect the JFK facility,

9   you would depose all the Postal Service workers who work at

10  JFK and so in terms of the appropriate place to conduct a case

11  like this, I think that JFK would be a central part of it and

12  that's why venue would be appropriate.

13          If I have addressed the questions you have, I just

14  want to point out one thing that's more in the nature of a

15  reply which is about the federal right to absentee ballots.

16          One of my friends and I believe it was my friend

17  from Georgia said something to the effect that we don't know

18  if our scanners would handle ballots in this form.  Under the

19  federal statute that is UOCAVA, they are required to handle

20  write-in, handwritten absentee ballots that contain certain

21  content.  So I think that that may be generally true, but

22  states are certainly required to handle federal write-in

23  absentee ballots separately from how they handle every other

24  ballot.

25          I think that kind of goes to the redressability

1    point that I want to say my friend from Kentucky raised.  No,

2    my friend from Wisconsin raised.

3           Ultimately, you don't have to handle these votes

4    exactly how you handle other votes because they are different

5    and they are already subject to different rules.  So you could

6    easily set up a, right, a centralized fax number that all

7    international voters subject to this injunction could send

8    their ballots to and those could be distributed to local

9    Boards of Elections and I don't think that that would actually

10   be particularly difficult.

11          The last thing I'll say is I think there is some

12   slighting that's going on here between, in the difference

13   between electronic ballot transmission and electronic voting.

14          Electronic voting uses voting machines or portals

15   where you have check boxes.  That is insecure and there's a

16   lot of data suggesting it's insecure.  Notwithstanding that, a

17   lot of states use it, but electronic voting has a lot of

18   issues.

19          Electronic transmission of ballots, by contrast, has

20   been done for more than a decade by some states and is

21   currently done by more than, by 30 states and it's done

22   securely and without issues.  I think that there is a way to

23   do it that is cabined in and is appropriate for this election.

24          So I think the real question is whether there is a

25   constitutional right to have your vote counted or whether you,

1  a state can set up a system where there are some people who

2  simply can't vote.  I don't know that that's an obvious

3  question but I think O'Brien provides the answer.

4            THE COURT:  Okay.  Thank you.

5            What I'd like to do is just have everyone turn off

6  their video and audio for about five minutes.  Don't leave the

7  call.  I want to think about whether I can give you a ruling

8  now or whether there are questions I've got to research more

9  in order to answer.  So everyone stand by for what I promise

10  will be no more than five minutes and then I'll be back to

11  you.

12            MX. GREEN:  Thank you, Judge.

13            THE COURT:  Okay.

14            (Pause in the proceedings.)

15            THE COURT:  Okay.  I am prepared to rule on the

16  motion now.  My finding and conclusions are as follows.

17            First, I don't think any of the basic facts here are

18  disputed.  I'll just summarize them briefly for the record.

19            Plaintiffs are U.S. citizens who are living

20  overseas.  They are registered to vote in the defendant states

21  and they're able to vote from overseas because under UOCAVA,

22  if I'm pronouncing it nearly correctly, the Uniformed and

23  Overseas Citizens Absentee Voting Act, that basically allows

24  states to permit overseas voters to use the same registration

25  procedures and vote by absentee ballot in any election the

1  same way their domestic residents can vote.  The Act requires

2  the states to send absentee ballots to overseas Americans at

3  least 45 days before the federal elections.

4          Plaintiffs claim that the COVID-19 pandemic has

5  effectively cut off or limited or made worrisome their ability

6  to exercise their right to vote.  The plaintiffs allege that

7  the pandemic has slowed or stopped the mail services in

8  various countries overseas and inhibiting their ability to

9  receive and to return absentee ballots.

10         The plaintiffs also allege that some number, I think

11 the plaintiffs referred to it as an unconscionable number, of

12 absentee ballots move from abroad through JFK Airport and

13 those ballots get a so-called NIXIE stamp, N-I-X-I-E, marking

14 the ballots as "Return to Sender, Undeliverable as Addressed,"

15 even though they are properly addressed.

16         The defendants are various officials in the states

17 which plaintiffs are registered to vote.  Although they have

18 somewhat different laws among these states which is not at all

19 surprising, they all require the absentee ballots to be sent

20 by mail.  That's in contrast to the other states, the

21 plaintiff put the number at about 30, which allow absentee

22 voting by fax or e-mail or some other electronic means.  For

23 instance, some states accept ballots e-mailed to the Board of

24 Elections as scanned PDF documents.

25         Plaintiffs claim that the defendants have violated

1  their right to vote under the First and the

2  Fourteenth Amendment by not having one of these alternative

3  means of collecting votes that does not depend on the COVID

4  sensitive snail-mail system.

5        So what relief I think I'm being asked to give here

6  is either to accept and count those ballots when they're

7  received by e-mail or some electronic means, or accepting

8  those ballots through what's been referred to as the

9  Department of Defense fax ballot system by which the

10  Department of Defense will make available some fax

11  capabilities for the purpose of voting.

12        The first line of defense for the non-New York

13  defendants is that they're not subject to personal

14  jurisdiction in New York.  Now, I don't hear the plaintiffs

15  contending and I don't think they could contend that the

16  non-New York defendants are subject to general jurisdiction in

17  New York.  They're certainly not doing business on a regular

18  basis in New York.

19        So I am looking at the New York statute and the only

20  thing that I can find that might apply here is Civil Practice

21  Law and Rules, Section 302(a)(1).  That's part of the long arm

22  statute and that requires a transaction of business in

23  New York.

24        The plaintiffs argue that the New York defendants

25  have transacted business because they sent and received

1    thousands of ballots through JFK.  I really don't think that's

2    enough for a whole bunch of reasons.

3            First of all, I don't think the defendants have

4    transacted any business at all, whether in New York or

5    elsewhere just as a statutory matter under the New York

6    statute.  Even assuming that the defendants have entered into

7    a transaction in the broadest sense of that word, it's not a

8    business transaction.  They're just dropping envelopes in the

9    mail in their home states and asking that the U.S. Post Office

10   will empty the mailboxes and send them to their addresses.

11   That's not business of any kind.  That's the quintessentially

12   sovereign function of running an election.

13           Secondly, even if I assume that was business, the

14   defendants haven't done that under the statute and all of the

15   cases construing it in New York.  Their sole connection to

16   New York is that the ballots traveled through New York.  Now,

17   I have a lot of doubt that a state official in the Midwest

18   like Ohio or Kentucky sending a ballot to a voter in Asia

19   would even know that the ballot would travel through New York.

20   Maybe it would travel through a different international

21   service center like maybe San Francisco.

22           I'm going to assume, although I don't think the

23   plaintiffs have proven it to my satisfaction, that the ballots

24   did travel through New York.  I still don't think that would

25   be enough.  They're not being sued, the defendants, because it

1   was illegal for them to drop the ballots in their local post

2   office box like they did for all their absentee voters.

3   Plaintiffs' claim is that they omitted to do something else,

4   like send an e-mail or establish a voting website.

5          Those omissions have nothing to do with New York.

6   For specific personal jurisdiction under CPLR 302(a)(1), the

7   plaintiffs' cause of action must have an articulable nexus or

8   a substantial relationship with the defendant's transaction of

9   business here in New York and I don't think these causes of

10  action do.

11         The plaintiffs have cited me to the Second Circuit's

12  decision in Grand River Enterprises Six Nations against Pryor,

13  425 F.3d 158, I think that was 2005, but that case has nothing

14  to do with this one.  There the long arm jurisdiction turned

15  on the fact that negotiations and discussions occurred in

16  New York and we don't have anything like that.

17         For those reasons, I don't think New York's long arm

18  statute would confer personal jurisdiction.  If it did, then I

19  don't think it would comport with due process.  The Supreme

20  Court has recently made it very clear that extraterritorial

21  personal jurisdiction is subject to due process constraints.

22         None of the conditions for satisfying due process

23  are met here.  The defendants have not purposely availed

24  themselves of the privilege of conducting business within the

25  state.  They just dropped the letters into their local

1   mailboxes.  The Postal Service decides how to process those

2   envelopes and, again, the defendants couldn't care less what

3   the Postal Service decides about that.

4            This is not a case against the Postal Service.  I

5   know that Mx. Green referred to the fact that she, I'm sorry,

6   that they were in that case, but that case really -- that's

7   not what these defendants are being accused of.  You know, the

8   constitutional violation that's being claimed is that a right

9   to vote was violated by not sending these ballots by

10  electronic or fax means.

11           Every one of those failures happened outside of

12  New York.  So for the same reason that I said in rejecting

13  statutory jurisdiction, I don't think that the defendants'

14  acts arise out of or relate to their contacts in New York.  In

15  fact, I don't even think they have any deliberate contacts

16  with New York.

17           Then finally, the Supreme Court has said, as is

18  typical in due process analyses, that the exercise of

19  jurisdiction has to be fundamentally reasonable and I just

20  don't think it would be reasonable to make all of these out of

21  state defendants answer in New York.

22           So the claims against the defendants from

23  Pennsylvania, Ohio, Kentucky, Wisconsin, Georgia, I think I

24  said Texas, those are going to have to be dismissed for

25  personal jurisdiction.  I'm not going to do that today but

1    when I come down to consider the wisdom of issuing an

2    injunction, I've got to recognize that I really don't think I

3    have personal jurisdiction over those states.

4         Mx. Green, if you want to argue somehow that these

5    states ought to stay in or more properly their state officials

6    want to stay in, I'll hear from you after this, but I really

7    think they have to be dismissed.  I'm just not going to do it

8    now because I don't have the procedural mechanism in front of

9    me.

10        I also want to note that the claims about the

11   defendants whose ballots have been received and counted, I

12   think those are clearly moot.  It's not enough for you to say

13   to me, Oh, we can find more plaintiffs.  This is not a class

14   action where you can do that sometimes and there's also not

15   time to find those plaintiffs so I don't think that would work

16   at all.  As the case stands now, where the ballots have been

17   received by the voting authorities in the states, those

18   plaintiffs' claims are clearly moot.

19        So that leaves us with the New York defendants and

20   let me turn to the preliminary injunction itself as to the

21   New York defendants.

22        You know, this is the hardest kind of injunction,

23   preliminary injunction for a plaintiff to get.  It's a

24   mandatory preliminary injunction.  It would give the

25   plaintiffs essentially all the relief they sought and if I

1    give them that relief, it can't be undone even if the

2    defendants were to prevail at a trial on the merits or on

3    appeal.

4           Because this is such a chaste ending kind of

5    injunction, a special standard applies in the Second Circuit:

6    The plaintiffs have to make a strong showing of irreparable

7    harm and they have to demonstrate a clear or substantial

8    likelihood of success on the merits in addition to the

9    ordinary showing that the balance of equities and public

10   interest favor an injunction.

11          Now, I'm not going to contrast that with the usual

12   test for an injunction.  I'll just tell you it's a lot more

13   stringent than a plaintiff usually has to meet.  I can't find

14   that clear or substantial likelihood of success on the merits.

15          Let me just talk about the constitutional framework

16   that I'm looking at here.

17          I have claims under the First and Fourteenth

18   Amendments from the plaintiff, but there are reasons that

19   cover both of these claims why I don't think the likelihood of

20   success on the merits can be shown.

21          First, I don't think these New York plaintiffs have

22   standing.  I'm not really seeing an injury in fact.  The

23   plaintiffs acknowledge that they've got their overseas ballots

24   and they sent them back to New York.  They're merely concerned

25   that because of the virus, maybe those ballots won't make it

1    back or they won't be counted or something like that, but the

2    Supreme Court has held that plaintiffs lack standing when they

3    haven't demonstrated that a potential future injury was

4    certainly impending and they've said, the Supreme Court has

5    said you can't have a speculative chain of possibilities.

6            I think really plaintiffs' concern here is

7    speculative and insufficient to confer standing.  The fact

8    that so many or at least several of the defendants here, the

9    groups of defendants have, in fact, received their ballots

10   back from their voters overseas is enough to make the whole

11   thing speculative to me.

12           Second, I really can't agree with Mx. Green on their

13   construction of the <u>Purcell</u> principle.  I really think it has

14   come to be for better or worse that courts ought to be really

15   cautious about messing with the election process so close to

16   an election as we are.

17           I don't fault the plaintiffs for not bringing this

18   claim sooner.  I appreciate the justification that Mx. Green

19   has offered for not doing that.  There were problems whenever

20   you brought this case but, you know, as someone has recently

21   said in the United States Senate, that courts are not there to

22   solve every problem, and this may be one of them they're not

23   there to solve.

24           You know, looking at the ability, the physical

25   ability to implement an injunction, I've heard argument from

1   both sides on it and I thought plaintiffs did a really good

2   job in telling me, Oh, it wouldn't be that hard.  I have

3   observed the way states work and I just don't see it happening

4   at all.  I think it's utterly unrealistic to think that

5   New York can come up with a viable, reliable and secure system

6   the way plaintiffs demand them to do in this amount of time.

7           You know, the Supreme Court just cited Purcell the

8   last term saying it has emphasized that lower federal courts

9   should ordinarily not alter the election rules on the eve of

10  an election.  If we're not on the eve, we're at, like,

11  5 o'clock in the afternoon.  We're very close to the eve.

12          You know, the Supreme Court has stayed a number of

13  injunctions like the one enjoining South Carolina's witness

14  requirement for absentee ballots.  And, by the way, that was a

15  prohibitory injunction, not a mandatory injunction which is

16  harder to get like we have here.  I appreciate that that's not

17  a precedential decision, but I think the trend and, really,

18  the wisdom of it really is overwhelming.  It just gives the

19  states too much credit and my knowledge of voting procedures

20  in New York gives them too much credit to think that this can

21  be done as easily as the plaintiffs have suggested.

22          Thirdly, I have to tell you I'm not sure that the

23  constitution guarantees plaintiffs the right to have overseas

24  ballots counted on their preferred timetable at all.  You

25  know, as the plaintiffs have conceded, this isn't a statutory

1    case.  They're not alleging that UOCAVA guarantees their right

2    to a transmittal process that increases the likelihood of

3    their votes being counted as opposed to transmitting them

4    through the federal mail system.

5         As the plaintiffs have recognized, they can't do

6    that because, really, all the statute does is to say that

7    foreign ballots have to be submitted and processed in the

8    manner provided by law for absentee ballots in the state

9    involved.  That, to me, is a pretty clear Congressional

10   observation:  Treat your foreign citizens the same way you

11   treat your domestic citizens for absentee ballot purposes.  I

12   think that's really all that has to be done.

13        In addition, I don't think, as a constitutional

14   matter, that an overseas citizen takes his right to vote with

15   him when he goes overseas.

16        You know, there is a Second Circuit case, Romeu

17   against Cohen, 265 F.3d at 118, where, you know, the facts are

18   somewhat distinguishable but the court rejected the idea that

19   a U.S. citizen residing in a U.S. territory, there, Puerto

20   Rico, had a constitutional right to vote.  You know, the

21   Circuit said that that citizen did not, and if an American

22   citizen living in Puerto Rico doesn't have the right to get

23   his ballot counted by his state in a national election, I

24   would think it's even less for a plaintiff who is an American

25   citizen that's living abroad.

1        Now, let me just turn briefly to the two claims that

2   plaintiff has raised.

3        The First Amendment claim just doesn't moot any of

4   the factors that the Second Circuit has required for First

5   Amendment claims in this context.

6        I'm referring specifically to Yang against Kosinski,

7   ironically, K-O-S-I-N-S-K-I, 960 F.3d 119.  On its face, the

8   mailing requirement is reasonable and nondiscriminatory.

9   That's why plaintiffs aren't making a facial challenge, but

10  even if it became a severe restriction under the circumstances

11  of the pandemic, it's far from clear that the restriction is

12  unconstitutional given the state interest at stake.

13        You know, as the Supreme Court stated in Purcell:

14  "A state indisputably has a compelling interest in preserving

15  the integrity of its election process.  Confidence in the

16  integrity of our electoral processes is essential to the

17  functioning of our participatory democracy.  Voter fraud

18  drives honest citizens out of the democratic process and

19  breeds distrust of our government.  Voters who fear their

20  legitimate votes will be outweighed by fraudulent ones will

21  feel disenfranchised."

22        I appreciate Mx. Green's point that, you know, it's

23  not the Board of Elections that would get confused, it's the

24  voters who have to have it straight, but I really think that

25  my imposition of new voting procedures here is something that

1   would confuse a lot of people including voters both domestic

2   and foreign.

3          I would also note that I appreciate the distinction

4   between electronic voting and I agree there are more security

5   problems with that, but I am not convinced that electronic

6   ballot counting is that much more reliable and the states

7   don't have to worry about fraud.

8          Here, you know, a court order, if I were to issue

9   this injunction, it would implement a whole new system of

10  voting right before a hotly contested election and that kind

11  of change would undermine voters' confidence in the results, I

12  think.

13         As to the equal protection claim, you know, the

14  plaintiffs don't allege that the defendants are treating them

15  any differently than any other voters in this case, the

16  remaining case, New York.  All voters in New York have to

17  abide by the mailing requirement.  What the plaintiffs, I

18  think, are really claiming is that New York officials have

19  violated the equal protection clause because they're not using

20  the same electronic procedures that 30 other states have used,

21  but equal protection doesn't apply between sovereigns.  It

22  applies over sovereigns.

23         So you can't say that just because 30 states are

24  doing this, the other states have violated equal protection if

25  they don't do it.  I think that's a factor that's of some

1    weight in the equal protection analysis but here, because the

2    citizens who are residents and the citizens who are

3    non-residents are being treated exactly the same, I don't see

4    a valid equal protection claim.

5             I am, therefore, denying the motion.  I probably

6    will issue a more detailed written decision after that and

7    then what I want the parties to do is I want the parties to

8    talk among themselves and decide what's left, if anything.

9    Obviously, the plaintiffs have got to decide if they want to

10   appeal.  They have to decide if they want to consent with a

11   reservation of rights on the personal jurisdiction issue the

12   dismissal of the other defendants because, frankly, if I get a

13   notice of motion from the non-New York defendants saying for

14   the reasons you've said in your decision, Judge, you should

15   dismiss, I'll probably grant that, but I want the parties to

16   try to work it out and see how much, if any, of the case is

17   left.  Okay?  Take a week, take ten days or so. Plaintiff may

18   want to move faster than that if they're intent on pursuing

19   this, but I'll wait to hear from you as to where we go next.

20            Okay.  Anything else we need to talk about?

21            MX. GREEN:  Your Honor, while we have everybody

22   here --

23            THE COURT:  Yes.

24            MX. GREEN:  I will just say, you know, reserving

25   everything on the appeal, we obviously believe that the Court

1  is not going to reach a different result on a different motion

2  and jurisdiction means dismissal.  So, you know, we're going

3  to consent to that.

4          THE COURT:  I appreciate your candor and also I want

5  to tell you everyone's papers were really good.  I was,

6  frankly, apprehensive that I would be able to digest all of

7  this in time for this hearing, but the papers really laid it

8  out and I appreciate all the lawyers' efforts in doing that.

9          Okay.  Thank you.

10          Yes, Mr. Westberry.

11          MR. WESTBERRY:  Quickly, Kentucky did file a motion,

12  Judge Cogan, in addition to the opposition to the injunction.

13  We may have been the only state that did.

14          THE COURT:  Yes.  I don't recall seeing that but

15  that's fine and Mx. Green has indicated, you know, it's not

16  going to be a problem.

17          MX. GREEN:  Yes.

18          THE COURT:  Thank you all.  I appreciate it.  Take

19  care.

20          MX. GREEN:  Thanks, Judge.

21          MS. GOLDBERG:  Thank you, Your Honor.

22          MR. JOHNSON-KARP:  Thank you, Your Honor.

23          MS. BUCHANAN:  Thank you, Your Honor.

24          (Matter concluded.)

25

CMH    OCR    RMR    CRR    FCRR

*I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*
       /s/ Charleane M. Heading   December 1, 2020